## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| Jedidiah Murphy, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. ___23-cv-1199___ |
| | : | |
| Bobby Lumpkin, Director of | : | |
| Correctional Institutions, | : | |
| Texas Dept. of Criminal Justice, | : | |
| | : | **THIS IS A CAPITAL CASE** |
| Kelly Strong, Warden, Texas State | : | |
| Penitentiary Huntsville Unit, | : | |
| | : | **EXECUTION SET FOR** |
| Bryan Collier, Executive Director, | : | **OCTOBER 10, 2023** |
| Texas Dept. of Criminal Justice, | : | |
| | : | |
| Defendants. | | |

## COMPLAINT PURSUANT TO 42 U.S.C. § 1983

Katherine Froyen Black
205 Blue Ridge Trail
Austin, Texas 78746
415-847-6127
kfroyen@gmail.com
Texas Bar No. 24099910

*Pro Hac Vice pending*

Catherine Clare Bernhard
P.O. Box 506
Seagoville, Texas 75159
972-294-7262
fax – 972-421-1604
cbernhard@sbcglobal.net
Texas State Bar No. 02216575

*Counsel for Jedidiah Murphy*

# TABLE OF CONTENTS

Table of Exhibits ................................................................................................. ii

Introduction ........................................................................................................1

Statement of Facts .............................................................................................3

    A.    TDCJ Intends to Execute Mr. Murphy with A Chemical That Was Compromised By a Catastrophic Fire .........................................................4

    B.    TDCJ Is Obstructing Mr. Murphy's Discovery of the Fire's Impact on the Substance Defendants Will Use to Execute Him. ...........8

    C.    Even Before the Fire, All of TDCJ's Pentobarbital Had Expired. ........11

    D.    The pH of TDCJ's Pentobarbital Has Never Been Tested. ..................14

    E.    Claims by TDCJ to "Extend" the Expiration Dates are Unscientific and Invalid. ........................................................................15

    F.    Recent Litigation in Civil Court Confirms the Factual Allegations Here, As Well As the Need for this Court's Jurisdiction. .....................17

    G.    Mr. Murphy Cannot Obtain Relief from the Texas Courts ..................21

    H.    TDCJ is Violating Not Only the United States Constitution (as Detailed in the Claims Below), but also Numerous State Laws...........22

Claims for Relief .............................................................................................25

Claim 1.    Attempting to Execute Mr. Murphy With Fire-Blighted, Expired Pentobarbital Violates the Eighth and Fourteenth Amendments. .........25

Claim 2.    TDCJ's Violation of State Laws Prohibiting Unnecessary Pain Violates Substantive Due Process and Equal Protection......................28

Claim 3.    Texas has Guaranteed Mr. Murphy Certain Liberty Interests but Provides No Means for him to Enforce Them, in Violation of Procedural Due Process under the Fourteenth Amendment.................29

Claim 4.    Mr. Murphy is Being Denied Meaningful Access to the Courts in Violation of the First and Fourteenth Amendments ..............................30

Claim 5.    Because Texas Provides No Remedy for Any of the Above Constitutional Violations, this Court Can Exercise General Federal Question Jurisdiction to Hear Mr. Murphy's Constitutional Claims ....................................................................................................32

Prayer For Relief..............................................................................................33

i

## TABLE OF EXHIBITS

| | |
|---|---|
| 1 | Execution Order |
| 2 | Death Warrant |
| 3 | Judgment of Conviction and Sentence |
| 4 | Execution Protocol |
| 5 | Huntsville Fire Department Report on Aug. 25 fire |
| 6 | Report of Dr. Almgren |
| 7 | Myriam Ajemni et al., Stability-Indicating Assay for the Determination of Pento-barbital Sodium in Liquid Formulations, International Journal of Analytical Chemistry, 2015 |
| 8 | Lab Reports |
| 9 | Inventory Logs 2.5 mg |
| 10 | Inventory Logs 5 mg |
| 11 | DEA Forms |
| 12 | Temporary Injunction of Travis County Civil District Court, *Ruiz et al. v. TDCJ et al.*, (Jan. 10, 2023) |
| 13 | Transcript, Jan. 10, 2023, Evidentiary Hearing |
| 14 | PIA Request of Sept. 8, 2023 |
| 15 | PIA Request Followup Correspondence Sept. 19, 2023 |
| 16 | PIA Response of Sept. 22, 2023 |

## INTRODUCTION

1.     This is not a typical "method of execution" lawsuit. It arises from an unanticipated catastrophic event that materially changes the legality of Mr. Murphy's October 10th, 2023, execution.

2.     On August 25, 2023, an uncontrolled building fire catastrophically damaged the third floor of the Administration Building at the Huntsville Unit of the Texas Department of Criminal Justice. The Huntsville Unit is not only the location where TDCJ (through Defendants) is scheduled to execute Petitioner Jedidiah Murphy on October 10, 2023; it also appears to be the location where Defendants stored the single drug they use to carry out such executions: pentobarbital.

3.     This recent fire – which took firefighters up to ten hours to control – would have exposed TDCJ's supply of pentobarbital to an extended period of excessively-high temperatures (upwards of 1800°Fahrenheit), smoke, and water.

4.     When exposed to high temperatures, pentobarbital quickly degrades, impacting the solution's pH, and causing insoluble precipitates to form. As pentobarbital further degrades, its chemical structure changes, and it turns into an entirely different chemical with a different pharmacological impact on the body.

5.     Amplifying the degradation of TDCJ's pentobarbital, there were multiple reasons to doubt its chemical integrity even before the fire: it was stored under improper conditions; TDCJ acquired it via unlawful methods; TDCJ fails to comply

1

with numerous state laws concerning possession of controlled substances; TDCJ conceals the identity of the pharmacy and laboratory it uses to compound and test it; and – most disturbingly – it was already expired.

6.   On information and belief, TDCJ intends to execute Mr. Murphy using these damaged vials of fire-blighted, long-ago expired pentobarbital – or whatever chemical substance it has now become.

7.   TDCJ has obstructed Mr. Murphy's attempts to learn the state of its pentobarbital following the Huntsville Unit Fire, by failing to respond to his requests under the Public Information Act and his internal inmate grievance.

8.   The Texas courts provide Mr. Murphy no way to redress this immediate threat to his constitutional rights.

9.   This action seeks relief from these constitutional violations, beginning with a temporary injunction and/or stay of Mr. Murphy's impending execution in order to permit litigation of this action in this Court.

**JURISDICTION**

10.   This Court has jurisdiction pursuant to 28 United States Code §§ 1331, 1343(a)(3)&(4), 2201(a), 42 United States Code § 1983, and original federal question jurisdiction stemming directly from the United States Constitution.[1]

---

[1] Given the above jurisdictional grants, this Court has additional authority under 28 United States Code § 1651(a), the "All Writs Act," by which Congress vested this Court with the authority to "issue all writs necessary or appropriate in aid of [its] jurisdiction[.]"

**VENUE**

11.     Venue is properly in this Court because Defendants Collier and Lumpkin maintain an official office address is in the Western District of Texas (Austin).

**PARTIES**

12.     Plaintiff Jedidiah Murphy is a United States citizen who resides in the State of Texas, currently incarcerated in the Allan B. Polunsky Unit of the Texas Department of Criminal Justice in Livingston, Texas, and under a sentence of death imposed by the 194th District Court of Texas. He is scheduled to be executed on October 10, 2023.

13.     Defendant Bobby Lumpkin, sued here in his official capacity, is the Director of Correctional Institutions of TDCJ, the agency that will carry out Mr. Murphy's execution.

14.     Defendant Bryan Collier, sued here in his official capacity, is the Executive Director of TDCJ, the agency that will carry out Mr. Murphy's execution.

15.     Defendant Kelly Strong is the Warden of the Huntsville Unit of TDCJ, the facility that will carry out Mr. Murphy's execution.

**STATEMENT OF FACTS**

16.     Mr. Murphy is scheduled to be executed on October 10, 2023.

17.     TDCJ's execution protocol, adopted on April 21, 2021,[2] requires lethal injection with 5 grams of the drug pentobarbital.[3]

18.     TDCJ's pentobarbital was affected by a catastrophic fire at the Huntsville Unit on August 25, 2023.

## A.     TDCJ Intends to Execute Mr. Murphy with A Chemical That Was Compromised By a Catastrophic Fire

19.     At approximately 2:30 a.m. on August 25, 2023, a fire erupted in the Administration Building at TDCJ's Huntsville Unit. It burned for up to ten hours, causing catastrophic damage to the third floor of the Administration Building, among other areas of the building.

20.     Multiple agencies, including the Huntsville Fire Department, the Montgomery County Emergency Services, the Willis Fire Department, the Walker County Emergency Services, the New Waverly Fire Department, the Crabb Prairie Fire Department, the Dodge Fire Department, the Riverside Fire Department, the Walker County Office of Emergency Management, and the Texas Department of Emergency Management responded to the scene.

21.     Greg Mathis, Fire Chief of the Huntsville Fire Department, led the fire response. According to Chief Mathis, emergency personnel finally managed to get the main blaze under control at approximately 6:30 a.m., four hours after the initial

---

[2] *See* Ex. 4, TDCJ Execution Protocol.

[3] *Id.* at 10.

alarms rang out. However, personnel remained on the scene and continued to battle small fires and smoke in the Administration Building until approximately noon.

22.     News reports indicate that the Administration Building was subject to extensive damage. At a press conference held after the fire, Chief Mathis indicated that dealing with the damage will require "a pretty extensive mop-up operation."[4]

23.     Given the extent of the damage, TDCJ was forced to relocate the staff that worked in the Administration Building as well as 655 inmates who were housed in a housing block next to the Administration Building.

24.     The affected areas of the Administration Building remain "sealed off until the State and local investigations can be completed." *Id.* The investigation remains ongoing.

25.     According to a report written by Captain Jon Brandon Kolaja from the Huntsville Fire Department, an unnamed correctional officer approached Captain Kolaja as the fire was blazing and asked him to "check on the pharmacy"—which, on information and belief, refers to lethal injection chemicals stored in the Administration Building.[5]

---

[4] Brenda Poe, *Walls Unit Damage in Overnight Fire*, The Huntsville Item (Aug. 25, 2023), https://www.itemonline.com/news/walls-unit-damaged-in-overnight-fire/article_9fa1c0a8-4340-11ee-aa57-f735e9eb6f55.html.

[5] *See* Ex. 5, Huntsville Fire Department Report, p. 2.

26.     According to the report, Captain Kolaja and the unnamed officer donned self-contained breathing apparatuses and entered the burning building in an attempt to retrieve the lethal injection chemicals. When they reached the third floor, however, they discovered that the area was being "overtaken by fire," and Captain Kolaja and the unnamed officer fled for their safety. *Id.*

27.     Captain Kolaja and the officer did not retrieve the lethal injection drugs from the burning Administration Building. Due to the destructive, long-burning fire from which Kolaja and the officer were forced to flee, that part of the building will, on information and belief, be considered a "total loss."

28.     Building fires create an extreme level of heat. "Fully developed building files can generally attain average gas temperatures throughout the room containing the fire in excess of 1,000 degrees Celsius (1800 degrees Fahrenheit)."[6] Features of the Huntsville Unit building would have increased, on information and belief, the internal temperatures even higher than average:

> a.      The Huntsville Unit building had a clay-tile roof, which trapped the fire within the building and made it harder for firefighters to control it. In addition, firefighters had trouble accessing the necessary areas of the fire due to "building construction," key-

---

[6] Milke et al., Overview of Fire Protection in Buildings, Federal Emergency Management Agency, at A-17, available at https://www.fema.gov/pdf/library/fema403_apa.pdf.

locked doors, and the size and strength of the fire; and outside water hoses could not get close enough to the affected area.[7]

b.    The fire burned and spread for over five hours before firefighters could bring it under control – and then continued to burn in numerous "hot spots" for another five hours after that.[8]

c.    The building was slated for major code-compliance upgrades – which had not yet begun – after the State Fire Marshal found "nearly 1700 violations," including failures to test "fire doors, dampers, or standpipe systems."[9]

29.    When exposed to high temperatures, pentobarbital suspensions quickly degrade, impacting the pH and causing insoluble precipitates to form. In other words, solid particles separate from the liquid in a vial, compromising the consistency of the chemical throughout the suspension.[10] Furthermore, its chemical structure can change, turning into an entirely different substance with a different

---

[7] Ex. 5, Huntsville Fire Dept. Rpt., p.2 ("Due to building construction and heavy fire, crews had difficult time making access. This was a prison unit with multiple keys needed for access and control to each area. After L624 and L614 flowed water for some time there was some control of the fire."); *id.* ("The water was partially successful in limiting the spread, however, the Spanish roofing tiles limited the water to reach all the fire. Also, the distance from the ladder tip to the admin building was farther than an effective water stream from the ladder truck."); *id.* at 3 ("Suppression Factor: Building construction or design, other, Roof collapse, Egress/exit problem").

[8] Poe, Inmates Evacuated Because of Fire at Texas Prison Unit, *supra*; Ex. 5, Huntsville Fire Dept. Rpt., p.3.

[9] Ken Miller, All Prisoners Accounted For After Fire at Texas Prison Forces Evacuation, NBCDFW (Aug. 25, 2023), available at https://www.nbcdfw.com/news/local/texas-news/all-prisoners-accounted-for-after-fire-at-texas-prison-forces- evacuation/3324120/

[10] *See* Ex. 6, Report of Dr. Almgren, at ¶ 31 ("The changes in pH can lead to formation of precipitant.").

pharmacological impact on the body.[11] For example, when pentobarbital is "heated to decomposition it emits toxic fumes of nitric oxide."[12] When exposed to much lower temperatures than a fire – those of 100°C (212°F) – and for only a single hour, chemical changes cause pentobarbital to lose 80 percent of its potency.[13] Pharmacological authorities warn that the type of pentobarbital at issue here – compounded pentobarbital – should be used within *48 hours if stored at room temperature.*[14]

### B. TDCJ Is Obstructing Mr. Murphy's Discovery of the Fire's Impact on the Substance Defendants Will Use to Execute Him.

30.     Mr. Murphy's attempts to gather information about the condition of the substances intended for use in in his execution in the wake of the Huntsville Unit fire have been met with bad faith delay and obstruction by TDCJ.

31.     On September 8, 2023, once the extent of the fire and damage became clearer, counsel Bernhard sent to the TDCJ via email transmission a Public Information Act requesting information about whether and how the lethal injection substances stored at the Huntsville Unit were affected by the fire.[15]

---

[11] *Id.* ("Also, exposure of pentobarbital to pH outside of the acceptable range can lead to quicker breakdown of the pentobarbital molecule itself, producing further degradation[.]"). Mr. Murphy intends to file a supplemental scientific report further supporting these allegations.

[12] NIH National Library of Medicine, PubChem: Pentobarbital (Compound), available at https://pubchem.ncbi.nlm.nih.gov/compound/Pentobarbital#section=Decomposition , citing authorities.

[13] *See* Ex. 7, Myriam Ajemni et al., *Stability-Indicating Assay for the Determination of Pentobarbital Sodium in Liquid Formulations*, Int'l Journal of Analytical Chemistry, 2015, at 3.

[14] Ex. 6, Almgren Rpt., ¶ 15.

[15] *See* Ex. 14, PIA Request of Sept. 8, 2023.

32.    On September 19, 2023, still lacking a response, Ms. Bernhard sent a

follow-up email inquiry:

> The Public Information Act requires that the governmental body
> must produce the requested information "promptly."  Gov't Code
> 552.221. Given that my client is scheduled for execution in three
> weeks, the delay in your response is neither prompt nor reasona-
> ble.  If you intend to seek an Attorney General opinion, please advise
> immediately, so that I have time to respond.  Regardless of the fact
> that the Act gives you 10 days to request such an opinion, in these
> circumstances the unnecessary use of the full period flouts the lan-
> guage and the spirit of the Act.

The TDCJ Open Records Coordinator responded:

> Your request was received on 9/8/2023 and sent for processing.
>
> We are allowed 10 full business days (Monday through Friday and
> excluding holidays) to process all requests, which means that your
> request is currently on day # 8.
>
> All requests are processed in the order in which they are received,
> not on the basis of need or urgency.[16]

33.    On the afternoon of the 10th day, TDCJ responded; but did not provide

any documents. Instead, they advised Ms. Bernhard that they would be seeking a

Request for Decision from the Office of the Attorney General ("OAG").[17]  Their

request to the OAG asserted that the "documents responsive to this request contain

information that is excepted from disclosure under the PIA . . . Specifically, TDCJ

invokes . . . sections 552.028 and 552.101 through 552.158 of the PIA."

---

[16] *See* Ex. 15, PIA Request Followup Correspondence, Sept. 19, 2023.

[17] *See* Ex. 16, PIA Response if September 22, 2023.

34.     TDCJ's invocation of sections "552.101 through 552.158" includes every possible exception from disclosure contained within the PIA except for the last four.  They are thus asserting that there are 72 exceptions (only a fraction conceivably applicable) which they argue excepts the information from disclosure.

35.     TDCJ's actions flout the language and spirit of the Act.  The PIA Handbook states:

> The officer for public information must "promptly" produce public information in response to an open records request. "Promptly" means that a governmental body may take a reasonable amount of time to produce the information, but may not delay. It is a common misconception that a governmental body may wait ten business days before releasing the information. In fact, as discussed above, the requirement is to produce information "promptly."  What constitutes a reasonable amount of time depends on the facts in each case. The volume of information requested is highly relevant to what constitutes a reasonable period of time.[18]

36.     TDCJ's actions reek of gamesmanship.  By unnecessarily delaying their response the maximum amount of time permitted – as opposed to responding "promptly,' as is their duty – they effectively deny Mr. Murphy even the opportunity to argue for his right to the information.

37.     Ms. Bernhard sent a subsequent PIA request to TDCJ, which has never been answered despite passage of the statutory deadline. At the time of filing this

---

[18] PIA Handbook 2022 p. 23 (citations omitted), available at https://www.texasattorneygeneral.gov/open-government/members-public/overview-public-information-act).

action, TDCJ has yet to respond to any of Mr. Murphy's or his counsel's requests for information about the drugs they intend to use to execute him.

38.    Neither Mr. Murphy nor his counsel delayed in seeking the information, as neither the relevance of the fire nor the extent of its damage were immediately clear. The critical nature of the information he seeks – whether a catastrophic event significantly denigrated the substances TDCJ intends to use to carry out his execution – cannot be overstated.  TDCJ's response is simply obstructionist, adding to the necessity of this Court's action on this application.

### C.    Even Before the Fire, All of TDCJ's Pentobarbital Had Expired.

39.    Other problems with TDCJ's pentobarbital predated the Huntsville Unit fire; but those issues and the fire's damage reciprocally amplify one another.

40.    Since September 2013, TDCJ has acquired and carried out executions with compounded—as opposed to commercially manufactured—pentobarbital.[19]

41.    When a drug is commercially manufactured, it is subjected to extensive quality control and testing to ensure that the quality, potency, and purity of the drug is stable until its expiration date.[20] These measures are product-specific.[21]

---

[19] TDCJ conceals the identity of the pharmacy and laboratory it uses to compound and test its pentobarbital.

[20] *Id*. at ¶ 6.

[21] *Id.* at ¶ 7.

42.     On the other hand, when drugs are compounded, pharmacists use Active Pharmaceutical Ingredients ("APIs") to prepare smaller batches of a medication.[22] APIs usually exist in a concentrated powder form.[23]

43.     Generally, drugs are compounded by specialized compounding pharmacies, with very specific – and sterile – equipment and procedures.[24] Sterile compounding must follow the strict guidelines set forth in the United States Pharmacopeia ("USP").[25] The USP is a compendium of quality requirements, specifications, and practices that apply to the practice of the pharmacy. USP sets the standards for the pharmaceutical industry.[26]

44.     If The USP guidelines are not followed it can lead to medication contamination, patient harm, and unpredictable drug effects.[27]

45.     The expiration date or Beyond Use Date ("BUD") of a compounded drug is significantly shorter than its commercially available equivalent because compounded drugs do not undergo the same extensive quality testing as commercially

---

[22] *Id.* at ¶ 8.

[23] *Id.*

[24] *Id.*

[25] *Id.* at ¶ 9.

[26] *Id.* at ¶¶ 9, 11.

[27] *Id.* at ¶ 11.

available products. The USP directs how pharmacists are to determine the BUD of a compounded product.[28]

46.     TDCJ purchases compounded pentobarbital for use in executions in batches that have ranged from nine to twenty-four vials. TDCJ stockpiles compounded pentobarbital, meaning that it obtains more pentobarbital than it can reasonably expect to use prior to its BUD.

47.     According to the USP, the maximum BUD for high-risk compounded sterile preparations, like the pentobarbital in TDCJ's possession, are:

- 24 hours, if stored at room temperature between 20° and 25℃;
- 72 hours, if refrigerated at a temperature range between 2° and 8℃; or
- 45 days, if in a solid, frozen state between -25° and -10℃.[29]

48.     On information and belief, TDCJ stores the compounded pentobarbital at room temperature.[30] The USP's BUD of TDCJ's pentobarbital is thus 24 hours. In other words, TDCJ's pentobarbital expires 24 hours after it is compounded because it is kept at room temperature. If it were kept frozen, it would expire 45 days after it is compounded.

---

[28] *Id.* at ¶ 10.

[29] *Id.* at ¶¶ 10, 14-15.

[30] *See* Ex. 8, Lab Reports.

49.     But at the time of filing this Petition, some of TDCJ's vials of pento-barbital are over **900 days old**;[31] and the rest of TDCJ's vials of pentobarbital are over **250 days old**.[32] On information and belief, TDCJ does not possess any pento-barbital that was not long-ago expired, even before taking into account the effect of the August 25, 2023, fire.

### D.     The pH of TDCJ's Pentobarbital Has Never Been Tested.

50.     The pH of pentobarbital shifts over time, which accelerates the break-down of pentobarbital molecules and leads to the formation of precipitants. Exposure to excess temperatures accelerates this process. For this reason, the USP specifies that the pH of compounded pentobarbital should be tested and maintained between 9.0 and 10.5.[33]

51.     None of the reports TDCJ has produced in the past indicate that the pH of the pentobarbital in its possession has ever been tested, nor have the solutions been visually inspected for particulates.[34]

---

[31] According to TDCJ's historical disclosures, TDCJ last received its 50ml vials of pentobarbital on March 18, 2021. Ex. 9, Huntsville Unit Storage Inventory Logs, Pentobarbital (2.5 grams). *See also* Ex. 11, DEA Forms; Ex. 6, Almgren Rpt. at ¶ 17.

[32] TDCJ last received its 100ml vials of pentobarbital on January 5, 2023. Ex. 10, Huntsville Unit Storage Inventory Logs, Pentobarbital (5 grams). *See also* Ex. 11, DEA Forms; Ex. 6, Almgren Rpt. at ¶ 18.

[33] Ex. 6, Almgren Rpt. at ¶ 31.

[34] Ex. 8, Lab Reports.

52.     The pharmacological activity of expired drugs – let alone drugs that were exposed to extreme temperatures – is unpredictable. At minimum, their effectiveness will have vastly decreased.[35] Some drug degradants have their own pharmacological activity, completely different from the original drug.[36] Expired medications can cause severe side effects, such as organ failure.[37] Particulates in an intravenous injection, furthermore, can pose risk of painful pulmonary emboli, hematoma, acute inflammation, or phlebitis.[38] For these and other reasons, the Food and Drug Administration strongly advises against using expired or spoiled medication.[39]

**E.      Claims by TDCJ to "Extend" the Expiration Dates are Unscientific and Invalid.**

53.     On several occasions, TDCJ has claimed to "extend" the BUD of its expired compounded pentobarbital based on the results of potency testing. TDCJ has removed a vial of pentobarbital from its existing stockpile and returned the

---

[35] *See* Ex. 6, Almgren Rpt. at ¶ 20; Ex. 7, Ajemni et al., at 3 (exposure to 100°C (212°F) for one hour causes pentobarbital to lose 80 percent of its potency).

[36] Ex. 6, Almgren Rpt. at ¶¶ 20, 24, 27.

[37] *Id.* at ¶ 20.

[38] *See, e.g.,* N. Chiannilkulchai, et al., Safety Concerns with Glass Particle Contamination: Improving the Standard Guidelines for Preparing Medication Injections, Int. J. Qual. Health Care, 33(2) (Jun. 2021), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8221140/#R5; J.W. Puntis et al., Hazarts of Parenteral Treatment: Do Particles Count? Arch. Dis. Child, 67(12), 1475-77 (Dec. 1992) ("Particulate contamination is known to cause phlebitis in peripheral vessels[.]"), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1793986/?page=2.

[39] Ex. 6, Almgren Rpt. at ¶ 20.

individual vial to the pharmacy.[40] The pharmacy then submits the single vials it receives from TDCJ for potency testing. Potency testing, also referred to as assay testing, measures the amount of API in a sample. This is an unscientific and invalid approach to extending the BUD of a compounded drug.[41]

54.    The only valid way to extend a BUD under the USP is to perform stability-indicating studies.[42] The method used to test the potency of TDCJ's compounded pentobarbital is not a stability-indicating test.[43]

55.    A stability-indicating test, unlike a potency/assay test, can determine whether there has been any degradation of the drug.[44] Degradants can be structurally similar to the API, and thus misleadingly inflate the results of assay testing. But degradants can have very different chemical qualities than the API, like solubility and pH, which impact the substance's function on the body.[45]

56.    Pentobarbital degrades over time and the resulting degradants do not have the same pharmacologic effect as pentobarbital. *Id.* at ¶ 27. Thus, the results of potency/assay tests on long-expired pentobarbital can be highly misleading.

---

[40] *See* Exs. 9, 10, Huntsville Unit Storage Inventory Logs.

[41] Ex. 6, Almgren Rpt. at ¶¶ 21-23.

[42] *Id.* at ¶¶ 23, 25-27.

[43] *Id.* at ¶¶ 23, 25.

[44] *Id.* at ¶¶ 23, 24-26.

[45] *Id.* at ¶¶ 24, 30.

57.     In addition, TDCJ has purported to extend the BUD of multiple vials of its pentobarbital based on potency testing performed on a just one vial. But the USP makes clear that the results from tests conducted post-compounding on one vial are not applicable to other vials (whether from the same or different batches).[46]

58.     Finally, vials that TDCJ sends to the pharmacy for this testing are sometimes shipped back to TDCJ afterward, and placed back into storage for future executions. This creates a high contamination risk.[47]

**F.     Recent Litigation in Civil Court Confirms the Factual Allegations Here, As Well As the Need for this Court's Jurisdiction.**

59.     In December 2022, several death-sentenced Texas prisoners filed a civil lawsuit against TDCJ and its officials, alleging that TDCJ's actions in procuring, selecting, storing, and administering drugs in connection to executions constituted *ultra vires* acts that violated several state laws[48] and would subject the Plaintiffs to unnecessary harm.[49]

60.     The District Court held a temporary injunction hearing on January 10, 2023 to determine whether TDCJ planned to use expired pentobarbital in upcoming

---

[46] *See id.* at ¶ 28-29.

[47] *Id.* at ¶¶ 33-34.

[48] These include the Texas Pharmacy Act, the Texas Controlled Substances Act, the Texas Food, Drug, and Cosmetic Act, and the Texas Penal Code.

[49] Original Petition, *Ruiz et al. v. TDCJ et al.*, Case No. D-1-GN-22-007149 (419th District Court, Travis County).

executions, and whether the use of the expired drugs violated state statutes. The District Court explained that, in accordance with a prior order of the CCA,[50] it could not stay any execution, but it could decide whether to enjoin TDCJ "from committing certain acts while conducting the executions."[51]

61.    After a two and a half hour hearing,[52] the District Court made detailed factual findings, including the following:

- "Defendants' actions in procuring, selecting, storing, and administering Pentobarbital mean that Defendants must comply with the Texas Pharmacy Act[,]"as well as "the Texas Controlled Substances Act, the Texas Food, Drug, and Cosmetic Act, and the Texas Penal."[53]

- "Plaintiffs offered unrebutted evidence that all of the Pentobarbital in Defendants' possession is expired."[54]

- "Plaintiffs offered unrebutted evidence that expired Pentobarbital can cause severe harm or unpredictable drug actions."[55]

- The harms from expired Pentobarbital include "burning pain[,]" "blockages in the blood vessels [which are] painful[,]" and that

---

[50] *In re State ex rel. Ken Paxton,* No. WR-94, 432-01, 2023 WL 110625 (Tex. Crim. App. Jan. 4, 2023).

[51] *See* Ex. 12, Temporary Injunction of Travis County Civil District Court, *Ruiz et al. v. TDCJ et al.*, (Jan. 10, 2023).

[52] Ex. 13, Jan. 10, 2023 Hearing Transcript, *Ruiz et al. v. TDCJ et al.*

[53] *Id.* at 2-3.

[54] *Id.* at 3.

[55] *Id.* at 4.

"Defendants' procedures create a risk of unnecessary pam and unpredictable activity in the body of condemned people."[56]

- "Defendants did not offer any evidence or witnesses to dispute Plaintiffs' assertions regarding Defendants practices regarding the legality, purity, stability, or microbiology of the Pentobarbital in Defendants' possession." *Id.*

- Defendants "have handled their pentobarbital with disregard for its purity, stability, and activity in the body in the presence of degradants and contaminants."[57]

62.    Based on these factual findings, the District Court concluded that TDCJ officials were violating the Texas Pharmacy Act, Texas Controlled Substances Act, the Texas Food, Drug, and Cosmetic Act, and the Texas Penal Code by continuing to store and administer these drugs.[58] The District Court then issued a temporary injunction ordering TDCJ officials to temporarily refrain from "administering or injecting Plaintiffs" with expired Pentobarbital.[59]

63.    The CCA summarily vacated the District Court's injunction, however, because it "purport[ed] to stay the executions of various inmates" and "circumvent[ed] . . . the orders of the inmates' convicting courts."[60] Judge Newell dissented.

---

[56] *Id*. at 4-5.

[57] *Id*. at 5.

[58] *Id.* at 2-4.

[59] *Id.* at 6.

[60] *In re State ex rel. Ken Paxton*, No. WR-94,432-01, 2023 WL 151779 (Tex. Crim. App. Jan. 10, 2023) (quotations omitted))

*Id.* He had previously observed that the law "creates a Catch-22 in which death-row inmates have a civil remedy to pursue claims regarding the method of execution but may not stop the execution to raise them.[61]

64.   When vacating the injunction, the CCA did not question—let alone reject—the District Court's factual findings that all of the pentobarbital in TDCJ's possession is expired and that it would cause a death-sentenced prisoner unnecessary harm and suffering upon administration. Nor did the CCA question or reject the District Court's legal conclusion that TDCJ officials would violate state law if they used those drugs to carry out a future execution.

65.   Hours after the CCA's ruling, TDCJ officials used expired pentobarbital to execute Robert Fratta. In the following weeks, expired pentobarbital was used in the executions of John Balentine, Wesley Ruiz, and Arthur Brown.

66.   Though the State carried out the execution of these men, the lawsuit remains pending on appeal from the District Court's denial of several defendants' plea to the jurisdiction.[62]

---

[61] *In re State ex rel. Paxton*, 667 S.W.3d 752, 753 (Tex. Crim. App. Jan. 4, 2023) (Newell, J., dissenting).

[62] *See TDCJ et al. v. Canales*, No. 03-23-00248-CV (Tex. App.—Austin) (appellants' brief filed June 15, 2023).

67.   Mr. Murphy is not a party to that lawsuit, nor could he obtain relief if he were, because Texas law disentitles him to a temporary injunction for that purpose.[63]

### G.   Mr. Murphy Cannot Obtain Relief from the Texas Courts

68.   There is no remedy for these violations of constitutional and statutory law in Texas:

a.   The Texas criminal courts will not cognize such claims in a subsequent state habeas writ brought under Article 11.071;[64]

b.   nor in an original or "constitutional" writ brought under Article 11.05 or Article I, Section 12 of the Texas Constitution;[65]

---

[63] The Texas Court of Criminal Appeals recently vacated a state civil court's temporary injunction in a suit challenging the use of expired execution drugs, because it "purport[ed] to stay the executions of the various inmates" and "circumvent[ed] [the CCA's] mandates and the orders of the inmates' convicting courts." *In re: State ex rel. Ken Paxton*, No. WR-94,432-01, 2023 WL 151779 (Tex. Crim. App. Jan. 10, 2023) (internal quotation marks omitted)).

[64] Article 11.071 applies only if a death-sentenced "applicant seeks relief from [the] judgment imposing a penalty of death." Tex. Code Crim. Proc. art. 11.071, § 1. A challenge to an execution procedures is thus not cognizable under Article 11.071 because it does not seek relief from the judgment of conviction or sentence of death. *Ex parte Alba*, 256 S.W.3d 682, 686 (Tex. Crim. App. 2008) (plurality op.) (holding that "Article 11.071 is not the proper avenue for relief" to challenge lethal injection protocol); *id.* at 689 (Cochran, J., concurring) ("This is a circumstance-of-punishment allegation. . . . it is not a challenge to the conviction or sentence."). Judge Cochran's concurring opinion, joined by Judge Womack, states the narrowest grounds for the decision in *Alba*. *See id.* at 687 ("Although I agree with the [plurality opinion] that applicant's claim is not cognizable under Article 11.071, I believe that a 'lethal-injection protocol' claim may be brought as an original writ application under the Texas Constitution[.]").

[65] Mr. Murphy has filed an original constitutional habeas writ, under Article 11.05 and Article I, Section 12, of the Texas Constitution, in the Dallas County District Court. He has sought a withdrawal of his execution date from that court, as well as a stay of execution from the Texas Court of Criminal Appeals. At the time of filing this Action, neither court has acted on these filings. Mr. Murphy's execution is still scheduled for October 10, 2023, with the damaged pentobarbital that is the subject of this federal complaint.

c.   No other specific procedure in Chapter 11 applies, because the action does not "involve a final felony conviction, . . . a case in which probation was imposed, or a felony case after indictment";[66]

d.   and the Texas civil courts do not have the authority to stop an execution in order to entertain these legal claims, no matter what title is assigned to the request (a stay of execution,[67] a writ of prohibition,[68] or a temporary injunction[69]).

## H.   TDCJ is Violating Not Only the United States Constitution (as Detailed in the Claims Below), but also Numerous State Laws.

69.   Despite the lack of remedies in the Texas state courts, TDCJ is violating not only the federal constitution, but also the Texas Constitution,[70] the Texas Code of Criminal Procedure, Article 43.24, which states: "No torture, or ill treatment, or unnecessary pain, shall be inflicted upon a prisoner to be executed under the sentence of the law"; and a panoply of other state laws, including:

---

[66] *In re Smith*, 665 S.W.3d 449, 455 (Tex. Crim. App. 2022).

[67] *See State ex rel. Holmes v. Third Court of Appeals*, 885 S.W.2d 389, 395-96 (Tex. Crim. App. 1994) (original proceeding) (holding that order by state civil court purporting to stay execution unlawfully circumvents jurisdiction of Court of Criminal Appeals in death-penalty case); *Alba*, 256 S.W.3d at 690 & n.19 (Cochran, J., concurring) (noting "inability of a Texas civil court to enjoin the carrying out of a lawful criminal sentence in the context of a civil-rights lawsuit" and citing *Holmes*, 885 S.W.2d at 395-96).

[68]  *Ex parte Chi*, 256 S.W.3d 702, 704 (Tex. Crim. App. 2008).

[69] The Texas Court of Criminal Appeals recently vacated a state civil court's temporary injunction in a suit challenging the use of expired execution drugs, because it "purport[ed] to stay the executions of the various inmates" and "circumvent[ed] [the CCA's] mandates and the orders of the inmates' convicting courts." *In re: State ex rel. Ken Paxton*, No. WR-94,432-01, 2023 WL 151779 (Tex. Crim. App. Jan. 10, 2023) (internal quotation marks omitted)).

[70] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." Tex. Const., Art. 1 § 13.

a. the Texas Pharmacy Act,[71] the regulations implementing which specify that "[a]ny drug which has been exposed to excessive heat, smoke, or other conditions which may have caused deterioration shall not be dispensed."[72] Among other violations, every vial of TDCJ's pentobarbital expired between 20 and 43 months ago; and TDCJ's compounding of the drug violates a number of different provisions;[73]

---

[71] The Texas Pharmacy Act recognizes the "matter of public interest and concern" that "only qualified persons be permitted to engage in the practice of pharmacy" and that such practice receive the "confidence of the public." Tex. Occ. Code § 551.002(b). To that end, the Pharmacy Act "control[s] and regulat[es] the practice of pharmacy." *Id.* at § 551.002(c)(1). This Act applies equally to incarcerated prisoners within TDCJ. The Pharmacy Act further requires compounding and testing of controlled drugs to be done in compliance with the United States Pharmacopeia. Tex. Occ. Code § 562.153(2); 22 Tex. Admin. Code § 291.133(f)(1)(D)(ii). Consistent with the USP, a drug "shall not be stored or transported or begin to be administered to a patient" after its BUD has passed. 22 Tex. Admin. Code § 291.133(b)(9). The BUD "shall be determined as outlined in Chapter 797" of the USP. 22 Tex. Admin. Code § 291.133(d)(9)(A)(iii). The Pharmacy Act further limits who may legally dispense or distribute controlled drugs to licensed pharmacists, Tex. Occ. Code §§ 558.001(c), 551.004, authorized by a medical prescription. Tex. Occ. Code § 551.003(9); *see also* 22 Tex. Admin. Code § 291.133(d)(1)(A).

[72] 22 Tex. Admin. Code § 291.3(g)(2)(A).

[73] 22 Tex. Admin. Code § 291.133(d)(1)(C) & (D)

b. the Texas Controlled Substances Act,[74] because (among other reasons), TDCJ does not have valid prescriptions to dispense or administer pentobarbital;[75]

c. the Texas Food, Drug, and Cosmetic Act;[76]

d. Texas Penal Code § 38.11(a)(1) (offense for any person to "provide" (or to possess with intent to provide) a controlled substance "to a person in the custody of a correctional facility or civil commitment facility, except on the prescription of a practitioner."[77]

---

[74] Pentobarbital is a Schedule II controlled substance. Tex. Health & Safety Code § 481.032; *Schedule of Controlled Substances*, 45 Tex. Reg. 2249 (March 27, 2020). The Texas Controlled Substances Act provides that, other than in an emergency, a person "may not dispense or administer a controlled substance without an electronic prescription." Tex. Health & Safety Code § 481.074(b). It further requires that a prescription for a controlled substance issue from a "practitioner" in the normal course of medical practice. *See* Tex. Health & Safety Code § 481.071(a); Tex. Health & Safety Code § 481.002(39) (defining "practitioner"). This Act applies equally to incarcerated prisoners within TDCJ, and contains specific requirements for written prescriptions, Tex. Health & Safety Code § 481.075(e)(1), prohibits pharmacists from dispensing them under any other circumstances. Tex. Health & Safety Code § 481.074(a). On information and belief, TDCJ does not obtain or receive a prescription from a medical practitioner when ordering pentobarbital for executions.

[75] Tex. Health & Safety Code § 481.074(b).

[76] The Texas Food, Drug, and Cosmetic Act likewise requires the issuance of a prescription in order to dispense any drug for which the federal Food, Drug, and Cosmetic Act ("FDCA") requires a prescription. Tex. Health & Safety Code § 431.113(c)(1); 21 U.S.C. § 353(b)(1); Tex. Health & Safety Code § 431.113(c)(1). This Act applies equally to incarcerated prisoners within TDCJ.

[77] The Penal Code uses the same definition of "practitioner" as the Controlled Substances Act. *See* Tex. Penal Code § 38.11(f)(1) (citing Tex. Health & Safety Code § 481.002).

## CLAIMS FOR RELIEF

**Claim 1.    Attempting to Execute Mr. Murphy With Fire-Blighted, Expired Pentobarbital Violates the Eighth and Fourteenth Amendments.**

70.    Mr. Murphy realleges and incorporates by reference the allegations contained in the above paragraphs.

71.    The use of pentobarbital that was exposed to extreme heat, smoke, and water during the August 25, 2023 Huntsville Unit fire violates the Eighth and Fourteenth Amendments of the United States Constitution. This is particularly true of expired pentobarbital.

72.    The Eighth Amendment forbids the State, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life.[78] "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *Id*. A method of execution violates the Eighth Amendment if it presents a "substantial risk of serious harm."[79] A method that "superadd[s] pain, terror, or disgrace" qualifies as cruel and unusual.[80]

73.    An inmate establishes an Eighth Amendment violation if he identifies a "feasible, readily implemented" alternative procedure that would "significantly

---

[78] *In re Kemmler*, 136 U.S. 436, 447 (1890).

[79] *Baze v. Rees*, 553 U.S. 35, 50 (2008). *See also Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion).

[80] *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1114 (2019).

reduce a substantial risk of severe pain."[81] To determine whether the risk of pain is "substantial[,]" the state's method must be "compared to a known and available alternative[]" that the state refuses to adopt without legitimate penological reason.[82]

74.     Here, Texas plans to execute Mr. Murphy with expired pentobarbital that was exposed to extreme heat, smoke, and water; and which it has not tested for stability. (Even if it has conducted potency testing, that does not reveal anything about the level of degradation of the drug.)

75.     When a drug is degraded, its method of action on the body becomes unpredictable and dangerous. Because TDCJ's pentobarbital is expired and was exposed to extreme heat – whether the two are considered separately or together – it is degraded to an unknown (but likely very high) degree. TDCJ thus does not and cannot know whether they will be injecting Mr. Murphy with pentobarbital, extremely weak pentobarbital, pentobarbital containing dangerous particulates, or a different chemical altogether.  This creates substantial risks of serious, severe, and superadded harm and pain. It also superadds terror, as Mr. Murphy is aware that Texas plans to inject him with unknown chemicals. This alone causes needless suffering.

76.     The use of pentobarbital that was not exposed to extreme heat, smoke, or water, and whose stability is confirmed by testing, is a simple, feasible, and

---

[81] *Baze*, 533 at 52.

[82] *Glossip v. Gross*, 576 U.S. 863, 878 (2015); *Bucklew*, 139 S. Ct. at 1114.

readily-implemented alternative procedure that would significantly reduce a substantial risk of severe pain.

77.    Separately, the use of expired pentobarbital is an unusual punishment under the Eighth Amendment because there is a consensus against the use of expired drugs in executions. Six states that currently have the death penalty (with no moratorium on executions) do not use expired drugs in executions: Arizona, Arkansas, Nebraska, Mississippi, Ohio, and South Carolina.[83] Prior to abolishing the death penalty, Virginia also did not use expired drugs.[84] Four additional States appear not

[83] Arizona: Def.'s Notice of Protocol Amend., Resp. to Ct. Order and Suggestion of Mootness, 2, *Wood v. Ryan*, No. 2:14–cv–01447–NVW (D. Ariz.); Arkansas: Camila Domonoske, *Arkansas Readies for 8 Executions, Despite Outcry Over Pace, Method*, Nat'l Pub. Radio (Mar. 31, 2017), https://www.npr.org/sections/thetwo-way/2017/03/31/521967661/arkansas-readies-for-8-executions-despite-outcry-over-pace-method; Mississippi: Mem. of Authorities in Supp. Of Mot. To Dismiss and in Opp'n to Mot. For Prelim. Inj., 2, 4, *Jordan v. Fisher*, No. 3:15-cv-00295-HTW-LRA (S.D. Miss.); Nebraska: *Death-Sentenced Prisoner Aubrey Trail Waives Appeals and Petitions Nebraska for Execution Date Despite Unavailability of Lethal Injection Drugs*, Death Penalty Info. Ctr. (Aug. 17, 2023), https://deathpenaltyinfo.org/news/death-sentenced-prisoner-aubrey-trail-waives-appeals-and-petitions-nebraska-for-execution-date-despite-unavailability-of-lethal-injection-drugs; Ohio: State Actor Def.'s Mot. For Permission to Remove and Dispose of Expired Drugs at SOCF, 1-2, *In re: Ohio Execution Protocol Litigation*, No. 2:11-cv-1016 (S.D. Ohio); *see also* Jeremy Pelzer, *Ohio prison officials seek to destroy expired execution drugs amid fears they might be used*, Cleveland.com (Sep. 13, 2019), https://www.cleveland.com/open/2019/09/ohio-prison-officials-seek-to-destroy-expired-execution-drugs-amid-fears-they-might-be-used.html#:~:text=In%20a%20legal%20brief%20with,Ohio%20Correctional%20Facility%20in%20Lucasville; South Carolina: Mot. to Lift Abeyance, Dismiss Appeal, and Vacate Circuit Ct. Order, 1-2, *Owens v. Stirling*, No. 2011-001280 (S.C.).

[84] *Texas Prison Officials Send Virginia Sought-After Drug for Execution This Week*, N.Y. Times (Sep. 26, 2015), https://www.nytimes.com/2015/09/27/us/texas-prison-officials-send-virginia-sought-after-drug-for-execution-this-week.html.

to use expired drugs in executions: Florida, Georgia, South Dakota, and Tennessee.[85]

23 states and 5 territories do not have capital punishment laws at all.

**Claim 2.   TDCJ's Violation of State Laws Prohibiting Unnecessary Pain Violates Substantive Due Process and Equal Protection.**

78.     Mr. Murphy realleges and incorporates by reference the allegations contained in the above paragraphs.

79.     State laws regulating the procurement, prescription, selection, and administration of drugs, like federal drug laws, have the "core" legislative purpose of ensuring that a "drug" is "safe and effective for its intended use."[86] By violating nearly every such statute on Texas's books, Defendants also violate Mr. Murphy's rights under the Fourteenth Amendment to the U.S. Constitution.

---

[85] Florida: Wilson Sayre, *Florida Uses New Drug to Execute First Inmate in More Than a Year*, WUSF Pub. Media (Aug. 24, 2017), https://wusfnews.wusf.usf.edu/2017-08-24/florida-uses-new-drug-to-execute-first-inmate-in-more-than-a-year; Georgia: Rhonda Cook, *Expired drugs led to cancellation of execution by lethal injection*, Atlanta Journal-Constitution (Aug. 2, 2012), https://www.ajc.com/news/local/expired-drugs-led-cancellation-execution-lethal-injection/7W9o5JQYriyQnNG8Yt9HQI/; South Dakota: *Judge to hear arguments on SD's single execution drug*, Mitchell Republic (Sep. 28, 2012), https://www.mitchellrepublic.com/news/judge-to-hear-arguments-on-sds-single-execution-drug; Tennessee: *Tennessee Lethal Injection Protocol Investigation: Report and Findings*, Butler Snow (Dec. 13, 2022), https://ewscripps.bright-spotcdn.com/a2/d3/b79f5e7e497e83cb01d884c62bf7/tn-lethal-injection-protocol-investigation-report-and-findings-12-13-22.pdf. Counsel could locate no information for Missouri, Alabama, Oklahoma, or the Federal Government.

[86] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

80.     Mr. Murphy has a right to life that may not be extinguished without due process, *i.e.* a process compliant with the "law of the land."[87] Defendants' knowing violation of state law, as alleged above, flouts that right.

81.     Furthermore, Defendants' deliberate use of disparate practices between death-sentenced and other-sentenced Texas prisoners violates Mr. Murphy's right to equal protection of law. Death-sentenced and other-sentenced Texas prisoners are similarly-situated in terms of their need for the safety-net created by state pharmacy and controlled-substance laws; yet Defendants arbitrarily exempt death-sentenced prisoners from all of those provisions when it comes time to execute them. There is no rational basis for Defendants to do so.

**Claim 3.     Texas has Guaranteed Mr. Murphy Certain Liberty Interests but Provides No Means for him to Enforce Them, in Violation of Procedural Due Process under the Fourteenth Amendment.**

82.     Mr. Murphy realleges and incorporates by reference the allegations contained in the above paragraphs.

83.     The State of Texas guarantees condemned inmates freedom from "torture, or ill treatment, or unnecessary pain." Texas Code of Criminal Procedure, Article 43.24 ("No torture, or ill treatment, or unnecessary pain, shall be inflicted upon a prisoner to be executed under the sentence of the law."). This is a liberty interest

---

[87] *See Hurtado v. People of California*, 110 U.S. 516, 540-541 (1884) (equating "by the law of the land" with "due process of law"); *Walker v. Sauvinet*, 92 U.S. (2 Otto) 90, 93 (1875) ("Due process of law is process due according to the law of the land.").

granted by state law. The same is true for the state constitution right against "cruel or unusual punishment." Tex. Const., Art. 1 § 13.  Additionally, the Texas Department of Criminal Justice is required to "effectively manage or administer correctional facilities based on constitutional and statutory standards."[1] TDCJ is also required to "determine" the execution procedure and "supervise" the execution[2], presumably in compliance with constitutional and statutory standards.

84.     But, as stated above, the Texas courts do not provide any legal remedy to vindicate these liberty interests once an execution has been scheduled. Texas's legal procedures are thus totally inadequate to enforce Mr. Murphy's liberty interests at this time – even though the factual grounds for his claim did not arise until *after* his execution was scheduled. This violates procedural due process.[88]

**Claim 4.     Mr. Murphy is Being Denied Meaningful Access to the Courts in Violation of the First and Fourteenth Amendments**

85.     Mr. Murphy realleges and incorporates by reference the allegations contained in the above paragraphs.

---

[88] *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (concluding that federal courts may disturb state postconviction procedures if they are "fundamentally inadequate to vindicate the substantive rights provided"); *Emerson*, 544 F. App'x at 327 ("Although states are under no obligation to provide mechanisms for postconviction relief, when they choose to do so, the procedures they create must comport with due process and provide litigants with a fair opportunity to assert their state-created rights.").

86.     The Fourteenth Amendment Due Process Clause confers a right to meaningful access to the courts.[89] The First Amendment "right of the people . . . to petition the Government for a redress of grievances," U.S. CONST. amend. I., is "really inseparable" from due process claims. *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 335 (1985). Claims under both Amendments turn on whether the aggrieved party has "been denied 'meaningful access to the courts' to present [its] claims." *Id.*

87.     Access to courts must be "adequate, effective and meaningful." *Bounds v. Smith*, 430 U.S. 817, 822 (1977), *abrogated in part by Lewis v. Casey*, 518 U.S. 343 (1996). This includes requiring "States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts." Id. at 824. Nominal access that is not meaningful is just as much a violation of this doctrine as no access at all.

88.     Mr. Murphy has several nonfrivolous statutory and constitutional claims (as alleged *supra*) against TDCJ, none of which he can meaningfully pursue in state court. *See Casey*, 518 U.S. at 352 (requiring "that a nonfrivolous legal claim had been frustrated or was being impeded" (internal footnote omitted)). It is clear that the state courts will not entertain his claims, no matter what form his petitions

---

[89] *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 857 (5th Cir. 2000) ("Access to the courts is a constitutionally protected fundamental right and one of the privileges and immunities awarded citizens under Article IV and the Fourteenth Amendment.").

31

take. His access is not meaningful in any sense, and thus violates his First and Fourteenth Amendment rights.

**Claim 5.** **Because Texas Provides No Remedy for Any of the Above Constitutional Violations, this Court Can Exercise General Federal Question Jurisdiction to Hear Mr. Murphy's Constitutional Claims**

89.    Mr. Murphy realleges and incorporates by reference the allegations contained in the above paragraphs.

90.    The State of Texas is violating Mr. Murphy's federal constitutional rights, not only by planning to execute him in a manner that violates the Eighth Amendment, but also by failing to provide any redress for that Eighth Amendment violation nor for the myriad state laws it is also violating (as alleged in the claims *supra*). This absence of redress results in a constitutionally-intolerable scenario of a "right without a remedy," such that this Court has an independent obligation to provide an appropriate remedy under general federal question jurisdiction, even if 42 U.S.C. Section 1983 could not serve that end. *See Davis v. Passman*, 442 U.S. 228, 241-44 (1979). *See also McBride v. Estis Well Serv., LLC*, 768 F.3d 382, 395 (5th Cir. 2014) ("we regularly rely on the presumption that there should be no right without a remedy") (citing cases).[90]

---

[90] *See also Globe Newspaper Co. v. Walker*, 210 U.S. 365, 360 (1908) ("That the law confers no right without a remedy to secure it is a maxim of the law.") (citing cases); *Barrett v. Holmes*, 102 U.S. 651, 655 (1880) ("A right without a remedy is unknown to the law."); *Alexander's Cotton*, 69 U.S. (2 Wall.) 404, 417 (1865) ("As there should be no right without a remedy, so the courts will not suffer our loyal people, who have been, themselves and their property also, placed in peril by this unfortunate conjunction of political circumstances, for which they are in nowise

**PRAYER FOR RELIEF**

91.   Mr. Murphy prays that this Court:

    o   Grant a preliminary injunction of Defendants' use of drugs affected by the August 25, 2023 Huntsville Unit fire in his imminent execution;

    o   Grant a preliminary injunction of Defendants' use of expired drugs in his imminent execution;

    o   Compel immediate disclosure/discovery of the documents Defendants have refused to provide to his counsel regarding the

---

responsible, to go away without redress."); *Hepburn v. Dubois*, 37 U.S. 345, 374 (1838) ("A person who is entitled, either in law or equity, to the possession or enjoyment of land, or has an estate in it, can enforce that right at law; otherwise he would have a right without a remedy.").

effects of the Huntsville Unit fire, or alternatively submission to the Court for in camera inspection;

o Declare that Defendants' use of expired drugs and drugs affected by the August 25, 2023 Huntsville Unit fire violates Mr. Murphy's various constitutional rights;

o Permanently enjoin Defendants from using such drugs in his execution; and

o Grant such other relief as law and justice require.

Respectfully submitted,

Katherine Froyen Black
205 Blue Ridge Trail
Austin, Texas 78746
415-847-6127
kfroyen@gmail.com
Texas Bar No. 24099910

*Pro Hac Vice pending*

Catherine Clare Bernhard
P.O. Box 506
Seagoville, Texas 75159
972-294-7262
fax – 972-421-1604
cbernhard@sbcglobal.net
Texas State Bar No. 02216575

*Counsel for Jedidiah Murphy*

34

## CERTIFICATE OF SERVICE

I hereby certify that on this date, the 4th day of October, 2023, I effected service of the foregoing pleading on the following counsel for all Defendants by email (and/or ECF notification) to:

> Ali Nassir, Assistant Attorney General
> Office of the Attorney General of Texas
> Post Office Box 12548, Capitol Station
> Austin, Texas 78711
> Tel: (512) 936-2134
> Ali.Nasser@oag.texas.gov

\_\_\_ *(signature)* _____