# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| Jedidiah Murphy, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 23-cv-1199 |
| | : | |
| Bobby Lumpkin, Director of | : | |
| Correctional Institutions, | : | |
| Texas Dept. of Criminal Justice, | : | |
| | : | **THIS IS A CAPITAL CASE** |
| Kelly Strong, Warden, Texas State | : | |
| Penitentiary Huntsville Unit, | : | |
| | : | **EXECUTION SET FOR** |
| Bryan Collier, Executive Director, | : | **OCTOBER 10, 2023** |
| Texas Dept. of Criminal Justice, | : | |
| | : | |
| Defendants. | | |

# EXHIBITS TO COMPLAINT

# VOL. 1

Exhibits 1-6

EXHIBIT 1

| STATE OF TEXAS | § | IN THE 194TH DISTRICT COURT |
|---|---|---|
| | § | |
| v. | § | OF |
| | § | |
| JEDIDIAH MURPHY | § | DALLAS COUNTY, TEXAS |

## EXECUTION ORDER

You, JEDIDIAH MURPHY, were indicted by the Grand Jury of Dallas County, Texas, and charged with the offense of capital murder in cause number F00-02424-NM. A jury in this Court returned a verdict finding you guilty of the offense of capital murder on June 11, 2001, in cause number F00-02424-NM. On June 30, 2001, the same jury in this Court returned answers to the special issues, submitted to the jury at punishment pursuant to Article 37.071 of the Texas Code of Criminal Procedure, and this Court, in accordance with the jury's findings at punishment, assessed your punishment at death. The judgment of this Court was reviewed by the Texas Court of Criminal Appeals on direct appeal, and it was affirmed by that court on June 25, 2003, with mandate issued on September 10, 2003. Subsequently, on March 25, 2009, the Court of Criminal Appeals denied your initial application for writ of habeas corpus. The Court of Criminal Appeals also dismissed your subsequent application for writ of habeas corpus on March 21, 2012. Thereafter, the District Court for the Northern District of Texas, Dallas Division, denied your federal petition for writ of habeas corpus on January 23, 2017, and the United States Court of Appeals for the Fifth Circuit granted your application for a Certificate of Appealability on April 20, 2018. The United States Court of Appeals for the Fifth Circuit affirmed the judgment of the district court on August 24, 2018. Afterwards, the United States Supreme Court denied your petition for writ of certiorari on February 25, 2019. This Court now proceeds with the judgment and sentence in your case and now enters the following order.

IT IS HEREBY ORDERED by this Court that you, JEDIDIAH MURPHY, having been adjudged guilty of capital murder and having been assessed punishment at death, in accordance with the findings of the jury and the judgment of this Court, shall at some time after the hour of 6:00 p.m. on the 10th day of October, 2023, be put to death by an executioner designated by the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice, who shall cause a substance or substances in a lethal quantity to be intravenously injected into your body sufficient to cause your death and until your death, such execution procedure to be determined and supervised by the said Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.

It is ORDERED that the Clerk of this Court shall issue a death warrant, in accordance with this sentence, to the Director of the Correctional Institutions

THE STATE OF TEXAS
COUNTY OF DALLAS

I, Felicia Pitre, District Clerk of
Dallas County, Texas, do hereby certify
that the foregoing is a true and correct
copy as the same appears on record now
on file in my office.

Witness my official hand and seal of
office, this _____ SEP 26 2023 _____

FELICIA PITRE, DISTRICT CLERK
Dallas County, Texas

Deputy
Tammie DeFreeze

Division of the Texas Department of Criminal Justice, and shall deliver such warrant to the Sheriff of Dallas County, Texas to be delivered by him to the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice together with the defendant, JEDIDIAH MURPHY, if not previously delivered.

The Defendant, JEDIDIAH MURPHY, is hereby remanded to the custody of the Sheriff of Dallas County, Texas, to await transfer to Huntsville, Texas, if not previously delivered, and the execution of this sentence of death.

ENTERED THIS _____ day of May, 2023.



Honorable Ernest White
Presiding Judge
194th District Court
Dallas County, Texas

THE STATE OF TEXAS
COUNTY OF DALLAS

I, Felicia Pitre, District Clerk of
Dallas County, Texas, do hereby certify
that the foregoing is a true and correct
copy as the same appears on record now
on file in my office.

Witness my official hand and seal of
office, this SEP 2 6 2022

FELICIA PITRE, DISTRICT CLERK
Dallas County, Texas

Tammie DeFreeze

EXHIBIT 2

# DEATH WARRANT

## Cause No. F00-02424-M

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 194TH DISTRICT COURT |
| | § | |
| v. | § | OF |
| | § | |
| JEDIDIAH MURPHY | § | DALLAS COUNTY, TEXAS |

## TO THE DIRECTOR OF THE CORRECTIONAL INSTITUTIONS DIVISION OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE AND TO THE SHERIFF OF DALLAS COUNTY, TEXAS:

On the 11th day of June 2001, the above-named defendant, in the above-styled and numbered cause, was convicted of the offense of capital murder. On the 30th day of June 2001, the Court sentenced the above-named defendant to death in accordance with the findings of the jury, pursuant to the Texas Code of Criminal Procedure.

The Court, having received the Court of Criminal Appeals's mandate affirming the above-named defendant's conviction for capital murder and having received notice of the Court of Criminal Appeals's denial of the defendant's initial application for writ of habeas corpus, sentenced the above-named defendant to death for the offense of capital murder and ORDERS that the execution be carried out on Tuesday, the 10th day of October 2023, at any time after the hour of 6:00 p.m. at the Correctional Institutions Division of the Texas Department of Criminal Justice at Huntsville, Texas.

The Sheriff of Dallas County, Texas, is hereby commanded to transport the defendant to the Correctional Institutions Division of the Texas Department of Criminal Justice and deliver the defendant, if not previously delivered, and this warrant to the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice for the purpose of executing this warrant, and to take from the Director the proper receipt for the defendant, if not previously delivered, and the sheriff will return the receipt to the office of the District Clerk of Dallas County, Texas.

The Director of the Correctional Institutions Division of the Texas Department of Criminal Justice is hereby commanded to receive from the Sheriff the defendant, if not previously delivered, and this warrant, and to give his receipt to the Sheriff, and to safely keep the defendant and to execute the sentence of death at any time after the hour of 6:00 p.m. on the day and date specified in paragraph two of this warrant, by causing a substance or substances in a lethal quantity to be intravenously injected into the body of the defendant sufficient to cause death, and the injection of the substance or substances into the body of the defendant to continue

THE STATE OF TEXAS
COUNTY OF DALLAS

I, Felicia Pitre, District Clerk of
Dallas County, Texas, do hereby certify
that the foregoing is a true and correct
copy as the same appears on record now
on file in my office.

Witness my official hand and seal of
office, this _____ SEP 2 8 2023 _____

FELICIA PITRE, DISTRICT CLERK
Dallas County, Texas

Deputy
Tammie DeFreeze

until the defendant is deceased, obeying all laws of the State of Texas with reference to such execution.

Witness my hand and seal of the 194th District Court of Dallas County, Texas. at my office in the City of Dallas, Texas, on the ___11___ day of ___May___, 2023.

FELICIA PITRE, DISTRICT CLERK
DALLAS COUNTY, TEXAS

_____
DISTRICT CLERK

## RETURN

The Sheriff of Dallas County, Texas, received this writ on the ___11th___ day of ___May___, 2023, at ___12:40___ ___P___. M. and executed the same by delivering the within-named defendant, if not previously delivered, in person and this warrant to the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice on the ___12th___ day of ___May___, 2023, and by taking his receipts for the said defendant, if not previously delivered, and this warrant, which receipts are hereto attached do here now make my return on this writ this ___12th___ day of ___May___, 2023.

MARIAN BROWN, SHERIFF
DALLAS COUNTY, TEXAS

_____
DEPUTY

On this the ___12th___ day of ___May___, 2023, the following papers related to cause number F00-02424-M, styled THE STATE OF TEXAS v. JEDIDIAH MURPHY, were received from the Sheriff of Dallas County, Texas.

1. One original of **DEATH WARRANT** to be delivered to the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.

2. One certified Execution Order.

_____  Timothy R. Fitzpatrick, Director III
SIGNATURE OF TDCJ OFFICIAL For:

CID Division Director
B. Lumpkin

2

THE STATE OF TEXAS
COUNTY OF DALLAS

I, Felicia Pitre, District Clerk of
Dallas County, Texas, do hereby certify
that the foregoing is a true and correct
copy as the same appears on record now
on file in my office.

Witness my official hand and seal of
office, this _____ SEP 26 2023 .

FELICIA PITRE, DISTRICT CLERK
Dallas County, Texas

Deputy
Tammie DeFreeze

You are hereby commanded to carry into execution the order of execution herein in accordance with this Warrant for the execution of the sentence of death, and in accordance with the Judgment and Sentence of this said Court, shown herein, which I certify to be true and correct copies of the original Judgment and Sentence, Mandate, and Order Setting Execution Date now on file on my office and entered on the Minutes of said Court.

**HEREIN FAIL NOT**, but due return make of this Warrant showing how you have executed the same.

Given under my hand and seal of the 194th Judicial District Court of Dallas County, Texas, on this _____11th_____ day of _____May_____, 2023.

FELICIA PITRE, DISTRICT CLERK
DALLAS COUNTY, TEXAS

THE STATE OF TEXAS
COUNTY OF DALLAS

I, Felicia Pitre, District Clerk of
Dallas County, Texas, do hereby certify
that the foregoing is a true and correct
copy as the same appears on record now
on file in my office.

Witness my official hand and seal of
office, this    SEP 2 6 2023

FELICIA PITRE, DISTRICT CLERK
Dallas County, Texas

Tammie DeFreeze

EXHIBIT 3



# TEXAS COURT OF CRIMINAL APPEALS
### Austin, Texas

## M A N D A T E

THE STATE OF TEXAS,

TO THE **194ᵗʰ JUDICIAL DISTRICT COURT OF DALLAS COUNTY** — GREETINGS:

Before our COURT OF CRIMINAL APPEALS, on the **25ᵗʰ** day of **JUNE**, A.D. 2003, the cause upon appeal to revise or reverse your Judgment between:

### JEDIDIAH ISAAC MURPHY

### VS.

### THE STATE OF TEXAS

CCRA NO. **74,145**

TRIAL COURT NO. **F00-02424-M**

was determined; and therein our said **COURT OF CRIMINAL APPEALS** made its order in these words:

"This cause came on to be heard on the record of the Court below, and the same being considered, because it is the Opinion of this Court that there was no error in the judgment, it is ORDERED, ADJUDGED AND DECREED by the Court that the judgment be AFFIRMED, in accordance with the Opinion of this Court, and that this Decision be certified below for observance."

Appellant's Motion for Rehearing is DENIED.

**WHEREFORE,** We command you to observe the Order of our said **COURT OF CRIMINAL APPEALS** in this behalf and in all things have it duly recognized, obeyed and executed.

WITNESS, THE HONORABLE SHARON KELLER,

Presiding Judge of our said COURT OF CRIMINAL APPEALS,

with the Seal thereof annexed, at the City of Austin,

this **10ᵗʰ** day of **SEPTEMBER**, A.D. 2003.

TROY C. BENNETT, JR., Clerk

_____ Deputy Clerk
Veronica Arellano

THE STATE OF TEXAS
COUNTY OF DALLAS
I, Felicia Pitre, District Clerk of
Dallas County, Texas, do hereby certify
that the foregoing is a true and correct
copy as the same appears on record now
on file in my office.

Witness my official hand and seal of
office this _____ SEP 29 2023 _____.

FELICIA PITRE, DISTRICT CLERK
Dallas County, Texas

Deputy
Tammie DeFreeze

THE STATE OF TEXAS

VS.

JEDIDIAH ISAAC MURPHY.

IN THE 194TH JUDICIAL DISTRICT
COURT
OF
DALLAS COUNTY, TEXAS

JUDGMENT ON JURY VERDICT OF GUILTY
PUNISHMENT FIXED BY COURT OR JURY - NO PROBATION GRANTED

JUDGE PRESIDING:  HAROLD ENTZ

JULY      TERM, A.D., 2001
DATE OF JUDGMENT: 06/30/01

ATTORNEY
FOR STATE:  GREG DAVIS/MARY MILLER

ATTORNEY
FOR DEFENDANT: JANE LITTLE, MICHAEL BYCK &
JENNIFER BALIDO

OFFENSE
CONVICTED OF:      CAPITAL MURDER

DEGREE: A CAPITAL FELONY

DATE OFFENSE COMMITTED:  10/04/00

CHARGING
INSTRUMENT: INDICTMENT

PLEA: NOT GUILTY

JURY VERDICT:      GUILTY

FOREMAN: NICHOLE MARIE BRISCOE

PLEA TO ENHANCEMENT
PARAGRAPH(S):   N/A

FINDINGS ON
ENHANCEMENT: N/A

FINDINGS ON
DEADLY WEAPON,
BIAS OR PREJUDICE,
AND/OR
FAMILY VIOLENCE:

THE JURY FINDS THAT DEFENDANT HEREIN USED OR EXHIBITED
A DEADLY WEAPON DURING THE COMMISSION OF SAID
OFFENSE TO-WIT: FIREARM.

PUNISHMENT
ASSESSED BY:      JURY   —   SEE SPECIAL ISSUES ATTACHED HERETO AND
INCORPORATED BY REFERENCE.

DATE SENTENCE
IMPOSED:      06/30/01

COSTS: YES

PUNISHMENT AND   DEATH
PLACE OF
CONFINEMENT: CONFINEMENT  IN  THE INSTITUTIONAL DIVISION   DATE TO
OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE   COMMENCE:   06/30/01
AND A FINE OF - 0 -

TIME CREDITED: 101600-063001

RESTITUTION/REPARATION: NO

CONCURRENT UNLESS OTHERWISE SPECIFIED.

PA

THE STATE OF TEXAS
COUNTY OF DALLAS

I, Felicia Pitre, District Clerk of
Dallas County, Texas, do hereby certify
that the foregoing is a true and correct
copy as the same appears on record now
on file in my office.

Witness my official hand and seal of
office this _____ SEP 2 6 2025 _____

FELICIA PITRE, DISTRICT CLERK
Dallas County, Texas

Tammie DeFreeze

ON THIS DAY, SET F'' TH ABOVE, THE ABOVE STYLED 'ND NUMBERED CAUSE CAME TO TRIAL. THE STATE OF TEXA AND DEFENDANT APPEARED BY D THROUGH THE ABOVE-NAMED ATTORNEYS AND ANNOUNCED READY FOR TRIAL. DEFENDANT APPEARED IN PERSON IN OPEN COURT. WHERE DEFENDANT WAS NOT REPRESENTED BY COUNSEL, DEFENDANT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED THE RIGHT TO REPRESENTATION BY COUNSEL. WHERE SHOWN ABOVE THAT THE CHARGING INSTRUMENT WAS BY INFORMATION INSTEAD OF INDICTMENT, THE DEFENDANT DID WITH THE CONSENT AND APPROVAL OF HIS ATTORNEY WAIVE HIS RIGHT TO PROSECUTION BY INDICTMENT AND AGREE TO BE TRIED ON AN INFORMATION; ALL SUCH WAIVERS, AGREEMENTS AND CONSENTS WERE IN WRITING AND FILED IN THE PAPERS OF THIS CAUSE PRIOR TO THE DEFENDANT ENTERING HIS PLEA HEREIN. DEFENDANT IN OPEN COURT WAS DULY ARRAIGNED, AND ENTERED THE ABOVE SHOWN PLEA. WHERE SHOWN ABOVE THAT DEFENDANT ENTERED A PLEA OF GUILTY, DEFENDANT WAS ASDMONISHED BY THE COURT OF THE CONSEQUENCES OF THE SAID PLEA AND DEFENDANT PERSISTED IN ENTERING SAID PLEA, AND IT PLAINLY APPEARING TO THE COURT THAT DEFENDANT IS MENTALLY COMPETENT AND SAID PLEA IS FREE AND VOLUNTARY, THE SAID PLEA WAS ACCEPTED BY THE COURT AND IS NOW ENTERED OF RECORD AS THE PLEA HEREIN OF DEFENDANT. THERE-UPON A JURY WAS DULY SELECTED, IMPANELED AND SWORN, WHO, HAVING HEARD THE CHARGING INSTRUMENT, AS SHOWN ABOVE PRESENTED, AND DEFENDANT'S PLEA THERETO, AND HAVING HEARD THE EVIDENCE SUBMITTED, AND HAVING BEEN DULY CHARGED BY THE COURT AS TO THEIR DUTY TO DETERMINE THE GUILT OR INNOCENCE OF THE DEFENDANT AND AFTER HAVING HEARD THE ARGUMENTS OF COUNSEL, RETIRED IN CHARGE OF THE PROPER OFFICER TO CONSIDER OF THEIR VERDICT, AND AFTERWARD WERE BROUGHT INTO OPEN COURT, BY THE PROPER OFFICER, DEFENDANT AND HIS COUNSEL BEING PRESENT, AND IN DUE FORM OF LAW RETURNED INTO OPEN COURT THE ABOVE SHOWN VERDICT, WHICH WAS RECEIVED AND ACCEPTED BY THE COURT, AND IS HERE AND NOW ENTERED UPON THE MINUTES OF THE COURT.

AND WHEN SHOWN ABOVE THAT THE CHARGING INSTRUMENT CONTAINS ENHANCE-MENT PARAGRAPHS(S), WHICH WERE NOT WAIVED OR DISMISSED, THE COURT, AFTER HEARING THE DEFENDANT'S PLEA TO SAID PARAGRAPH(S) AS SET OUT ABOVE AND AFTER HEARING FURTHER EVIDENCE ON THE ISSUE OF PUNISHMENT, THE COURT, OR JURY, MAKES ITS FINDING AS SET OUT ABOVE; IF TRUE, THE COURT, OR JURY, IS OF THE OPINION AND FINDS DEFENDANT HAS BEEN HERETOFORE CONVICTED OF SAID OFFENSE(S) ALLEGED IN THE SAID ENHANCEMENT PARAGRAPH(S) AS MAY BE SHOWN ABOVE.

WHEN IT IS SHOWN ABOVE THE DEFENDANT IS GUILTY OF THE OFFENSE SET FORTH ABOVE, IT IS CONSIDERED BY THE COURT THAT SAID DEFENDANT IS ADJUDGED TO BE GUILTY OF THE OFFENSE SET FORTH ABOVE, AND THAT DEFENDANT COM-MITTED THE OFFENSE ON THE DATE SET FORTH ABOVE AS CHARGED IN THE INSTRUMENT SHOWN ABOVE, AND THAT DEFENDANT WAS PREVIOUSLY CONVICTED WHEN SHOWN ABOVE IN THE MANNER ABOVE, AND THAT SAID DEFENDANT BE PUNISHED AS HAS BEEN DETERMINED, SAID PUNISHMENT BEING ASSESSED BY THE ABOVE SHOWN ASSESSOR OF PUNISHMENT, AS ELECTED IN WRITING BY DEFENDANT, AND BE CONFINED IN THE PLACE OF CONFINEMENT SHOWN ABOVE FOR THE TERM OF TIME SET FORTH ABOVE, AND THAT THE STATE OF TEXAS DO HAVE AND RECOVER OF THE SAID DEFENDANT ALL COSTS IN THIS PROSECUTION EXPENDED INCLUDING ANY FINE SHOWN FOR WHICH LET EXECUTION ISSUE. THE COURT FURTHER MAKES ITS FINDING AS TO DEADLY WEAPON AS SET FORTH ABOVE BASED UPON THE JURY'S VERDICT OR THE FINDINGS OF THE COURT WHEN PUNISHMENT FIXED BY THE COURT. THE COURT MAKES ITS FINDINGS AS TO FAMILY VIOLENCE AND BIAS OR PREJUDICE AS SET FORTH ABOVE.

WHEN IT IS SHOWN ABOVE THAT RESTITUTION HAS BEEN ORDERED, BUT THE COURT DETERMINES THAT THE INCLUSION OF THE VICTIM'S NAME AND ADDRESS IN THE JUDGMENT IS NOT IN THE BEST INTEREST OF THE VICTIM, THE PERSON OR AGENCY WHOSE NAME AND ADDRESS IS SET OUT IN THIS JUDGMENT WILL ACCEPT AND FORWARD THE RESTITUTION PAYMENTS TO THE VICTIM.

AND WHEN IT IS SHOWN BELOW THAT PAYMENT OF THE COSTS OF LEGAL SERVICES PROVIDED TO THE DEFENDANT IN THIS CAUSE HAS BEEN ORDERED, THE COURT FINDS THAT THE DEFENDANT HAS THE FINANCIAL RESOURCES TO ENABLE THE DEFENDANT TO OFFSET SAID COSTS IN THE AMOUNT ORDERED.

THEREUPON THE SAID DEFENDANT WAS ASKED BY THE COURT WHETHER HE HAD ANYTHING TO SAY WHY SAID SENTENCE SHOULD NOT BE PRONOUNCED AGAINST HIM, AND HE ANSWERED NOTHING IN BAR THEREOF, AND IT APPEARING TO THE COURT THAT THE DEFENDANT IS MENTALLY COMPETENT AND UNDERSTANDING OF THE PROCEEDINGS.

IT IS, THEREFORE, CONSIDERED AND ORDERED BY THE COURT, IN THE PRESENCE OF DEFENDANT, AND HIS ATTORNEY, THAT SAID JUDGMENT AS SET FORTH ABOVE IS HEREBY IN ALL THINGS APPROVED AND CONFIRMED, AND THAT DEFENDANT, WHO HAS

THE STATE OF TEXAS
COUNTY OF DALLAS

I, Felicia Pitre, District Clerk of
Dallas County, Texas, do hereby certify
that the foregoing is a true and correct
copy as the same appears on record now
on file in my office.

Witness my official hand and seal of of-
fice, this _____ day of _____ 20___

FELICIA PITRE, DISTRICT CLERK
Dallas County, Texas

Deputy
Tammie DeFreeze

BEEN ADJUDGED GUILTY OF THE ABOVE NAMED OFFENSE, SHOWN APOVE, AND WHOSE PUNISHMENT HAS BEEN ASSESSED BY THE COURT OR THE JURY AS SHOWN ABOVE, THAT SAID DEFENDANT BE PUNISHED IN ACCORDANCE WITH THE PUNISHMENT SET FORTH ABOVE AND THAT DEFENDANT SHALL BE DELIVERED BY THE SHERIFF TO THE DIRECTOR OF THE INSTITUTIONAL DIVISION OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE, OR OTHER PERSON LEGALLY AUTHORIZED TO RECEIVE SUCH CONVICTS FOR THE PUNISHMENT ASSESSED HEREIN, AND SAID DEFENDANT SHALL BE CONFINED FOR THE ABOVE-NAMED TERM IN ACCORDANCE WITH THE PROVISIONS OF LAW GOVERNING SUCH PUNISHMENTS. IT IS FURTHER ORDERED THAT THE DEFENDANT PAY THE FINE, COURT COSTS, COSTS AND EXPENSES OF LEGAL SERVICES PROVIDED BY THE COURT APPOINTED ATTORNEY IN THIS CAUSE, IF ANY, AND RESTITUTION OR REPARATION, AS SET FORTH HEREIN, FOR WHICH LET EXECUTION ISSUE.

DEFENDANT IS HEREBY ORDERED REMANDED TO JAIL UNTIL SAID SHERIFF CAN OBEY THE DIRECTIONS OF THE JUDGMENT.

FOLLOWING THE DISPOSITION OF THIS CAUSE THE DEFENDANT S FINGERPRINT WAS, IN OPEN COURT, PLACED UPON A CERTIFICATE OF FINGERPRINT. SAID CERTIFICATE IS ATTACHED HERETO AND IS INCORPORATED BY REFERENCE AS A PART OF THIS JUDGMENT.

WHEN REQUIRED, A PRESENTENCE INVESTIGATION WAS CONDUCTED IN ACCORDANCE WITH THE APPLICABLE PROVISIONS OF LAW.


DEFENDANT EXCEPTS AND GIVES NOTICE OF APPEAL TO THE COURT OF APPEALS, FIFTH DISTRICT OF TEXAS AT DALLAS.

COURT COSTS IN THE AMOUNT OF $243.25

*Immediately upon release, defendant must report in person to the Felony Collections Dept., 2ⁿᵈ fl., Rm. C2-3, Crowley Courts Bldg., Dallas, TX, for payment arrangement of court ordered costs, fines and/or attorney fees.

JUDGE PRESIDING



THE STATE OF TEXAS
COUNTY OF DALLAS

I, Felicia Pitre, District Clerk of
Dallas County, Texas, do hereby certify
that the foregoing is a true and correct
copy as the same appears on record now
on file in my office.

Witness my official hand and seal of
office, this _____ SEP 2 6 2023 _____

FELICIA PITRE, DISTRICT CLERK
Dallas County, Texas

Deputy
Tammie DeFreeze

EXHIBIT 4

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE

## Correctional Institutions Division



# EXECUTION PROCEDURE

## April 2021

## *ADOPTION OF EXECUTION PROCEDURE*

In my duties as Division Director of the Correctional Institutions Division, I hereby adopt the attached Execution Procedure for use in the operation of the Texas Department of Criminal Justice Death Row housing units and perimeter functions. This Procedure complies with Texas Board of Criminal Justice Rule §152.51; §§492.013(a), 493.004, Texas Government Code; and Articles 43.14 – 43.20, Texas Code of Criminal Procedure.


Bobby Lumpkin
Director, Correctional Institutions Division

4. 21. 2021

Date

# EXECUTION PROCEDURES

I. **Notification of a Scheduled Execution Date**

A.  Pursuant to Article 43.15, Texas Code of Criminal Procedure, the clerk of the trial court shall officially notify the Correctional Institutions Division (CID) Director, who shall then notify the Death Row Unit Warden and the Huntsville Unit Warden, of an inmate's scheduled execution date. Once a scheduled execution date is received, the Death Row Unit Warden's office shall notify the unit's Chief of Classification and the Death Row Supervisor.

B.  The Death Row Supervisor shall schedule an interview with the inmate and provide the inmate with the Notification of Execution Date (Form 1). This form provides the inmate with a list of the information that shall be requested from the inmate two (2) weeks before the scheduled execution.

C.  The inmate may be moved to a designated cell. Any keep-on-person (KOP) medication shall be confiscated and administered to the inmate as needed by medical staff on the unit.

D.  Upon the inmate's receipt of the Notification of Execution Date (Form 1), the inmate shall have thirty (30) days to submit a request in writing to the Death Row Unit Warden to have a TDCJ Chaplain or the inmate's spiritual advisor present inside the execution chamber during the inmate's scheduled execution.

E.  The inmate's requested spiritual advisor must be included on the inmate's visitation list and have previously established an ongoing spiritual relationship with the inmate demonstrated by regular communications or in-person visits with the inmate before the inmate's scheduled execution date.

F.  If an inmate requests to have a spiritual advisor present inside the execution chamber during the inmate's scheduled execution, the inmate will provide the Death Row Unit Warden with contact information for the spiritual advisor. Upon receipt of the spiritual advisor's contact information, the Death Row Unit Warden shall contact the spiritual advisor.

1.  The spiritual advisor shall have fourteen (14) days from the date of contact with the Death Row Unit Warden to provide credentials to the Death Row Unit Warden verifying the individual's official status as a spiritual advisor. As required in TDCJ Chaplaincy Manual Policy 11.09, "Inmate Ministerial and Spiritual Advisor Visits," the credentials shall be at least one of the following:

a.  Minister Identification Card supplied by the authorizing denomination or religious group;

b. License or ordination certificate;

c. Official letter from an organized religious body or congregation indicating the status of the letter holder as an official representative of the religious body or congregation for all religious functions or for specific prison-related religious functions; or

d. A current listing as a clergy person in an official listing of ministers and clergy from an organized religious body.

2. The TDCJ will perform a background check, including but not limited to a criminal background check, on the spiritual advisor.

3. If the spiritual advisor is approved to be present inside the execution chamber during the inmate's scheduled execution, the spiritual advisor must satisfactorily complete a two (2) hour, in-person orientation with a staff member of the Rehabilitation Programs Division a minimum of ten (10) days before the inmate's scheduled execution date.

4. If the spiritual advisor is determined to be a security risk, the Huntsville Unit Warden or designee may deny the inmate's request for the spiritual advisor to be present inside the execution chamber during the inmate's scheduled execution.

5. The inmate or spiritual advisor may appeal the denial of the inmate's request to have the spiritual advisor present inside the execution chamber during the inmate's scheduled execution by submitting a request in writing to the CID Director. The decision of the CID Director is final.

II. **Preparation of the Execution Summary and Packet**

A. Two Weeks (14 days) Before the Scheduled Execution

1. The Death Row Unit is responsible for completion of the Execution Packet which shall include:

   a. Execution Summary;
   b. Religious Orientation Statement;
   c. Current Visitation List;
   d. Execution Watch Notification;
   e. Execution Watch Log;
   f. Inmate Request for Withdrawal (I-25);
   g. Inmate Property Documentation (PROP-05 and PROP-08); and
   h. Other documents as necessary.

2. The Execution Summary (Form 2) and the Religious Orientation Statement (Form 3) shall be forwarded to the Death Row Supervisor or the Death Row Unit Warden's designee for completion. A copy of the inmate's current visitation list and recent commissary activity shall also be provided.

3. The Death Row Supervisor shall arrange an interview with the inmate to gather the information necessary to complete the Execution Summary and Religious Orientation Statement.

4. The Execution Summary must be completed and returned by the Death Row Supervisor or the Death Row Unit Warden's designee in sufficient time to be forwarded to the CID Director's Office by noon of the fourteenth (14th) day. After approval by the CID Director, the Execution Summary shall be forwarded to the Death Row Unit Chaplain, the Huntsville Unit Warden's Office, and the Communications Department.

5. If the inmate wishes to change the names of the inmate's witnesses, and it is less than fourteen (14) days before the scheduled execution date, the inmate shall submit a request in writing to the CID Director, through the Death Row Unit Warden, who shall approve or disapprove the changes.

6. While completing the Religious Orientation Statement, staff shall confirm if the inmate still requests the presence of a TDCJ Chaplain or the inmate's approved spiritual advisor in the execution chamber during the inmate's scheduled execution.

7. An inmate may request to have the inmate's body donated to the Texas State Anatomical Board for medical education and research. The appropriate paperwork shall be supplied to the inmate upon request.

B. One Week (7 days) Before the Scheduled Execution

1. The Death Row Supervisor or the Death Row Unit Warden's designee shall notify staff (Form 4) to begin the Execution Watch Log (Form 5).

2. The Execution Watch Log shall begin at 6:00 a.m. Central Time seven (7) days before the inmate's scheduled execution. The seven (7) day timeframe shall not include the day of the inmate's scheduled execution. The inmate shall be observed, logging the inmate's activities every 30 minutes for the first six (6) days and every 15 minutes for the remaining 36 hours.

3. The Communications Department may request information from the Execution Watch Log on the day of the inmate's scheduled execution.

4. The original Execution Packet and the inmate's medical file shall be sent with the inmate in the transport vehicle to the Huntsville Unit or the Goree Unit for a female inmate.

   a. The Death Row Unit Warden shall maintain a copy of the Execution Packet on the Death Row Unit.

   b. If there are any changes necessary to the Execution Packet, staff shall notify the CID Director's Office and the Huntsville Unit Warden's Office.

C. The Day of the Scheduled Execution

   1. On the morning of the day of the scheduled execution, before final visitation, all the inmate's personal property shall be packed and inventoried. The property officer shall complete an "Inmate Property Inventory" (PROP-05) detailing each item of the inmate's property. The property officer shall also complete a "Disposition of Confiscated Inmate Property" (PROP-08) indicating the inmate's choice of disposition of personal property.

      a. If disposition is to be made from the Huntsville Unit, a copy of the property forms shall be maintained by the Death Row Unit Property Officer, and the original property forms shall be forwarded to the Huntsville Unit with the inmate's property.

      b. If disposition is to be made from the Death Row Unit, a copy of the property forms shall be placed in the Execution Packet, and the original forms shall be maintained on the Death Row Unit through the completion of the disposition process.

      c. The Mountain View Unit Warden shall ensure that a female inmate brings personal hygiene and gender-specific items to the Huntsville Unit as appropriate.

   2. Designated staff shall obtain the inmate's current trust fund balance and prepare the Inmate Request for Withdrawal (I-25) for completion by the inmate.

      a. The following statement shall be written or typed on the reverse side of the I-25 form, "In the event of my execution, please distribute the balance of my Inmate Trust Fund account as directed by this Request for Withdrawal." The inmate's name, number, signature, thumbprint, and the date and time of the inmate's signature shall be included below this statement. Two (2) employees' names and signatures shall be printed and signed below the inmate's signature

as witnesses that the inmate authorized the form.

b.    The I-25 form shall be delivered to the Commissary and Trust Fund Department for processing by 10:00 a.m. Central Time the next business day following the completed execution.

3.    The inmate shall be permitted visitation with individuals designated on the inmate's approved visitation list on the morning of the day of the scheduled execution.

a.    Exceptions may be made to schedule as many visits as possible before the inmate is transported to the Huntsville Unit. These visits are considered "Special Visits."

b.    Special visits (spiritual advisor, attorney(s), and individuals not on the inmate's approved visitation list) shall be approved by the Death Row or Goree Unit Warden or designee. No changes shall be made to the inmate's approved visitation list.

c.    No media visits shall be allowed at the Goree Unit.

4.    When appropriate, a male inmate shall be escorted to a holding cell at the Polunsky Unit. The Execution Transport Log for Male Inmates (Form 6) shall be initiated, and the inmate shall be prepared for transport to the Huntsville Unit. The Execution Watch Log shall be discontinued when the Execution Transport Log for Male Inmates is initiated.

5.    A female inmate may be transported to the Goree Unit before the day of the inmate's scheduled execution. The Execution Transport Log for Female Inmates (Form 7) shall be initiated at the Mountain View Unit. The Goree Unit staff will initiate the Execution Watch Log upon arrival at the Goree Unit, permit visitation as appropriate, and transport the female inmate to the Huntsville Unit. The Execution Watch Log shall be discontinued, and the Execution Transport Log for Female Inmates shall resume when the female inmate departs the Goree Unit.

6.    Any transportation arrangements for the inmate between units shall be known only to the Wardens involved, the CID Director, as well as those persons they designate as having a need to know. No public announcement shall be made concerning the exact time, method, or route of transfer.

7.    Upon arrival at the Huntsville Unit, the inmate shall be removed from the transport vehicle and escorted by Huntsville Unit security staff into the execution holding area. The CID Director's Office and the Communications Department shall be notified immediately after the inmate arrives at the Huntsville Unit.

8. The Execution Watch Log shall immediately resume when the inmate enters the pre-execution holding area.

9. The inmate's restraints shall be removed, and the inmate shall be fingerprinted and strip-searched.

10. The inmate shall be placed in a holding cell and issued a clean set of TDCJ clothing.

11. The Huntsville Unit Warden shall be notified after the inmate has been secured in the holding cell. The Huntsville Unit Warden or designee shall interview the inmate and review the information in the Execution Packet.

12. The inmate shall be permitted visitation with a TDCJ Chaplain(s), the inmate's approved spiritual advisor, and the inmate's attorney(s) on the day of the scheduled execution at the Huntsville Unit. The Huntsville Unit Warden must approve all visits.

13. There shall be no family or media visits allowed at the Huntsville Unit.

## III. Drug Team Qualifications and Training

A. The drug team shall have at least one medically trained individual. Each medically trained individual shall at least be certified or licensed as a certified medical assistant, phlebotomist, emergency medical technician, paramedic, or military corpsman. Each medically trained individual shall have one year of professional experience before participating as part of the drug team, shall retain current licensure, and shall fulfill continuing education requirements commensurate with licensure. Neither medically trained individuals nor any other members of the drug team shall be identified.

B. Each new member of the drug team shall receive training before participating in an execution without direct supervision. The training shall consist of following the drug team through at least two (2) executions, receiving step-by-step instruction from existing team members. The new team member will then participate in at least two (2) executions under the direct supervision of existing team members. Thereafter, the new team member may participate in executions without the direct supervision of existing team members.

C. The Huntsville Unit Warden shall review annually the training and current licensure, as appropriate, of each drug team member to ensure compliance with the required qualifications and training.

## IV.    Pre-execution Procedures

A.    The Huntsville Unit Warden's Office shall serve as the communication command post, and entry to the office area shall be restricted.

B.    Inventory and Equipment Check

    1.    Designated Huntsville Unit staff are responsible for ensuring the purchase, storage, and control of all chemicals used in lethal injection executions for the State of Texas.

    2.    The drug team shall obtain all equipment and supplies necessary to perform the lethal injection from the designated storage area.

    3.    An inventory and equipment check shall be conducted.

    4.    Expiration or beyond use dates of all applicable items are to be checked on each individual item. Outdated items shall be replaced immediately.

C.    Attorney visits shall occur between 3:00 and 4:00 p.m. Central Time, and spiritual advisor visits shall occur between 3:00 and 5:00 p.m. Central Time. The attorney and spiritual advisor may not meet with the inmate at the same time. Exceptions may be granted under unusual circumstances and must be approved by the Huntsville Unit Warden.

    1.    The inmate's attorney or the inmate's approved spiritual advisor must arrive at the Huntsville Unit no later than 2:30 p.m. Central Time on the day of the scheduled execution to participate in an attorney or spiritual advisor visit with the inmate.

    2.    The inmate's approved spiritual advisor must arrive at the Huntsville Unit no later than 5:00 p.m. Central Time on the day of the scheduled execution to accompany the inmate in the execution chamber.

    3.    The failure of an inmate's approved spiritual advisor to arrive at the Huntsville Unit before 5:00 p.m. Central Time on the day of the scheduled execution will not prevent the execution from proceeding.

D.    The inmate shall be served a last meal at approximately 5:00 p.m. Central Time.

E.    The inmate shall be afforded an opportunity to shower and shall be issued a clean set of TDCJ clothing at some time before 6:00 p.m. Central Time.

## V.    Preparations for the Lethal Injection

A.    One (1) syringe of normal saline shall be prepared by members of the drug team.

B.    The lethal injection drug shall be mixed and syringes shall be prepared by members of the drug team as follows:

Pentobarbital - 100 milliliters of solution containing 5 grams of Pentobarbital.

C.    The drug team shall have available a back-up set of the normal saline syringe and the lethal injection drug in case unforeseen events make their use necessary.

## VI.    Execution Procedures

A.    After 6:00 p.m. Central Time and after confirming with the Office of the Attorney General and the Governor's Office that no further stays of execution, if any, will be imposed and that imposition of the court's order should proceed, the CID Director or designee shall give the order to escort the inmate into the execution chamber.

B.    The inmate shall be escorted from the holding cell into the execution chamber and secured to the gurney.

C.    A medically trained individual shall insert intravenous (IV) catheters into a suitable vein of the inmate. If a suitable vein cannot be discovered in an arm, the medically trained individual shall substitute a suitable vein in another part of the body but shall not use a "cut-down" procedure to access a suitable vein. The medically trained individual shall take as much time as is needed to properly insert the IV lines. The medically trained individual shall connect an IV administration set and start a normal saline solution to flow at a slow rate through one of the lines. The second line is started as a precaution and is used only if a potential problem is identified with the primary line. The CID Director or designee, the Huntsville Unit Warden or designee, and the medically trained individual shall observe the IV lines to ensure that the rate of flow is uninterrupted.

D.    After the normal saline solution IV has been started and is running properly, the following shall occur as instructed by the Huntsville Unit Warden or designee:

1.    If requested by the inmate and previously approved by the TDCJ, a TDCJ Chaplain or the inmate's approved spiritual advisor will be escorted into the execution chamber by an agency representative to observe the inmate's execution.

2.    Witnesses to the execution shall be escorted into the appropriate witness rooms.

NOTE: Any behavior by the spiritual advisor or witnesses deemed by the CID Director or designee to be disruptive to the execution procedure shall be cause for immediate removal from the Huntsville Unit.

E.   The CID Director or designee shall give the order to commence with the execution.

F.   The Huntsville Unit Warden or designee shall allow the inmate to make a brief, last statement.

G.   The Huntsville Unit Warden or designee shall instruct the drug team to induce, by syringe, substances necessary to cause death.

H.   The flow of normal saline solution through the IV shall be discontinued, and the lethal dose of Pentobarbital shall be commenced.

I.   When the entire contents of the syringe have been injected, the line shall be flushed with an injection of normal saline solution.

J.   The CID Director or designee and the Huntsville Unit Warden or designee shall observe the appearance of the inmate during application of the Pentobarbital. If, after a sufficient time for death to have occurred, the inmate exhibits visible signs of life, the CID Director or designee shall instruct the drug team to administer an additional 5 grams of Pentobarbital followed with a normal saline solution flush.

K.   At the completion of the process and after a sufficient time for death to have occurred, the Huntsville Unit Warden or designee shall direct the physician to enter the execution chamber to examine the inmate, pronounce the inmate death, and designate the official time of death. After the inmate is pronounced deceased, the spiritual advisor will be escorted from the execution chamber, and the witnesses shall be escorted from the witness rooms.

L.   The inmate's body shall be immediately removed from the execution chamber and transported by a coordinating funeral home. Arrangements for the inmate's body shall be concluded before the execution.

VII.   **Stays of Execution**

A.   Official notification of a stay of execution shall be delivered to the CID Director, the Death Row Unit Warden, and the Huntsville Unit Warden. **Staff must not accept a stay of execution from the inmate's attorney**. After the official stay of execution is received, the Death Row Unit Warden's office shall notify the unit's Chief of Classification and Death Row Supervisor.

B.   Designated staff on the Death Row Unit shall notify the inmate that a stay of execution has been received.

**VIII.**     **Confidentiality of Participants**

A.     Participants in the execution process shall not be identified, nor shall their names be released to the public.

B.     Before participating in a scheduled execution, the inmate's approved spiritual advisor must sign a nondisclosure agreement and agree to keep confidential all information, including but not limited to the identities of TDCJ employees, members of the drug team, and any other participant in the execution, obtained or learned by the inmate's approved spiritual advisor when participating in the inmate's scheduled execution.

C.     Violation of the nondisclosure agreement may subject the inmate's approved spiritual advisor to civil or criminal penalties under state law.

**IX.**     **TDCJ Employee Orientation**

A.     TDCJ employees shall receive an orientation with the Huntsville, Goree, Polunsky, or Mountain View Unit Wardens, who shall inform the employees of TDCJ Executive Directive 06.63, "Crisis Response Intervention Support Program," (CRISP).

B.     TDCJ employees shall be encouraged to contact the Regional CRISP Team Leader following their initial participation in the execution process.

EXHIBIT 5



| Location:<br>**Walls Unit TDCJ**<br>**815 12th ST**<br>**Huntsville TX 77340**<br><br>Lat/Long:<br>**N 30° 43' 22"**<br>**W 95° 32' 47.78"**<br><br>Zone:<br>**City Limits - City Limits**<br>Location Type: **1 - Street address** | Incident Type:<br>**111 - Building fire**<br><br>FDID: **XB601**<br>Incident #: **2023-1274**<br>Exposure ID: **75263854**<br>Exposure #: **0**<br>Incident Date: **08/25/2023** |
| --- | --- |

**Huntsville Fire Department**
Station: **S62**
Shifts Or Platoon: **D Shift**

| Report Completed by: | Kolaja , Jon Brandon | **ID:** 607 | **Date:** 08/25/2023 | |
| --- | --- | --- | --- | --- |
| Report Reviewed by: | **Not Reviewed** | | | |
| Report Printed by: | Winningham, Adam L | **ID:** 604 | **Date:** 9/14/2023 | **Time:** 13:49 |

| Structure Type: **Enclosed building** | Property Use: **361 - Jail, prison (not juvenile)** |
| --- | --- |

| Automatic Extinguishment System Present: ☐ | Detectors Present: ☐ | Cause of Ignition: **Failure of equipment or heat source** |
| --- | --- | --- |

| Aid Given or Received: **Mutual aid received** | Primary action taken: **10 - Fire control or extinguishment, other** |
| --- | --- |

Additional actions: **12 - Salvage & overhaul , 50 - Fires, rescues & hazardous conditions, other**

| **Losses** | | **Pre-Incident Values** | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Property: | **$5,000,000.00** | Property: | **$5,000,000.00** | Civilian Injuries: | **0** | Fire Service Injuries: | **0** |
| Contents: | **$100,000.00** | Contents: | **$200,000.00** | Civilian Fatalities: | **0** | Fire Service Fatalities: | **0** |
| Total: | **$5,100,000.00** | Total: | **$5,200,000.00** | Total Casualties: | **0** | Total Fire Service Casualties: | **0** |

| Total # of apparatus on call: | **7** | Total # of personnel on call: | **18** |
| --- | --- | --- | --- |

**Neighboring Agencies**

**Agency Name:** Crabbs Prairie VFD - XB305
**Agency ID:** XB305
**Agency Type:** Fire

**Agency Name:** Huntsville Police Department
**Agency ID:**
**Agency Type:** Law

**Agency Name:** Huntsville-Walker County EMS
**Agency ID:**
**Agency Type:** EMS Mutual Aid

**Agency Name:** New Waverly Fire Department - XB302
**Agency ID:** XB302
**Agency Type:** Fire

**Agency Name:** Other Fire
**Agency ID:**
**Agency Type:** Fire

**Agency Name:** Other Law
**Agency ID:**
**Agency Type:** Law

## NARRATIVE (1)

**Narrative Title:** Initial

**Narrative Author:** Kolaja, Jon

**Narrative Date:** 08/28/2023 11:50:05

**Narrative Apparatus ID:** E620

**Narrative:**

E 620 dispatched to commercial fire at the Walls Unit. Upon arrival, heavy smoke was outside as E 620 approached the building. This was around 2:30 am and still being dark, we were unable to see where the smoke was coming from. The crew made it in to front door and was met by on site personnel who advised the fire was on the roof. There was very faint smoke on bottom 2 stories, as we were led through the gates and cellblocks to the third story to make access through a roof scuttle hole. (Later in the fire, the location of this access hole was clear. It was an opening in the floor of the west end tower (equipment room). This room was full of hvac equipment.) Upon reaching the location of the roof access, smoke was more noticeable. Cpt. Kolaja climbed the wall mounted ladder to open the door and was immediately hit with heavy smoke. He made a quick look with tic and saw heavy fire behind him. All E 620 crew was told to evacuate the building. The door was closed back and the crew exited the building. TDCJ personnel advised the unit was evacuated.

E 620 crew then went to assist E 617 whom arrived on location to
set up water supply at nearby hydrant. L 624 was enroute upon their arrival a
5" line was on the ground to supply the aerial monitor. L 624 raised the
ladder and began aerial operations. 602 arrived on location and took command.
Multiple other agencies were requested and arrived on scene to include New
Waverly, Montgomery County, Walker County Emergency Management.

E 620 was moved to the rec area in the back. There was fire seen
on the cellblock roof between the clock and west end towers. Cpt. Kolaja was
approached by one of the officers about trying to check on the pharmacy in the
admin area. He asked to use a scba and Cpt. Kolaja went with him, as they approached
the 3rd floor, the area was about to be overtaken by fire, that was almost
completely burned through the door. They quickly evacuated back to the rec area
due to unsafe conditions.

E620 crew then met New Waverly crews inside and tried to make
access to the area of the fire in the attic. We were being told to access from
the 3rd story of the clock tower. Due to building construction and heavy fire,
crews had difficult time making access. This was a prison unit with multiple
keys needed for access and control to each area. After L624 and L614 flowed
water for some time there was some control of the fire. Crews were then able to
make access through the roof and from interior areas. Out of town units were
released, all other units continued to overhaul until fire was completely
extinguished. Major overhaul areas included the 3rd story admin area in the
clock tower, and the top of the west end tower.

## NARRATIVE (2)

**Narrative Title:** n/a

**Narrative Author:** Winningham, Adam

**Narrative Date:** 08/30/2023 13:33:39

**Narrative Apparatus ID:** L624

**Narrative:**

604 responded from his residence to station #2 to retrieve L624, upon the request of 602. At station #2, 604 was met by Will Wheeler, who drove 604 and L624 to the Walls unit. Upon arrival, L624 was directed by 602 to 12th St. We parked just west of the administration building. Wheeler assisted in getting the ladder truck set up and establishing a water supply. 604 went in the platform of the ladder to direct the water stream. Once the platform was in the air, a large amount of fire was noted in the center between the admin building and the West ventilation room (west building) of the cell block. The fire was viewed to have been advancing both toward the admin building and the west building. Water was sprayed along the block, attempting to extinguish the flames. The water was partially successful in limiting the spread, however, the Spanish roofing tiles limited the water to reach all the fire. Also, the distance from the ladder tip to the admin building was farther than an effective water stream from the ladder truck. The ladder flowed water for nearly 4 -5 hours at the rate of approximately 1,500 gallons per minute. The fire is viewed to have a minor extension into the admin building and a moderate extension in the west ventilation room. The ladder truck remained in place throughout the morning. Once all visible fire was extinguished water flow was stopped and the truck remained in place to provide an overwatch.

## APPARATUS

| Unit | E620 | Unit | B623 |
|---|---|---|---|
| Type: | Engine | Type: | Brush truck |
| Use: | Suppression | Use: | Suppression |
| Response Mode: | Lights and Sirens | Response Mode: | Lights and Sirens |
| # of People | 3 | # of People | 2 |
| Alarm | 08 /25/2023 02:29:00 | Alarm | 08 /25/2023 02:29:00 |
| Dispatched | 08 /25/2023 02:29:00 | Dispatched | 08 /25/2023 02:29:00 |
| Enroute | 08 /25/2023 02:31:00 | Enroute | 08 /25/2023 02:31:00 |
| Arrived | 08 /25/2023 02:37:00 | Arrived | 08 /25/2023 02:37:00 |
| Cancelled | -- / -- / -- -- : -- : -- | Cancelled | -- / -- / -- -- : -- : -- |
| Cleared Scene | 08 /25/2023 11:34:00 | Cleared Scene | 08 /25/2023 11:34:00 |
| In Quarters | -- / -- / -- -- : -- : -- | In Quarters | -- / -- / -- -- : -- : -- |
| In Service | 08 /25/2023 12:30:00 | In Service | 08 /25/2023 12:30:00 |
| Unit | E617 | Unit | L624 |
| Type: | Engine | Type: | Truck or aerial |
| Use: | Suppression | Use: | Suppression |
| Response Mode: | Lights and Sirens | Response Mode: | Lights and Sirens |
| # of People | 1 | # of People | 2 |
| Alarm | 08 /25/2023 02:29:00 | Alarm | 08 /25/2023 02:29:00 |
| Dispatched | 08 /25/2023 02:29:00 | Dispatched | 08 /25/2023 02:29:00 |
| Enroute | 08 /25/2023 02:41:00 | Enroute | 08 /25/2023 02:44:00 |
| Arrived | 08 /25/2023 02:48:00 | Arrived | 08 /25/2023 02:53:00 |
| Cancelled | -- / -- / -- -- : -- : -- | Cancelled | -- / -- / -- -- : -- : -- |
| Cleared Scene | 08 /25/2023 11:34:00 | Cleared Scene | 08 /25/2023 11:34:00 |
| In Quarters | -- / -- / -- -- : -- : -- | In Quarters | -- / -- / -- -- : -- : -- |
| In Service | 08 /25/2023 12:30:00 | In Service | 08 /25/2023 12:30:00 |
| Unit | L614 | Unit | T629 |
| Type: | Quint | Type: | Tanker & pumper combination |
| Use: | Suppression | Use: | Suppression |
| Response Mode: | Lights and Sirens | Response Mode: | Lights and Sirens |
| # of People | 1 | # of People | 2 |
| Alarm | 08 /25/2023 02:29:00 | Alarm | 08 /25/2023 02:29:00 |
| Dispatched | 08 /25/2023 02:29:00 | Dispatched | 08 /25/2023 02:29:00 |
| Enroute | 08 /25/2023 02:48:00 | Enroute | 08 /25/2023 02:41:00 |
| Arrived | 08 /25/2023 03:03:00 | Arrived | 08 /25/2023 02:48:00 |
| Cancelled | -- / -- / -- -- : -- : -- | Cancelled | -- / -- / -- -- : -- : -- |
| Cleared Scene | 08 /25/2023 11:34:00 | Cleared Scene | 08 /25/2023 11:34:00 |
| In Quarters | -- / -- / -- -- : -- : -- | In Quarters | -- / -- / -- -- : -- : -- |
| In Service | 08 /25/2023 12:30:00 | In Service | 08 /25/2023 12:00:00 |
| Unit | E613 | | |
| Type: | Engine | | |
| Use: | Suppression | | |
| Response Mode: | Lights and Sirens | | |
| # of People | 4 | | |
| Alarm | 08 /25/2023 02:29:00 | | |
| Dispatched | 08 /25/2023 02:29:00 | | |
| Enroute | 08 /25/2023 02:41:00 | | |
| Arrived | 08 /25/2023 02:48:00 | | |
| Cancelled | -- / -- / -- -- : -- : -- | | |
| Cleared Scene | 08 /25/2023 11:34:00 | | |
| In Quarters | -- / -- / -- -- : -- : -- | | |
| In Service | 08 /25/2023 12:00:00 | | |

**Number Of People not on apparatus: 3**

## FIRE

| | | | |
|---|---|---|---|
| Acres Burned | None or Less Than One | Acres Burn From Wildland Form | False |
| Area Of Fire Origin | Undetermined | Heat Source | Undetermined |
| Item First Ignited | Undetermined | Fire Is Confined To Object Of Origin | |
| Type Of Material | Undetermined | Cause Of Ignition | Failure of equipment or heat source |
| Factor Contributing To Ignition | Fire spread or control, other | | |
| Human Factors Contributing | None | | |
| Suppression Factors | Building construction or design, other , Roof collapse , Egress/exit problem, other | | |

**STRUCTURE FIRE**

| | | | |
|---|---|---|---|
| **Structure Type** | Enclosed building | **Building Status** | In normal use |
| **# Of Stories At Above Grade** | 4 | **# Of Stories Below Grade** | 0 |
| **Square Feet** | 1000000 | **Length** | |
| **Width** | | **Floor Of Origin** | 3 |
| **Fire Spread** | Beyond building of origin | | |
| **Minor Damage** | 0 | **Significant Damage** | 0 |
| **Heavy Damage** | 0 | **Extreme Damage** | 0 |

**CUSTOM FIELDS FORM**

| | |
|---|---|
| **Was this a Main Alarm** | Yes |

EXHIBIT 6

# EXPERT DECLARATION OF DR. MICHAELA ALMGREN

## I.    Background and Qualifications

1.    My name is Michaela Almgren, Pharm.D., M.S. I am over the age of eighteen and competent to testify to the truth of the matters contained herein. The factual statements I make here are true and correct to the best of my knowledge. I hold the opinions expressed in this declaration to reasonable degree of scientific certainty.

2.    I am a Clinical Associate Professor in the Department of Clinical Pharmacy and Outcomes Sciences at the University of South Carolina College of Pharmacy. I teach principles of sterile compounding per United States Pharmacopeia ("USP") Chapters 797 and 800, aseptic technique in drug compounding[1] and pharmacy regulations applicable in a compounding environment run under Section 503B of the Drug Quality and Security Act of 2013, as well as pharmacokinetics and biopharmaceutics courses. I specialize in sterile compounding, medication safety, and pharmacy laws and regulations that relate to pharmacy compounding practices. I also provide continuing education courses for pharmacists in those topics. I received my Doctor of Pharmacy degree from the University of South Carolina College of Pharmacy in 2010. Additionally, I have a Master's Degree in Pharmaceutical Chemistry from the University of Florida.

3.    In conjunction with my academic appointment, I currently maintain a practice site at a 503B[2] outsourcing pharmacy where I perform duties of outsourcing pharmacist, clinical advisor, and pharmacy student preceptor. Previously, I worked in

---

[1] Aseptic technique in drug compounding refers to specific practices to avoid physical and microbial contamination when preparing sterile medications that are to be used for parenteral applications, such as IV infusion, injection, etc.

[2] 503B Outsourcing Pharmacy is a compounding pharmacy that produces large batches of sterile products and distributes them directly to health systems pharmacies to address drug shortages, as specified in Section 503B of the FD&C Act.

pharmacy operations in a local large teaching hospital as a pharmacist. I have almost 15 years of experience in sterile compounding and aseptic technique. Prior to joining the faculty at the University of South Carolina, I worked for several years in pharmaceutical manufacturing where I was involved in drug formulation, quality assurance, quality control and analytical method development. A copy of my CV is attached as Exhibit A.

## II. Referral Questions.

4. I have been asked by the Federal Community Defender Office for the Eastern District of Pennsylvania ("FCDO"), who represent death-sentenced prisoners in the State of Texas, to submit an expert medical and scientific opinion, based on the information and documentation provided to me, about whether Texas is properly extending the Beyond Use Dates ("BUDs") on their lethal injection drugs, or if the drugs are in fact expired. The FCDO further asked me to opine on whether there is a risk of harm that can be caused by administration of compounded pentobarbital past its BUD.

## III. Materials Relied Upon.

5. I have reviewed the following documents: Texas Department of Criminal Justice ("TDCJ") Execution Procedure (version published April 2021); order and purchase forms, including DEA Forms 222; and analytical and inventory records reflecting TDCJ's Pentobarbital ordering and storage from December 2018 to November 2022. I have also reviewed an email that TDCJ sent to the FDCO on November 29th, 2022, containing information about the BUDs of pentobarbital currently in the possession of TDCJ.

## IV. Background Information.

6. When drugs are commercially manufactured, they undergo extensive quality control testing which assures that they maintain their quality, such as potency and

purity, up to their expiration date. Stability studies are performed to determine if there are any concerns with drug deterioration. Expiration dates are determined using these carefully designed stability studies.

7.      Commercially manufactured medications are tested for important quality attributes such as assay, potency, impurities, content uniformity, and other characteristics that are product specific and typically defined for each product in the USP Compendium Monograph for each individual drug. The medications are tested multiple times during the manufacturing process and again when completed and prior to release for sale and distribution using methodologies that are validated according to the USP Compendium Monograph. The manufacturers collect stability data showing that the medications do not degrade before their expiration date. The medication's storage container and the container's closure also undergo extensive integrity testing. Additionally, if these medications are sterile, each batch must undergo extensive sterility testing.

8.      When medications are compounded, Active Pharmaceutical Ingredients ("APIs")[3] may be used to prepare them. The compounding is usually done in a pharmacy that specializes in sterile compounding, as specific equipment and personnel training are necessary to prepare the sterile products correctly.

9.      Sterile compounding can be performed in a Biological Safety Cabinet or Laminar Airflow Hood and it must follow the strict guidelines of USP Chapter <797>. USP Chapter <797> describes best practices to follow in order to prepare the product aseptically and to keep it sterile, how to sterilize it, how to maintain the compounding environment free

---

[3] Active Pharmaceutical Ingredient is typically concentrated drug active ingredients in powder form.

from contamination, how to perform training assessments for the personnel handling the medication preparation, how to determine BUDs of sterile compounded products, etc.

10.     BUD refers to Beyond Use Date, or expiry of the compounded product. Because compounded products do not undergo the same extensive quality testing as commercially available products, their expiry or BUD is significantly shorter.   While commercially produced medications may have expiry dates measured in months and years, compounded products typically have BUDs specified in days, or even just hours. The APIs used are typically not sterile and the product has to be sterilized at the final stage of compounding. It is important to use APIs from sources that guarantee high quality and offer USP or pharmaceutical grade APIs, as those are most likely to meet all USP quality standards.

11.     USP is a compendium of quality requirements, quality specifications, practices, and guidelines to achieve the highest pharmaceutical quality for pharmacy practice as well as to set the standards for the pharmaceutical industry. Chapters 1 through 999 are enforceable by the Food and Drug Administration. Individual states' Boards of Pharmacy may also enforce USP.  Texas State Board of Pharmacy has codified language from USP Chapter <797> into its regulations regarding compounded sterile products.  A compounding pharmacist should be very familiar with USP Chapter <797> guidelines in order to prepare safe and effective sterile compounded products.  If USP Chapter <797> guidance is not followed, it can lead to medication contamination which will cause patient harm and unpredictable drug actions.

## V.  The pentobarbital in TDCJ's possession is expired.

12.     It is my understanding that TDCJ intends to execute prisoners by an intravenous ("IV") injection of compounded pentobarbital prepared by an undisclosed compounding pharmacy.

13.     According to USP Chapter <797>, sterile medications that are prepared from initially non-sterile components, such as APIs, or using a methodology that potentially causes the preparation to lose sterility, are considered high-risk sterile compounds. The preparation then must be terminally sterilized if it is to be used for parenteral application such as IV bolus injection, or IV infusion.

14.     Based on the records I reviewed, it appears that TDCJ is using compounded pentobarbital. Pursuant to USP Chapter<797>, once prepared, this is considered a high-risk sterile compound. All the pentobarbital in TDCJ's possession has already been prepared—meaning that the active ingredient has been compounded and put into a solution for IV injection. If that is the case, all the pentobarbital in TDCJ's possession is expired, as it is far beyond the USP specified BUD.

15.     A BUD is defined in USP Chapter <797> as "the date or time after which a compounded sterile product (CSP) shall not be stored or transported." The BUD is determined from the date and time the preparation was compounded. A compounded product's BUD shall be determined as outlined in current USP Chapter <797>, Pharmaceutical Compounding—Sterile Preparations, of the USP/NF 2022 Issue 3. The maximum BUD for high-risk compounded sterile preparations such as the compounded pentobarbital in TDCJ's possession are:

- 24 hours, if stored at room temperature between 20° and 25°C;

- 72 hours, if kept refrigerated at temperature range between 2° and 8°C, or

- 45 days, if kept in a solid, frozen state at temperature range -25° and -10°C.

16.  TDCJ receives pentobarbital in two different vials sizes – 50ml and 100ml final volume. It appears that the solution in the vials are of the same concentration – 50mg/ml – regardless of the vial size.  Therefore, if prepared as specified, each 50ml vial should contain 2.5 grams of pentobarbital and each 100ml vial should contain 5 grams of pentobarbital.

17.  Based on my review of the Huntsville Unit Storage Inventory logs, it appears that TDCJ most recently received 50ml vials of pentobarbital injection solution on March 18, 2021.  Those 50ml vials are now (at the time of writing this report, December 2022) more than 630 days old, well over the BUD limit of 24 hours when stored at room temperature as specified in USP Chapter <797> (or 45 days if kept frozen). However, based on the email TDCJ sent on November 29, 2022, those 50ml vials (2.5grams of pentobarbital) have a newly assigned BUD of September 27, 2023.

18.  Also, based on my review of the Huntsville Unit Storage Inventory logs, it appears that TDCJ most recently received 100ml vials of pentobarbital injection solution on April 29, 2019.  Those 100ml vials are now more than 1,300 days old, well over the BUD limit of 24 hours as specified in USP Chapter <797> (or 45 days if kept frozen). And again, according to the TDCJ email, these 100ml vials (5 grams of pentobarbital) now have a BUD of November 1, 2023. Based on the records I reviewed, the BUDs were extended in contravention of USP.

19.     Other preparations in TDCJ's possession may be even older, as the records do not show specific lot numbers, so there is a possibility that some vials in stock could be from previous shipments.

20.     A drug that has surpassed its BUD is at risk of stability and sterility failings and may not retain sufficient potency, thus it must not be used. Pharmacological activity of expired medications is unpredictable, but in general the effectiveness will decrease over time. The risk of degradation is even greater if the drug storage conditions are not optimal, as specified in the USP. Some of the drug degradants may have their own pharmacological activity, often times completely different from the original drug action. There is vast evidence in literature pointing to the fact that expired medications should not be used in human patients due to unpredictability of the action, and potential harm, including nausea, vomiting, acute renal failure, and other severe side effects. The FDA also strongly advises against the use of all expired medication. For injectable medications this is even a greater concern, as the pharmacological activity of the drug may decrease significantly when in solution.

## VI.     TDCJ improperly extended the expiration date (BUD) of its pentobarbital. The "potency" test results TDCJ obtained cannot be used to extend expiry. The true potency of the drug is not known and needs to be determined.

21.     I have reviewed a set of documents labeled "Laboratory Report" which appear to show that potency testing of the pentobarbital injection was performed in attempt to extend the BUD or drug expiry. However, this approach to extending BUD is completely unscientific and incorrect, and therefore the results are invalid. A stability study should be performed to establish an extended BUD using completely different methodology. It appears that TDCJ's pentobarbital was tested for potency using the High-Performance

Liquid Chromatography ("HPLC") assay method specified and validated in the USP monograph for pentobarbital injection. This HPLC method is a quantitative test commonly used to determine the amount of the drug in a sample which is freshly prepared/compounded, when there are no concerns about potential degradation. However, this method is not intended to determine stability of pentobarbital, and it may not detect if the drug has deteriorated over time as it is not sufficiently sensitive to detect degradation.

22. The purpose of an assay or potency method listed in the USP Monograph is to verify that the prepared drug contains the correct amount of API, as stated on the drug label, for example 50 milligrams per milliliter. It is appropriate to use this method for quality control purposes, for manufacturing release and product approval when the drug is freshly compounded or manufactured, but not to extend the expiry of the drug. A stability indicating HPLC method needs to be used to determine whether there is any degradation of the drug.

23. The HPLC Assay test method used by the laboratory is not validated for use as a stability-indicating assay. A stability-indicating assay is an analytical method that is capable of separating the API drug peak from degradation residues, which are impurities that form over time. This method is necessary to determine the extent of degradation that happens over time and will show the true potency of the drug. An assay used to release freshly prepared medications does not test for degradation, as there should not be any, thus this type of method is not designed to be sensitive enough to detect any degradants potentially present.

24. Degradation products of the drug can be structurally similar to the drug (API) itself, but their pharmacological action may be completely different. Additionally, the presence of degradants will likely lower the potency of the compounded drug tested (because

some of the drug has degraded), and may change solubility, pH and other parameters of the solution which may also impact the pharmacology and pharmacodynamics of the drug product itself. A change in pH can lead to formation of precipitants and isomers, decrease in drug solubility and other potential changes in the drug's actions.

25.    Here is an example of a chromatogram of **non-stability-indicating HPLC** assay method that evaluates the potency of a single API only:

**Chromatography Example 1:[4]**



The potency of the drug is calculated based on the area of the peak shown in the chromatography (labeled as Analyte). Due to lower sensitivity of the method only one peak is visible, although other impurities may be present.

26.    Here is an example of a chromatogram of the **same drug using stability-indicating method** that shows the presence of degradant in addition to the API (Analyte):

---

[4] Reference: USP Compounding Expert Committee: Loyd V Allen Jr, PhD, Gus S Bassani, PharmD, Edmund J Elder Jr, PhD, Alan F Parr, PharmD. Strength and Stability Testing for Compounded Preparations.

**Chromatography Example 2:[5]**



Because the stability-indicating study separated the API peak (labeled Analyte) from the Degradant, the area of the Analyte peak will be smaller and thus the calculated true potency of the drug will be different (lower) in Chromatography Example 2 than the assay result obtained using the less sensitive HPLC assay method in Chromatography Example 1. In other words, the HPLC assay method with lower sensitivity overstates the amount of API present when the sample has degraded over time.

27.     Pentobarbital is known to have degradants that form over time.   The pentobarbital molecule breaks down into a number of different substances. Pentobarbital's three most commonly identified degradants are:     N-(Aminocarbony])-2-ethyl-3-methylhexanamide,     2-Ethyl-2-(1-methylbutyl)propanediamide     and     2-Allyl-2-(1-methylbutyl)propanediamide.  Pharmacology of these structures is poorly understood, but it

---

[5] *Id.*

is clear from their chemical structures alone that they do not produce the same pharmacologic effect as pentobarbital. Included below is the chromatography showing stability-indicating assay for pentobarbital:[6]



**Figure 3—Chromatogram of a synthetic mixture of pentobarbital and its degradation products. Compound 2a is N-(aminocarbonyl)-2-carboxy-2-ethyl-3-methylhexanamide; 3a is 2-ethyl-2-(1-methylbutyl)propanediamide; 4a is N-(aminocarbonyl)-2-ethyl-3-methylhexanamide.**

25.     Strength and assay testing is designed to determine how much API is in the product, while stability testing is required to extend BUD and to determine the true expiry of the product. The assay test used to assess TDCJ's pentobarbital is unable to detect if degradation of the API has occurred.

26.     A stability study is required to properly extend the BUD. Stability studies are used to determine if there are any concerns with drug deterioration over time and are used to establish extended expiry for compounded drugs, beyond the BUD as established in

---

[6] Reif VD, Kaufmann KL, DeAngelis NJ, Frankhouser MC. Liquid chromatographic assays for barbiturate injections. J Pharm Sci. 1986 Jul;75(7):714-6.

the USP Chapter <797>. Stability studies must be performed to determine if expiry of the drug can be extended beyond the BUD limits specified in USP Chapter <797>. Without performing the adequate stability studies, it is unknown if the compounded drug will perform pharmacologically as expected once it is past its assigned BUD.

27.     Stability study requirements are listed and explained in FDA guidance documents and mentioned in USP Chapter <797>. Under the proper FDA protocol, the drug substances are stored in their final containers inside of stability chambers with specified storage conditions (for example 25 degrees C with 60% relative humidity, or 40 degrees C with 75% relative humidity for accelerated studies). Regular testing according to USP specified parameters, which will also include the stability-indicating assay, must be performed to determine if any significant changes in drug quality had occurred. If such changes occur, it signals that the drug is expired, and its pharmacological action cannot be guaranteed. These studies are typically done using multiple samples from multiple batches to assure reproducibility. A stability study determines a proper expiration period. It is completely wrong to test the medication and to predict what the expiry is based on the current data without any stability study results. Additionally, each strength, formulation, and type of container used to store the drug needs to have a separate stability study performed to extend the BUD correctly.

28.     TDCJ tests a single vial of pentobarbital for potency and then assumes that the results of that test apply to every vial from a particular batch. Such an assumption is faulty. Even if potency testing were a sufficient basis to extend BUD, which it is not, extending the BUD for all vials based on the test results of a single vial is unscientific and further violates USP requirements.

29.     TDCJ also appears to test a single vial of pentobarbital from a 50ml batch and then assume that the results of that test apply to every vial from a different 100ml batch. Such an assumption is also faulty. Extending the BUD for 100ml vials based on testing results from a single 50ml vial of an unrelated batch is likewise unscientific and further violates USP requirements.

30.     The process of compounding pentobarbital is rather complex because this drug is not water soluble. Additional ingredients with poor stability profiles such as propylene glycol and alcohol are utilized, and sodium hydroxide and hydrochloric acid are used to adjust pH. The presence of these additional ingredients is a concern as they effect the stability of the solution, play a role in the rate of the API degradation, and thus impact the BUD.

## VII.    Not all quality testing as specified by USP Monograph for Pentobarbital Injection was performed.

31.     The USP Monograph, which lists quality attributes for pentobarbital injection, specifies that pH should be tested and be in the range between 9.0 and 10.5. However, none of the analytical reports contain this information. This test result is also important, as the pH can shift over time and impact stability and BUD of the product, as well as solubility of the API. The changes in pH can lead to formation of precipitant. Also, exposure of pentobarbital to pH outside of the acceptable range can lead to quicker breakdown of the pentobarbital molecule itself, producing further degradation, leading to decrease in potency. Additionally, based on the records I reviewed, it does not appear that visual inspection as per USP Chapter <790> has been performed, thus it is not certain that the drug is free and clear of particulate matter.

**VIII. Sterility testing was performed using incorrect methodology and the sterility results are therefore unreliable.**

32.     According to the analytical reports I reviewed, ScanRDI technology was used to determine if TDCJ's pentobarbital is contaminated by microorganisms and thus not sterile. But this method for sterility testing is not acceptable by USP as USP <71> is the correct method to be used for sterility testing. Rapid sterility test methods, such as ScanRDI, may not detect all microorganisms that a traditional USP <71> sterility test method would detect. Bacterial contamination of sterile preparations to be used in parenteral applications is an unacceptable practice that can lead to severe harm.

**IX. Questionable recordkeeping and concerning pattern of samples shipping and returning into the stock inventory.**

33.     The Huntsville Unit Storage logs raise serious concerns about TDCJ's inventory practices. From the records it appears that the drug vials are occasionally removed from the inventory, shipped out for testing, and then the samples are shipped back from the laboratory and returned to TDCJ's inventory.

34.     For example, it appears that a sample (a 100ml vial) was removed from TDCJ's inventory and shipped back to the supplier on September 8, 2020. A lab report indicates that testing was performed on this sample between September 18, 2020, and September 24, 2020. On January 21, 2021, a "Return" is noted in the records showing that a 100ml vial was returned back to the stock. It is not certain where the vial came from and there is a possibility that the vial was used for testing and the remainder of the drug was placed back into the inventory. This practice is completely unacceptable. Once a drug vial is opened to get a sufficient amount of the liquid out for testing, it is considered adulterated and misbranded, as defined in the FD&C Act. When a sterile container is opened in the

laboratory to perform any kind of test, the reminder of the vial must be wasted, as there is a potential for chemical and microbial contamination, decrease in total volume leading to an incomplete dose, and potential for tampering with the drug.

35.    A similar situation occurred on November 2, 2020, when a 50ml vial was returned to supplier, followed by the removal of seven additional 50ml vials from the stock. It is not clear why these vials were removed, leaving just one 50ml vial in the inventory. On February 23, 2021, one 50ml vial was received from the supplier and entered onto the inventory.

36.    There is also a question about the BUD and how the expired drugs are removed from the inventory. For example, a single 100ml vial was removed from the inventory on May 6, 2020, and labeled as "expired," but the rest of the 100ml vials were kept in stock. If these vials were all made on the same date, they all should be expired and removed at the same time.

37.    The recordkeeping of the pentobarbital inventory lacks fundamental information such as expiry, lot numbers for traceability, explanations for removal and replacement of each vial, and an accounting of who handled the drug vials, in addition to the storage conditions monitoring, which should also be performed on a regular basis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 12th day of December 2022.

Michaela M. Almgren, PharmD, MS

# EXHIBIT A

# Michaela M. Almgren, PharmD, MS

161 Wilmont Drive
Lexington, SC 29072
almgren@cop.sc.edu
(803) 622-5231

## EDUCATION

**Doctor of Pharmacy, 2010** *Magna Cum Laude*
South Carolina College of Pharmacy, University of South Carolina, Columbia, SC

**Master of Science in Pharmacy, 2010** *Magna Cum Laude*
**Pharmaceutical Chemistry (Industrial Pharmacy focus)**
University of Florida, Gainesville, FL

**Bachelor of Science, 1997** *Magna Cum Laude, Graduated with Honors*
**Major: Biology, Chemistry**
Columbia College of South Carolina, Columbia, SC

## EMPLOYMENT HISTORY AND EXPERIENCE
**Clinical Associate Professor**
**University of South Carolina, College of Pharmacy, Columbia, SC**
**August 2013 – present**

- Teach pharmacokinetics and biopharmaceutics lectures.
- Teach pharmacy law and ethics lectures and moderate in-class discussions, including ethics debates .
- Lectures at USC School of Medicine on natural medicine, pain management pharmacology, opioid and non-opioid as well as multimodal analgesia.
- Teach in USC School of Medicine PA program lectures on women's health.
- As a former Institutional Lab Course coordinator taught basic and advanced institutional pharmacy practice focused laboratory courses with focus on sterile compounding and aseptic technique to students in the second year of pharmacy education. Typical class size is 110 students.
- Developed, completely designed and implemented training course content for basic sterile compounding training with focus on USP chapters 797 and 800, and introduction to current institutional pharmacy practice.
- Developed and implemented 6-hour module for student training in 503A versus 503B environment regulations to emphasize critical differences in cGMP (per 21 CFR 210 and 211) versus USP standard requirements.
- Implemented practical assessment criteria for student competency of performing basic sterile compounding procedures according to USP 797 and 800 guidelines to demonstrate and document preparedness for IPPEs and APPEs.

- Revised course content and objectives for the laboratories to meet the ASHP-ACPE Task Force guidelines for entry-level competencies needed for pharmacy practice in hospital and health-systems.
- Enhanced and updated the content of advanced sterile compounding course PHMY 791, including TPN compounding, neonatal TPN formulation and compounding, chemotherapy and hazardous drug compounding, and IV access line introduction and maintenance.
- Introduced hazardous drug handling guidelines and USP 800, with emphasis on student training in utilization of all closed system transfer devices currently available in the U.S.
- Provided competency testing and certification for students to be able to participate in institutional pharmacy practice site sterile compounding activities (media fill testing, fingertip testing).
- Consulting pharmacist, performing duties of a permit holder (Non-dispensing pharmacy permit # 4956) and fully responsible for maintaining the facility, inventory control and daily operations.
- Mentor students in research offering variety of independent study projects.
- Clinical seminar evaluator and student advisor.
- Developed and implemented ACPE accredited course titled *Basic Aseptic Technique* for Kennedy Pharmacy Innovation Center, offering pharmacists and pharmacy technicians 23.5 hours of continuing education credit composed of two-day live hands-on course as well as home study.

**Outsourcing Pharmacist and Clinical Specialist**
**Preceptor for University of South Carolina College of Pharmacy APPE Program**
**Nephron Pharmaceuticals Company, West Columbia SC**
**September 2018 - present**
- Lead number of innovative and research-oriented projects (Yaskawa, Straubli, SteraMist) for manufacturing and outsourcing facility.
- Oversee formulation and filling operations for 503B outsourcing pharmacy.
- Perform product development including scale-ups for product development for outsourcing pharmacy.
- Troubleshoot quality events to develop safe solutions and set clinical limits for quality excursions.
- Develop new standard operating procedures and train staff as needed.
- Provide research information about new products, develop support materials for marketing purposes.
- Answer clinical questions when customers reah out for product guidance.
- Developed and maintain APPE site for 4th year pharmacy students, precepting record numbers of students yearly.
- ACTO app (training platform for sales force) management—review of content, provide training information about products.
- Assist with FDA quality inquiry investigations and management.
- Provide information for product development and production planning.
- Provide important information on labeling guidance for new products.
- Provide DocMatter clinician Q and A website support.
- Training of sales force via live lectures, seminars and pre-recorded lectures.

**Hospital Staff Pharmacist**
**Palmetto Health Richland Hospital Pharmacy, Columbia SC**
**August 2013 – September 2018**

- Performed duties of staff pharmacist—review orders, medication utilization review, order entry.
- Preparation and checking of sterile and non-sterile medication compounds.
- Medication history pharmacist—collect medication history via patient interviews, perform medication reconciliation, clinical consultations, patient education, medication use evaluation, and medication history consults.
- Maintained USC College of Pharmacy practice site.

**Assistant Professor of Clinical and Pharmaceutical Sciences**
**South University School of Pharmacy, Columbia, SC**
**May 2010 -- August 2013**
- Taught lectures in large number of courses in pharmaceutical sciences as well as pharmacy practice in distance education setting, managing two classrooms and collaborating with faculty members located in Savannah, GA. Typical class size was 80 students in the Columbia campus classroom, with 90 additional students at the distant site in Savannah.
- Completely redesigned Pharmaceutical Calculations course structure to flipped classroom model in order to increase effectiveness of teaching, significantly reducing the number of students needing remediation and improving overall test scores in the capstone course.
- Applied several active learning teaching techniques and team-based learning to traditionally taught courses to enhance student learning.
- Developed laboratory exercises to increase student understanding by applying learned material to practice using hands-on experiments.
- Developed and delivered elective course on animal envenomation pharmacology, medicinal chemistry and drug management.
- Taught majority of hospital-related lab coursework including TPN compounding, IV and chemotherapy preparation, and USP<797> training.
- Provided competency testing and certification for students to be able to participate in institutional pharmacy practice site sterile compounding activities (media fill testing, fingertip testing).
- Evaluated student performance of Objectively Structured Clinical Examination (OSCEs).
- Provided APhA certified immunization training for pharmacy students.
- Initiated student chapter of Student Society of Health Systems Pharmacists and guided students to the ASHP national recognition of the chapter.
- Served as faculty advisor for Rho Chi chapter.
- Academic advisor to 30 students per year.
- Faculty advisor to Student Society of Health Systems Pharmacists chapter.
- Research interests: use of complementary medicine in treatment of chronic disease states, smoking cessation and electronic cigarette utilization, new and engaging teaching methods in pharmacy education.
- Precepted Advanced Pharmacy Practice Experience students in elective academia setting.

**Adjunct Faculty, University of Florida Graduate Distance Programs**
**University of Florida, School of Pharmacy**
**January 2011-- May 2014**
- Supported distance education learning for UF Masters and Doctorate degree programs.
- Met with students on-line in small group setting as well as large discussion groups.
- Led chat sessions, communicate via email.
- Graded assignments, tests and presentations.

**Consulting/Dispensing Pharmacist PRN**
**United Healthcare, Lexington, SC**
**August 2010 - August 2012**
- Performed patient medical chart reviews, clinical monitoring, and managed appropriate drug therapy in accordance with federal and state regulations.
- Evaluated physician medication orders regarding dosage, appropriateness of drug, potential interactions, stability and route of administration.
- Analyzed, retrospectively and prospectively, drug utilization for the institutional drug formulary maintenance.
- Reviewed and checked technician prepared orders for delivery and dispensing.
- Consulted with advanced practitioners, healthcare professionals and managers of pharmaceutical services to develop and implement best working practices.

**Hospital Pharmacy Student Intern**
**Lexington Medical Center, West Columbia, SC**
**June 2008 - May 2010**
- Prepared IV compounded medications, interpreted and prepared orders per medications orders in CPOE.
- Ensured proper control and dispensing of narcotics.
- Interacted with clinical pharmacists, physicians, and nurses regarding drug therapy.
- Compounded a wide variety of specialty preparations including chemotherapy and TPN.

**Retail Pharmacy Student Intern**
**Rite Aid Pharmacy, Columbia, SC**
**September 2006 – May 2010**
- Accurately interpreted, processed, and filled prescriptions.
- Effectively communicated with physicians' offices and insurance companies regarding patients' pharmacy needs.
- Counseled and answered patients' questions concerning their prescriptions, OTC medications, nutritional supplements, and herbal products.
- Assisted with appropriate recordkeeping to assure compliance with federal and state laws.
- Maintained pharmacy inventory and supplies.
- Provided excellent customer support and follow up.

**Senior Pharmaceutical Formulation Scientist**
**Pfizer Inc., December 2004 – August 2006**
- Worked with formulation team in determining of yields (actual and theoretical), performed batch production record verification, ingredient review, and conditional quality releases, all per company's SOPs (standard operating procedures) and following guidance of cGMPs.
- Performed OOS (Out-Of-Specifications) investigations and reported process deviations on products not meeting all quality criteria set by QC department (for example, content uniformity, particle size and other quality issues.)
- Collaborated with drug formulation research team in development of new products and their test methods, with focus on natural products, supplements, and vitamins.
- Assisted with development of new medication delivery system of liquid drug products (Licaps), assisting with taking the products through ANDA process.

- Developed and validated methods for analytical testing of raw materials and finished products for QC department to test for identity, purity and strength to meet quality standards set by FDA and USP.
- Assisted with improvements in stability studies, including utilizing USP 71 guidance in new products.
- Supported all activities involving new product transfers, compliance, testing and various manufacturing process validations.
- Authored, updated and edited SOPs for training of new employees, changes in process control as well as laboratory manuals, then trained personnel to assure proper understanding of the methodology and troubleshooting.
- Comfortable with regulatory environment as set by cGMPs per 21CFR 210 and 211, USP, BP, EP, ISO, ICH and FDA regulations.
- Assisted with management of five laboratory technician team.
- Certified emergency responder.

# OTHER PROFESSIONAL ACTIVITIES

**Sterile Compounding Committee Volunteer Expert**
**SC Board of Pharmacy, Columbia SC**
**August 2019-present**
- Provide expertise on sterile compounding practices to the Board of Pharmacy members to help with updating of the assessment forms for inspections of pharmacy facilities.
- Consult members of state legislature on options in regulatory areas of pharmacy practice, specifically in the area of compounding.

**Expert Witness**
- Area of expertise includes sterile compounding, compounding, pharmacy, pharmacokinetics, USP 797, drug preparation.
- Provide medicolegal consulting for state and federal court cases.
- Analyze evidence provided and consult the legal team with options for further actions.
- Prepare testimony statements, depositions, testify in court.

**Lexington School District 1 Health Sciences Advisory Committee Member**
- Provide guidance and recommendations on development of health and science related courses in the district's curriculum for high school students.

**Lexington School District 2 Health Sciences Advisory Committee Member**
- Provide guidance and recommendations on how to initiate and develop health and science related courses in the district's curriculum for high school students.

**Member of South Carolina Pharmacy Practice Act (SC PPA) Revision taskforce**
- <u>Chair of the committee</u> on compounding section revision: lead a group of professionals to update SC PPA section of steile and non-sterile compounding
- Memmber of the group aligning the SC PPA with NABP's Model pharmacy act
- Member of the taskforce working on pharmacy practice expansion

# FACULTY APPOINTMENTS AND TEACHING EXPERIENCE

## DIDACTIC TEACHING EXPERIENCE
**Clinical Assistant Professor in Department of Clinical Pharmacy and Outcomes Sciences, University of South Carolina, Columbia SC**
**August 2013 to present**
- PHMY 885: Pharmacy Law and Ethics (3 credit hours, course coordinator)
- PHMY 790: Pharmacy Skills Laboratory III: Introduction to Health-Systems Pharmacy I (1 credit laboratory course, course coordinator)
- PHMY 791: Pharmacy Skills Laboratory IV: Advanced Health System Pharmacy Practice (1 credit laboratory course, course coordinator)
- PHAR 401: Introduction to Pharmacy as a Profession
- PHMY 710: Biopharmaceutics, Pharmaceutics and Pharmacokinetics (3 credit hours)
- PHMY 999: Clinical Seminar
- PHMY 757: Independent Study

**KPIC Master instructor, University of South Carolina, Columbia SC**
**August 2014 to March 2015**
- Basic Aseptic Technique course, 23.5 hours of CE, Master instructor
- Advanced Aseptic Technique course 16 live hours of CE, Master instructor

**Assistant Professor of Pharmacy**
**South University School of Pharmacy, Columbia SC,**
**May 2010 to August 2013**
- PHA 4367 Integrated Sequence IV Autonomic Nervous System (Pharmacology and Pharmacotherapy lectures), 8 credit hours
- PHA 3159 Introduction to Integrated Sequence: Basic Pharmacology Modules, Medicinal Chemistry, 6 credit hours
- PHA 3107 Pharmaceutical Calculations (use of pre-recorded lectures and in-class hands-on exercises), 3 credit hours (course coordinator)
- PHA 3113 Pathophysiology I (topics include geriatrics, inflammation, cancer, HIV, immune response), 4 credit hours (course coordinator)
- PHA 3114 Pathophysiology II (topics include autonomic nervous system, wound healing, gout, RA), 4 credit hours
- PHA 3109 Microbiology and Immunology (lectures in immunology, virology), 5 credit hours
- PHA 5335 Animal Venoms and Poisons (developed and implemented this elective), 3 credit hours (course coordinator)
- PHA 5332 Applied Pharmaceutical Care II (topics including, OA, RA, BPH, ED), 4 credit hours
- PHA 4265 Integrated Sequence III Inflammation (Pharmacology and Pharmacotherapy of osteoarthritis, rheumatoid arthritis, gout, would healing, lupus), 6 credit hours
- PHA 3162 Integrated Sequence I: Introductory Pharmacology and Medicinal Chemistry, 5 credit hours
- PHA 4212 Pharmacokinetics I (Implemented team-based learning), 4 credit hours

- PHA 4228 Pharmacokinetics II (Implemented team-based learning), 4 credit hours
- PHA 3135 Integrated Pharmacy Skills Lab I, 3 credit hours
- PHA 3136 Integrated Pharmacy Skills Lab II, 3 credit hours
- PHA 3137 Integrated Pharmacy Skills Lab III, 3 credit hours
- PHA 4238 Integrated Pharmacy Skills Lab IV, 3 credit hours
- Longitudinal Pharmacy Practice Experiences I – V: PHA 3135, 3163, 4266, 4369, 5330, 1 credit hour, course coordinator

**Adjunct Faculty, UFL Graduate Distance Programs**
**University of Florida, School of Pharmacy, January 2012—April 2016**
- Medicinal Chemistry I
- Fundamentals of Medicinal Chemistry, course coordinator
- Herbal and Dietary Supplements


**EXPERIENTIALTEACHING EXPERIENCE**
**Advanced Pharmacy Practice Experience (APPE) Elective INDUSTRY—University of South Carolina College of Pharmacy,** Preceptor for PharmD students**.**

**Advanced Pharmacy Practice Experience (APPE) Academic Rotation—South Carolina College of Pharmacy,** Preceptor for PharmD students.

**Advanced Pharmacy Practice Experience (APPE) Academic Rotation—South University School of Pharmacy,** Preceptor for PharmD students.

---

# COLLEGE OF PHARMACY COMITTEES
- South University SOP Curriculum Committee, member, chair 2013
- South University SOP Curriculum Subcommittee for Pharmaceutical Calculations course advisory member, 2010-2012
- South University SOP Committee for Professional Outreach, member 2011-2013
- South University SOP Technology Committee, member 2010-2013
- South University SOP ACPE Self-Study and Assessment Committee, member 2012-2013
- South University SOP Admissions Committee, member 2012-2013
- University of South Carolina COP Continuing Education Committee, member 2013-2016
- University of South Carolina COP Search Committee for Lab assistant, chair, 2014-2016
- University of South Carolina COP Curriculum Committee, member 2017-2019
- University of South Carolina COP Admissions Committee, member 2019-present

---

# AWARDS
2018: SC College of Pharmacy CPOS Department Service Award
2020: SC College of Pharmacy CPOS Department Service Award
2022: University of South Carolina Clinical Teaching Award

# INVITED LECTURES AND PRESENTATIONS

Almgren M. Mitigation Strategies of COVID-19 in the Workplace. Palmetto Business Forum. Presented Webinar September 13, 2021.

Almgren M. CDB: Exploring Regulations, Trends and a Potential role in Opioid Epidemic. Annual Continuing Education Conference. Presented live April 21st, 2021.

Emelia Beam PharmD, Michaela Almgren, PharmD, MS. Update on COVID19 Vaccines. Nephron Pharmaceuticals, May 3, 2021.

Almgren, M., COVID-19 Prevention Myth vs. Fact: Assessment of Complementary Therapies as Preventative Measures for Safety and Efficacy. SCSHP Fall 2020 Meeting, Columbia, SC, October 2020.

2020 Immunization Update. 1.0 ACPE accredited CE presentation at Nephron Pharmaceuticals, October 2020.

COVID 19 Prevention: Myth versus Fact. 1.0 credit hour ACPE accredited presentation at Nephron Pharmaceuticals Inc., West Columbia, SC June 8th, 2020.

Update on COVID19 Vaccines. 1.0 credit hour ACPE accredited presentation at Nephron Pharmaceuticals Inc., West Columbia SC, May 3rd, 2021.

M. Almgren. My Path to Pharmacy. CAPPS USC student chapter speaker, February 4th, 2021.

USP Updates in Sterile Compounding. 1.0 credit hour ACPE accredited presentation at Nephron Pharmaceuticals Inc., West Columbia, SC, April 13th and 15th, 2020.

Multimodal Analgesia Basics. 1.0 credit hour ACPE accredited presentation at Nephron Pharmaceuticals Inc., West Columbia SC, April 1st and April 3rd, 2020.

COVID19—Separating Facts from Fiction. SC Palmetto Business Forum Quarterly Meeting in Columbia SC, March 9th, 2020.

New Approaches to Pain Management: Multimodal Opioid Free Analgesia. 1.0 credit hour ACPE accredited presentation at UofSC COP CE Conference, February 1st, 2020.

Medication Safety of Hazardous Drugs: Can We All Be Safe? 1.0 credit hour ACPE accredited CE presentation at SCSHP Fall Meeting in Columbia SC, October 17th 2018.

Review of Sterile Compounding per USP 797. 1.0 credit hour ACPE accredited CE presentation at SCSHP Fall Meeting in Columbia SC, October 17th 2018.

M. Almgren. Current Status and Future Trends in Sterile Compounding as Defined by USP Chapters 797 and 800. 1.0 ACPE Live CE accreditation awarded. SCSHP Annual Meeting March 11-13, 2018, Hilton Head Island, SC.

M. Almgren. Who wants to be a pharmacist? CAPPS USC student chapter speaker, April 11th, 2018.

M. Almgren. Importance of unification of performance protocols for CSTD testing per NIOSH. November 7, 2016, Cincinnati, OH. NIOSH Public Comment meeting, invited speaker.

M. Almgren. Important role of CSTD utilization in compounding of hazardous materials to enhance protection of the compounder. 2016 ASHP Midyear, Las Vegas. Hazardous Drug Task Force speaker for USP 800 implementation.

M. Almgren. Sterile Compounding and Implementation of USP Chapter 797: Where we came from, where we are and where we might be headed. 1.0 ACPE Live CE accreditation awarded. SCSHP Annual Meeting, March 2015, Hilton Head Island, SC.

M. Almgren. Pharmacy school pathways. CAPPS USC student chapter speaker, April 2015.

## PEER-REVIEWED PUBLICATIONS

**Almgren M**., Cooper C., Maxwell W., Baker J. Instruction on compounded sterile preparations at U.S. schools of pharmacy—a ten year follow up study. American Journal of Health-System Pharmacy, Volume 75, Issue 12, 15 June 2018 Pages 845-847, https://doi.org/10.2146/ajhp170641

Textbook chapter: Khazan M., Phillips C., **Almgren M**. "Pharmaceutical Calculations" In: Sutton S. Scott. McGraw Hill's NAPLEX Review Guide. 3rd Edition, McGraw Hill 2018

Textbook chapter: **Almgren M**. "Sterile Compounding Regulations" In: Sutton S. Scott. *McGraw Hill's NAPLEX Review Guide*. 3rd Edition.

Karyn I. Cotta, Samit Shah, PhD, RPh, MBA, **Michaela M. Almgren**, PharmD, MS, Lilia Z. Macías-Moriarity, PhD, MPH, Vicky Mody. Effectiveness of flipped classroom instructional model in teaching pharmaceutical calculations. *Currents in Pharmacy Teaching and Learning.* 2016. Volume 8, Issue 5, Pages 646–653. https://doi.org/10.1016/j.cptl.2016.06.011

Braga S, **Almgren M**. Complementary Therapies in Cystic Fibrosis: nutritional supplements and herbal products. *Journal of Pharmacy Practice*. 2013 Feb;26(1):14-7.

Wynn W, **Almgren M**, Stroman R, Clark K. Pharmacist's Toolbox for Smoking Cessation. *Journal of Pharmacy Practice*. 2012 Dec;25(6):591-9.

## POSTERS WITH ABSTRACTS

Rachel Lehn, BS, PharmD Candidate; Kayla Hutto, BS, PharmD Candidate; Nikki Chen, PharmD Candidate; Lauren Caines, PharmD Candidate; **Michaela Almgren, PharmD, MS**. Comparison of Impact of Facial Coverings Mandate as Mitigation Strategy on Positivity Rates of COVID-19 in a Workplace versus Community Rates Prior to Vaccine Availability. December 2021 ASHP Midyear Virtual Clinical Meeting.

Kara Taylor, PharmD Candidate; Lauren Caines, PharmD Candidate; Cole Colemander, PharmD Candidate; Zach Altenberg, PharmD Candidate; **Michela Almgren, PharmD, MS**.

Safety Evaluation of a New Container Closure System Design of a Blow Fill Seal Type of IV Bottles. December 2021 ASHP Midyear Virtual Clinical Meeting.

Lauren Caines, PharmD Candidate; Kara Taylor, PharmD Candidate; **Michaela Almgren, PharmD, MS**. Impact of Implementation of Mandatory Facial Coverings as Mitigation Strategy on Rates of Positive Cases of COVID19 in a Workplace Prior to Vaccine Availability. December 2021 ASHP Midyear Virtual Clinical Meeting.

Petscavage Katie, PharmD Candidate; **Almgren Michaela, PharmD, MS**.  Assessment of complementary therapies as preventive measures for COVID-19 for safety and efficacy. December 2020 ASHP Midyear Virtual Clinical Meeting. Poster #SP-243.

Aya Ahmed PharmD Candidate; **Michaela Almgren PharmD, MS**; Ryan McCormick PharmD Candidate; Carolyn McNamara PharmD Candidate; Robert Singleton PhD. Establishing a Coronavirus (COVID-19) Testing Lab in 40 Days. December 2020 ASHP Midyear Virtual Clinical Meeting.

Ryan McCormick PharmD Candidate; **Michaela Almgren, PharmD, MS**; Sarah Arnold PharmD Candidate, Madeline Dean PharmD Candidate, Marianna Vinson, PharmD Candidate. Process improvements and validation of a syringe-filling robot though collaboration between pharmacy and engineering student teams. December 2020 ASHP Midyear Virtual Clinical Meeting.

Alexis Caronis, PharmD Candidate 2021; **Michaela Almgren, PharmD, MS**; Samantha Lindeman, PharmD Candidate 2021; Kristen Kilby, PharmD Candidate 2021. Evaluation of medication safety effectiveness training in a workplace environment. 2020 APHA Annual Meeting, Baltimore MD, March 2020.

Caroline Hansen PharmD Candidate; **Michaela Almgren PharmD, MS**; Kristen Kilby PharmD Candidate; Alexis Caronis PharmD Candidate; Ryan McCormick PharmD Candidate; Benjamin Tabor PharmD Candidate. College of Pharmacy and School of Engineering Student Teams' collaboration to design pharmacy compounding system using robotic arm to perform aseptic syringe filling. 2020 SCSHP Annual Meeting, Charleston SC, March 2020.

Alexis Caronis, PharmD Candidate 2021; **Michaela Almgren, PharmD, MS**; Kristen Kilby, PharmD Candidate 2021; Caroline Hansen, PharmD Candidate 2021; Benjamin Tabor, PharmD Candidate 2021; Ryan McCormick, PharmD Candidate 2022. Development of the Masterflex L/S peristaltic pump process validation in a 503B outsourcing pharmacy. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-445.

Ashton Holley, PharmD Candidate**; Michaela Almgren, PharmD, M.S.**; Normando Sandoval, PharmD Candidate; Priya Patel, PharmD Candidate; Xiaoxia Wang, PharmD Candidate; Lauren Moran, PharmD Candidate. Evaluation of cleaning effectiveness of 7.8% ionized hydrogen peroxide mist versus 7.8% hydrogen peroxide mist in a cleanroom environment. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-449.

Caroline Hansen PharmD Candidate; **Michaela Almgren PharmD, MS**; Kristen Kilby PharmD Candidate; Alexis Caronis PharmD Candidate; Ryan McCormick PharmD Candidate; Benjamin Tabor PharmD Candidate. College of Pharmacy and School of Engineering Student Teams' collaboration to design pharmacy compounding system using robotic arm to perform aseptic

syringe filling. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-432.

Kristen Kilby PharmD Candidate**; Michaela Almgren PharmD, MS**; Alexis Caronis PharmD Candidate; Caroline Hansen PharmD Candidate; Ryan McCormick PharmD Candidate, Benjamin Tabor PharmD Candidate, Noah Smith MBA, PharmD Candidate**.** Performance comparison of the Baxter repeater pump and the Masterflex peristaltic pump using high flow tubing set L/S 24. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-446.

Samantha Lindeman, PharmD Candidate 2021; **Michaela Almgren, PharmD, MS**; Alexis Caronis, PharmD Candidate 2021; Kristen Kilby, PharmD Candidate 2021; Noah Smith, Pharm D Candidate 2020; Caroline Hansen, PharmD Candidate 2021; Ashton Holley, PharmD Candidate 2021; Priya Patel, PharmD Candidate 2021. Evaluation of naloxone safety effectiveness training in a workplace environment. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-440.

Tristan Gore, PharmD Candidate 2022. Noah Smith, PharmD Candidate 2020. Dana Nelson, PharmD Candidate 2020. **Michaela Almgren, PharmD, MS**. Incidence and clinical impact of particulate matter in injectable drug products. 2019 ASHP Midyear Clinical Meeting, Las Vegas, December 2019. Poster #3-422.

**Almgren M**, Maxwell W, Grant A, Hembree H, Shah A. Disability and Accommodations in Pharmacy Practice and Education. 2019 AACP Annual Meeting, Chicago 2019. Abstract #53.

Cooper C., **Almgren M.**, Maxwell W., Baker J. Instruction on compounded sterile preparations at US pharmacy schools. 2018 SCSHP Annual Meeting poster session, Hilton Head Island, SC.

Cooper C., **Almgren M**. Maxwell W., Baker J. Instruction on compounded sterile preparations at US pharmacy schools. Poster presentation at 2017 ASHP Midyear in Orlando, FL, poster # 368.

Parth Parikh, PharmD. Candidate; Paul Philavong, PharmD Candidate, Sam McCallum, PharmD Candidate, Nhung Nguyen, PharmD Candidate; **Michaela Almgren, PharmD, MS**. Assessing Microbial Growth Rates of Sterile Versus Non-Sterile Gloves Used During Sterile Compounding. 2017 SCSHP Annual Meeting Hilton Head, SC, poster session.

Cotta K**, Almgren M**. "Effectiveness of Blended Teaching Method for Pharmaceutical Calculations." Poster presentation at 2012 AACP Annual meeting in Kissimmee FL.

**Almgren M**., Clark K. "Laboratory Exercise to Enhance Integration and Application of Basic Sciences to Pharmacy Practice in Students." Poster presentation at 2012 AACP Annual meeting in Kissimmee FL**.**

---

## Peer Review/Editorial Boards/Editorships for Journals
Reviewer for AJPE
Reviewed: Prerequisite Courses: Barriers to Pharmacy Admission or the Keys to Student Success?

Reviewer for Currents in Pharmacy Teaching and Learning.

Reviewed: Book review of the Handbook on Injectable Drugs

Reviewer for AJHP
Reviewed: Commentary: Impact of revised USP 797 guidance and how we might mitigate risk: A real-world example

Reviewer for AJHP
Reviewed: Third Consensus Development Conference on the Safety of Intravenous Drug Delivery Systems – 2018

Peer Reviewer for The Joint Commission Journal on Quality and Patient Safety
Reviewer and member of editorial board of Alternative Medicine Studies Journal
Reviewer for Journal of Dietary Supplements
Reviewer for Natural Standard Research Collaboration
Reviewer for Currents in Pharmacy Teaching and Learning
Reviewer for AACP Annual Meeting Research/Education Abstracts for Poster Session

# PROFESSIONAL AFFILIATIONS

American Pharmacist Association (APhA), 2006-2018

American Society of Consultant Pharmacists (ASCP), 2008-2013

American Society of Health-System Pharmacists (ASHP), 2008-present
- Pain management SIG 2011-2013

SC Pharmacist Association (SCPhA), member 2006-2018
- Professional Affairs committee 2010-2011, 2017-2018
- Legislative Affairs Committee 2011-2012

SC Society of Health Systems Pharmacists member (SCSHP) 2008-present
- Education Committee 2014-2016
- Professional Affairs Committee 2015-2016
- Legislative Committee 2017-2018

American Association of College of Pharmacy (AACP), member 2010-present
- AACP Pharmacy Practice Strategic Plan, Bylaws, and Resolutions Committee member 2018-2020
- Member of the Scholarship Committee of the Curriculum SIG for AACP 2018-2020
- AACP Audit Committee member 2018-present
- House of Delegates representative for USC College of Pharmacy 2017-2018
- AACP Pharmacy Practice Strategic Plan, Bylaws, and Resolutions Committee member 2018-2019
- Lyman Award Committee Member 2012-2013

Parenteral Drug Association Member (PDA) 2019-2022