# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

Jedidiah Murphy,                            :
               Plaintiff,         :
                             :

v.                                          :        Case No. 23-cv-1199
                             :

Bobby Lumpkin, Director of                  :
Correctional Institutions,                  :
Texas Dept. of Criminal Justice,            :
                             :        **THIS IS A CAPITAL CASE**

Kelly Strong, Warden, Texas State           :
Penitentiary Huntsville Unit,               :
                             :        **EXECUTION SET FOR**
Bryan Collier, Executive Director,          :        **OCTOBER 10, 2023**
Texas Dept. of Criminal Justice,            :
                             :
               Defendants.

## EXHIBITS TO COMPLAINT

## VOL. 3

Exhibits 13-16

EXHIBIT 13

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. D-1-N-22-7149

| | |
|---|---|
| RUIZ, ET AL, | ) IN THE DISTRICT COURT |
| Plaintiff, | ) |
| | ) |
| VS. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| TDCJ, ET AL, | ) |
| Defendant. | ) 345TH JUDICIAL DISTRICT |

_____

**EMERGENCY MOTION FOR TEMPORARY INJUNCTION**

_____

On the 10th day of January, 2023, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Catherine A. Mauzy Judge Presiding, held in Austin, Travis County, Texas REMOTELY VIA VIDEOCONFERENCE:

Proceedings reported by machine shorthand.

**APPEARANCES**

FOR THE PLAINTIFFS BALENTINE AND RUIZ:

    **MR. ALEX KURSMAN**
    SBOT NO. 19106546
    AND
    **MS. HAYDEN NELSON-MAJOR**
    AND
    **MS. JENNAE SWIERGULA**
    Federal Community Defender Office in the
    Eastern District of Pennsylvania
    601 Walnut St 545 West
    Philadelphia, PA  19106
    Phone:  (215) 928-0520


    **MR. DANIEL WILSON**
    SBOT NO. 24070859
    SUSMAN GODFREY
    1221 Lamar St., Ste 1000
    Houston, Texas 77010


FOR THE PLAINTIFF FRATTA:

    **MR. TIVON SCHARDL**
    SBOT NO. 24127495
    FEDERAL PUBLIC DEFENDER FOR THE
    WESTERN DISTRICT OF TEXAS, CAPITAL HABEAS UNIT
    919 Congress Ave, Ste 95-
    Austin, Texas 78701

FOR THE DEFENDANTS:

    **MS. LEAH OLEARY**
    SBOT NO. 24079074
    AND
    **MR. ED MARSHALL**
    ASSISTANT ATTORNEY GENERAL
    PO Box 12548
    Austin, Texas  78701
    Phone:  (512) 350-1528

1

2  FOR THE INTERVENOR ARTHUR BROWN JR.:

3      **MR. BENJAMIN WOLFF**
       OFFICE OF CAPITAL AND FORENSIC WRITS
4      **MR. PAUL MANSER**
       FEDERAL HABEAS COUNSEL

5

6      **MR. JAMES RYTTING**
       SBOT 24002883
7      HILDER LAW
       819 Lovett Blvd
8      Houston, Texas 77006

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>INDEX</u>

VOLUME 1

EMERGENCY MOTION FOR TEMPORARY INJUNCTION

<u>JANUARY 10, 2023</u>

|  | Page | Vol. |
|---|---|---|
| Announcements........................... | 6 | 1 |
| Opening by Mr. Kursman................... | 14 | 1 |
| Opening by Ms. O'Leary.................. | 15 | 1 |

<u>PLAINTIFF'S WITNESS</u>

|  | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| MICHAELA ALMGREN | | | | |
| By Mr. Kursman | 22,71 | | | 1 |
| By Ms. O'Leary | | 66 | | 1 |

<u>INDEX CONTINUED</u>

|  | Page | Vol. |
|---|---|---|
| Closing Argument by Ms. Nelson-Major.... | 73 | 1 |
| Closing Argument by Ms. O'Leary......... | 86 | 1 |
| Closing Argument by Mr. Kursman......... | 93 | 1 |
| Court Takes Ruling Under Advisement...................... | 95 | 1 |
| Adjournment............................. | 96 | 1 |
| Court Reporter's Certificate............ | 97 | 1 |

# EXHIBIT INDEX

**PLAINTIFF'S**

| NO. | DESCRIPTION | OFFER | ADMIT | VOL. |
|-----|-------------|-------|-------|------|
| 1 | CV | 26 | 26 | 1 |
| 3 | USP Chapter 797 | 35 | 35 | 1 |
| 4 | USP Chapter 71 | 37 | 37 | 1 |
| 5 | USP Chapter 790 | 38 | 38 | 1 |
| 6 | Storage Inventory | 10 | 11 | 1 |
| 7 | Storage Inventory | 10 | 11 | 1 |
| 8 | Email | 10 | 11 | 1 |
| 9 | Email | 10 | 11 | 1 |
| 10 | Lab Report | 10 | 11 | 1 |
| 11 | Execution Procedure | 10 | 11 | 1 |

PROCEEDINGS

January 10, 2023

07:21AM

07:23AM          THE COURT:  Let me call for hearing Cause

10:10AM     No. D-1-GN-22-7149 Wesley Ruiz, John Balentine, Robert

10:10AM     Fratta versus Texas Department of Criminal Justice, Et

10:10AM     Al.

10:10AM          Your appearances for the record, please.

10:10AM          MR. KURSMAN:  Good morning, Your Honor.

10:10AM     Alex Kursman for Petitioners Balentine and Ruiz.  This

10:11AM     morning Ms. Swiergula filed an order with the Court

10:11AM     asking for pro hac vice admission for myself and my

10:11AM     colleague, Hayden Nelson-Major.  I just want to make sure

10:11AM     that order was granted before the hearing begins.

10:11AM          THE COURT:  I am told that that has been

10:11AM     filed.  I'll need to, yeah, take that up and get that

10:11AM     signed.  We might take a little break after we do

10:11AM     appearances since that order -- I'll take appearances and

10:11AM     then I'll see if there's any objection.  I don't think

10:11AM     there should be.

10:11AM          I'm going to ask everyone as you give your

10:11AM     appearances or if you go through, because I have so many

10:11AM     counsel appearing this morning, if everyone could go

10:11AM     through and change their name and include who they

10:11AM     represent.  It may not all show up and it may not be

10:12AM     possible, but we can try.

10:12AM 1        Mr. Kursman and Ms. Swiergula, and who else
10:12AM 2 do I have, please.
10:12AM 3        MS. NELSON-MAJOR:  This is Hayden
10:12AM 4 Nelson-Major with the Federal Community Defender Office
10:12AM 5 in the Eastern District of Pennsylvania on behalf of John
10:12AM 6 Balentine and Wesley Ruiz.
10:12AM 7        MR. WILSON:  Good morning, Your Honor.
10:12AM 8 Daniel Wilson with Sussman Godfrey as additional counsel
10:12AM 9 for Ruiz and Balentine, and I filed a notice of
10:12AM 10 appearance this morning.
10:12AM 11        THE COURT:  Thank you.
10:12AM 12        (Zoom audio distortion)
10:12AM 13        MR. SCHARDL:  Good morning, Your Honor.
10:12AM 14 This is Tivon Schardl from the Federal Defender Office
10:12AM 15 here in Austin for Robert Fratta.
10:12AM 16        THE COURT:  Thank you.
10:12AM 17        MR. WOLFF:  Good morning, Your Honor.  My
10:12AM 18 name is Benjamin Wolff.  I'm with the Office of Capital
10:13AM 19 and Forensic Writs, and along with Paul Manser, who is
10:13AM 20 federal habeas counsel, we represent Arthur Brown, Jr.
10:13AM 21 We filed a petition intervention yesterday.
10:13AM 22        MS. O'LEARY:  Good morning, Your Honor.
10:13AM 23 Leah O'Leary from the Attorney General's Office.  I
10:13AM 24 represent TDCJ, Brian Collier, Bobby Lumpkin and Kelly
10:13AM 25 Strong, the Respondents.

10:13AM 1        THE COURT:  Thank you.

10:13AM 2        Anyone else?  Before I begin, I need to

10:13AM 3   look at those pro hac vice --

10:13AM 4        MR. MARSHALL:  This is Ed Marshall.  I'm

10:13AM 5   also here on behalf of Respondents.

10:13AM 6        THE COURT:  Thank you, Mr. Marshall.

10:13AM 7        All right.  Before -- I need to look at

10:13AM 8   those pro hac vice orders and get those filed.  Let me

10:13AM 9   just ask, does anyone have any objection to those?  I

10:14AM 10  have not had a chance to look at those yet.

10:14AM 11       MS. O'LEARY:  No objection, Your Honor.  I

10:14AM 12  believe they are filed as unopposed.

10:14AM 13       THE COURT:  Okay, great.  I'll take a

10:14AM 14  little break.  Let me give you some preliminary

10:14AM 15  announcements.  I'll take a break and get those signed so

10:14AM 16  that we can proceed.  We are holding today's hearing

10:14AM 17  today remotely on the Zoom platform.

10:14AM 18       (Court's COVID instructions.)

10:14AM 19       MR. KURSMAN:  We have an expert witness

10:14AM 20  that needs to be through by 1:30 eastern time.

10:14AM 21       THE COURT:  That's fine.  I'm assuming,

10:16AM 22  Ms. O'Leary, you don't have an objection to that.

10:16AM 23       MS. O'LEARY:  Our position is going to be

10:16AM 24  that we don't need to reach the expert at all.  We also

10:16AM 25  have some housekeeping matters like objections to

10:16AM 1  exhibits that have been filed.

10:16AM 2  And we'd like to understand the scope of

10:16AM 3  the hearing. The hearing has only been noticed for Mr.

10:16AM 4  Fratta's amended emergency motion for temporary

10:16AM 5  injunction. So we haven't been noticed to hear the

10:16AM 6  original petition in the case, and we just want to make

10:16AM 7  sure that we understand that correctly.

10:16AM 8  THE COURT: We'll get to all those

10:16AM 9  housekeeping matters in a minute. Let me take care of

10:16AM 10  those pro hac vice motions and orders. I'm going to take

10:17AM 11  a short break and in the meantime you-all can stand by.

10:17AM 12  Let me get those orders taken care of and then we'll go

10:17AM 13  right into the housekeeping matters, into the evidence,

10:17AM 14  realizing that we have a witness who needs to be done by

10:17AM 15  12:30 our time. Thank you.

10:17AM 16  (Whereupon There was a Break in the Proceedings)

10:22AM 17  THE COURT: I've reviewed the motions for

10:22AM 18  pro hac vice for Mr. Kursman and Ms. Nelson-Major and I

10:22AM 19  have signed those and we'll get those filed. So now

10:22AM 20  let's begin. We can go ahead and begin with any

10:22AM 21  housekeeping matters that we need to take up.

10:22AM 22  MS. O'LEARY: Yes, Your Honor. We have

10:22AM 23  some objections to the exhibits that were uploaded last

10:22AM 24  night. We can address those now or I'm happy to address

10:22AM 25  them as we go, as Petitioners try to offer them.

10:22AM 1      THE COURT:  Go ahead, Mr. Kursman.

10:22AM 2      MR. KURSMAN:  That is -- I think it's more

10:22AM 3  appropriate if they are objected to as offered.  We

10:22AM 4  wanted to introduce six of those exhibits prior to

10:23AM 5  offering our witness based on stipulations with

10:23AM 6  Respondents, and those would be Exhibits 6, 7, 8, 9, 10

10:23AM 7  and 11.  Respondents agreed to stipulate to the

10:23AM 8  following, that if a record custodian was called to

10:23AM 9  testify, they would testify to the following:

10:23AM 10     That the record was made at or near the

10:23AM 11 time by or from information transmitted by someone with

10:23AM 12 knowledge, that the record was kept in the course of

10:23AM 13 regularly conducted business activity and that making the

10:23AM 14 record was a regular practice of that activity.

10:23AM 15     Respondents also agree to stipulate to the

10:23AM 16 accuracy and authenticity of those exhibits.  So

10:23AM 17 Petitioners would move to admit Exhibits 6, 7, 8, 9, 10

10:23AM 18 and 11.

10:23AM 19     THE COURT:  Ms. O'Leary.

10:23AM 20     MS. O'LEARY:  Respondents do so stipulate

10:23AM 21 and we have no objection to the admission of 6 through

10:24AM 22 10.

10:24AM 23     THE COURT:  Through 11.

10:24AM 24     MS. O'LEARY:  I'm sorry; was it 11?

10:24AM 25     THE COURT:  I heard Mr. Kursman offering 6,

| | | |
|---|---|---|
| 10:24AM | 1 | 7, 8, 9, 10 and 11. |
| 10:24AM | 2 | MR. KURSMAN: Yes. No. 11, Ms. O'Leary, is |
| 10:24AM | 3 | the TDCJ protocol. |
| 10:24AM | 4 | MS. O'LEARY: I'm sorry; I didn't see that |
| 10:24AM | 5 | one. TDCJ's execution procedure, may I ask if it's the |
| 10:24AM | 6 | current version, revision? |
| 10:24AM | 7 | MR. KURSMAN: Yes, Ms. O'Leary. It's the |
| 10:24AM | 8 | version that was sent to us pursuant to the requests. |
| 10:24AM | 9 | MS. O'LEARY: We have no objection to |
| 10:24AM | 10 | admission of No. 11 then. |
| 10:24AM | 11 | THE COURT: All right. Then Petitioner's |
| 10:24AM | 12 | Exhibits 6 through 11 are admitted without objection. I |
| 10:24AM | 13 | agree that the rest -- if you don't have agreements on |
| 10:24AM | 14 | them, let's just take up your objections to any other |
| 10:24AM | 15 | exhibits as they come up. |
| 10:24AM | 16 | MS. O'LEARY: Yes, Your Honor. |
| 10:24AM | 17 | The other issue, before the Petitioners put |
| 10:25AM | 18 | on their expert, is we have some argument to make as to |
| 10:25AM | 19 | why the Court doesn't need to consider the expert's |
| 10:25AM | 20 | opinion on the factual issues in the case. So if the |
| 10:25AM | 21 | Court is amenable, I'm happy to present that right now. |
| 10:25AM | 22 | THE COURT: Well, yes, go ahead and do |
| 10:25AM | 23 | that, then I'm going to ask for brief openings. I've |
| 10:25AM | 24 | reviewed I believe almost all the pleadings, almost all |
| 10:25AM | 25 | of them. And again, apologies that this came up in the |

10:25AM 1 middle of -- I was moving yesterday, so I didn't have

10:25AM 2 much technology set up. I'm going to try to read all of

10:25AM 3 the pleadings.

10:25AM 4 So let's go ahead and start with that

10:25AM 5 argument, Ms. O'Leary.

10:25AM 6 MS. O'LEARY: Yes, Your Honor. The

10:25AM 7 Petitioners intend to introduce expert testimony from

10:25AM 8 I'll just say a pharmaceutical expert to discuss

10:25AM 9 expiration dates and beyond-use dates of the drug that

10:25AM 10 TDCJ uses for lethal injection. The Court does not need

10:26AM 11 to get into the question of whether the drugs are, quote,

10:26AM 12 expired or whether they are being used beyond-use date,

10:26AM 13 which is contested.

10:26AM 14 But even if, for argument's sake, the Court

10:26AM 15 assumes that the drugs are expired or are being used

10:26AM 16 beyond the beyond-use date -- the Court can assume that

10:26AM 17 to be true -- but first the Court should instead

10:26AM 18 recognize that the Petitioners haven't stated a cause of

10:26AM 19 action here. And so even if factually there's a factual

10:26AM 20 dispute or assumption that the asserted facts are true,

10:26AM 21 without a cause of action the Court can't issue an

10:26AM 22 injunction here and no declaratory relief is available.

10:26AM 23 This is an ultra vires action against TDCJ

10:26AM 24 officials. The basis of the ultra vires asserted conduct

10:26AM 25 is they have violated certain state statutes such as the

10:26AM 1 Texas Pharmacy Act. As we have laid out in our briefing,

10:26AM 2 none of the statutes that the Petitioners have cited

10:27AM 3 actually apply to TDCJ's use of pentobarbital lethal

10:27AM 4 injection; they simply don't apply. They also cite

10:27AM 5 things like the Texas Penal Code. There's clear

10:27AM 6 exceptions to each of those statutes that exempt TDCJ or

10:27AM 7 exempt this situation from those standards. And so

10:27AM 8 without demonstrating that there's a potential, at least

10:27AM 9 a potential ultra vires claim here, there's no reason to

10:27AM 10 get into the factual disputes about whether the drugs are

10:27AM 11 beyond a beyond-use date.

10:27AM 12 And I'm happy to go through each of those

10:27AM 13 state statutes if the Court wants to hear that now, and

10:27AM 14 that includes the Texas Pharmacy Act, the Texas

10:27AM 15 Controlled Substance Act, the Penal Code and the Texas

10:27AM 16 Food, Drug and Cosmetics Act.

10:27AM 17 THE COURT: Mr. Kursman, you want to

10:27AM 18 respond to that, please.

10:27AM 19 MR. KURSMAN: Sure, Your Honor.

10:27AM 20 So all of those issues were briefed in our

10:27AM 21 initial petition in Respondents' response and in our

10:28AM 22 reply. I think we can get into those in more detail

10:28AM 23 after Dr. Almgren testifies if Your Honor would like, but

10:28AM 24 I think those are pretty well-briefed in all of our

10:28AM 25 pleadings.

10:28AM 1        Ms. O'Leary began with saying that we
10:28AM 2 didn't state a cause of action, but then describes the
10:28AM 3 cause of action that we stated in our petition.  And I'm
10:28AM 4 sure Your Honor is fully aware of what that is, as we
10:28AM 5 filed that petition weeks ago.
10:28AM 6        THE COURT:  Yes, I am.  I've read your
10:28AM 7 petition.
10:28AM 8        So that objection is overruled,
10:28AM 9 Ms. O'Leary.  All right.
10:28AM 10        Then let's begin, Mr. Kursman, or whoever
10:28AM 11 is going to make argument with brief opening statements.
10:28AM 12        MR. KURSMAN:  Sure, Your Honor.
10:28AM 13        The Texas Department of Criminal Justice
10:28AM 14 planned to administer expired drugs to Petitioners
10:28AM 15 Fratta, Ruiz, Balentine and Brown during their
10:28AM 16 executions.  These drugs expired anywhere from 630 days
10:29AM 17 ago to over 1,300 days ago.  You will hear that when
10:29AM 18 drugs are this old the pharmacological property of the
10:29AM 19 drugs themselves change.  So although the drugs may be
10:29AM 20 labeled pentobarbital, because they are hundreds or
10:29AM 21 thousands of days past their expiration date, the
10:29AM 22 pharmacological effects of those drugs may not be
10:29AM 23 pentobarbital at all.
10:29AM 24        You will also hear when drugs are this old
10:29AM 25 there's a high risk that they fall out of solution.  What

10:29AM 1   this means is that the drug themselves become grainy.  So

10:29AM 2   instead of injection of a liquid into a vein, the drug

10:29AM 3   themselves will contain solid particles, and when

10:29AM 4   injected into one of the prisoner's veins, it will cause

10:29AM 5   burning at the injection site.  Because of these risks

10:29AM 6   the Texas statutes that we outlined in our petition

10:29AM 7   protect against administering expired drugs to humans.

10:30AM 8   Under the statutes in Texas outlined in our petition, it

10:30AM 9   is unlawful to administer expired drugs to human beings.

10:30AM 10          TDCJ acknowledges that these statutes

10:30AM 11  exist, they implicitly concede that these drugs are

10:30AM 12  expired, but they claim to be above the law.  They say

10:30AM 13  that these statutes don't apply to them because the drugs

10:30AM 14  are being used for an execution.  There is no legal

10:30AM 15  support for that argument.  TDCJ and individuals who work

10:30AM 16  for TDCJ are not above the law.  They, too, must follow

10:30AM 17  the laws of practice, even during an execution.

10:30AM 18          After hearing the evidence this Court

10:30AM 19  should grant a temporary injunction prohibiting TDCJ from

10:30AM 20  administering expired drugs to Messrs. Fratta, Ruiz,

10:30AM 21  Balentine and Brown.

10:31AM 22          THE COURT:  Thank you.

10:31AM 23          Ms. O'Leary.

10:31AM 24          MS. O'LEARY:  Your Honor, I just want to

10:31AM 25  comment, Mr. Kursman is asking for relief for Mr. Ruiz

10:31AM 1  and Balentine.  We have not been noticed on their

10:31AM 2  petition for today's hearing; we've only been noticed on

10:31AM 3  Mr. Fratta's request for temporary injunction.  And so I

10:31AM 4  think that their idea of what this hearing is covering is

10:31AM 5  different from ours.  And I just, again I ask for clarity

10:31AM 6  from the Court on whether we are hearing the original

10:31AM 7  petition today, which again was not noticed.

10:31AM 8          THE COURT:  Well, I think the amended

10:31AM 9  request -- I should have -- I skipped over attorney for

10:31AM 10 Mr. Fratta, Mr. Schardl.  I should let him speak, as

10:31AM 11 well.  But so I think the -- what was noticed is clearly

10:31AM 12 we wouldn't be here but for the original petition; it's

10:31AM 13 the underlying pleadings.  I'm willing to hear all of it.

10:31AM 14 I'm going to let Mr. Kursman, participate; Mr. Schardl,

10:31AM 15 as well.

10:32AM 16          I guess I should let you go ahead and make

10:32AM 17 a statement before Ms. O'Leary goes on.

10:32AM 18          MR. SCHARDL:  Thank you very much, Your

10:32AM 19 Honor.  I have nothing to add to what Mr. Kursman said or

10:32AM 20 to what the Court just said.

10:32AM 21          THE COURT:  Thank you.

10:32AM 22          All right, Ms. O'Leary.

10:32AM 23          MS. O'LEARY:  Yes, Your Honor.  It's

10:32AM 24 important to be aware of the context and timing in which

10:32AM 25 we find ourselves in court today.  Mr. Fratta's death

10:32AM 1  sentence became final in 2011.  TDCJ has been using

10:32AM 2  compounded single drug pentobarbital for lethal injection

10:32AM 3  since 2013, using the current testing and retesting

10:32AM 4  processes that are currently in place since 2013.  So at

10:32AM 5  any time over the past nine years the Petitioners could

10:32AM 6  have raised this claim; but instead we find ourselves in

10:32AM 7  a hearing hours before Mr. Fratta's scheduled execution.

10:32AM 8           It's also important to note that there's an

10:32AM 9  active writ of prohibition in the case that prevents --

10:32AM 10 it orders this Court to refrain from issuing any order

10:33AM 11 purporting to stay an execution.  And even if an order

10:33AM 12 doesn't say that it stays an execution, it can have that

10:33AM 13 effect; and so we just want to point out that is still in

10:33AM 14 place.

10:33AM 15          And again, the Court doesn't need to go

10:33AM 16 into the factual assertions in the case because the

10:33AM 17 Petitioners haven't demonstrated a cause of action.  They

10:33AM 18 wrote ultra vires on their petition; so they have picked

10:33AM 19 out a cause of action, but they haven't asserted any

10:33AM 20 facts that would allow this Court to find that any

10:33AM 21 official acted in an ultra vires manner.

10:33AM 22          An ultra vires action cannot lie where

10:33AM 23 there is discretion.  The Respondents are statutorily

10:33AM 24 required to carry out lethal injection, and that is in

10:33AM 25 the Code of Criminal Procedure.  The statute gives

| | |
|---|---|
| 10:33AM | 1 |

Director Bobby Lumpkin discretion in deciding how to

carry out lethal injection.

The State is indeed regulated on how it

carries out a lethal injection and it is regulated by the

8th Amendment, which is not a cause of action that's been

raised here.  It is not regulated by things like the

Texas Pharmacy Act or the Food, Drug and Cosmetic Act.

Petitioners allege that Respondents have

violated the Texas Pharmacy Act.  If the Court looks at

the statute, it describes who the statute applies to.

The pharmaceutical standards are codified in Texas law

and again, they specify who they apply to.  They do not

apply to TDCJ, its officials or lethal injection.

For example, the Texas Pharmacy Acts states

it applies to a provider prescribing a medication to a

patient.  That's obviously something that doesn't apply

here.  And right in the introduction of the Texas

Pharmacy Act it says that it, "Regulates the practice of

pharmacy and licensing pharmacies that are engaged in

distribution of prescription drugs and devices that are

used in diagnosing illness, injury or disease."

That is not something that is happening

when TDCJ is carrying out lethal injection.  We're not

treating anything, we're not providing any kind of

therapeutic treatment or drugs.  We're not treating

10:35AM 1 illness, injury or disease.  And so right from the

10:35AM 2 introduction of the Pharmacy Act, it's clear that it does

10:35AM 3 not apply to TDCJ.

10:35AM 4       The Texas Controlled Substances Act,

10:35AM 5 there's a clear exception that involves the licensing to

10:35AM 6 possess controlled substances.  There's a clear exception

10:35AM 7 for employees of the State engaged in the enforcement of

10:35AM 8 law or carrying out an official duty.

10:35AM 9       Additionally, TDCJ has a DEA license to

10:35AM 10 possess pentobarbital.  The Petitioners have copies of

10:35AM 11 the DEA order forms they appended back to their original

10:35AM 12 petition.  So for those reasons, the Controlled

10:35AM 13 Substances Act doesn't apply to TDCJ.

10:35AM 14       The Texas Food, Drug and Cosmetic Act is a

10:36AM 15 consumer protection statute.  It regulates labelling,

10:36AM 16 branding and other safety mechanisms for products that

10:36AM 17 are introduced into commerce.  That is not what is

10:36AM 18 happening in lethal injection.  We don't need to be

10:36AM 19 concerned with consumers who are reading the labels on

10:36AM 20 lethal doses of pentobarbital.

10:36AM 21       And lastly, Petitioners allege that TDCJ

10:36AM 22 officials are violating the Penal Code because they are

10:36AM 23 bringing a controlled substance into a correctional

10:36AM 24 facility.  There is a clear exception in the Penal Code

10:36AM 25 for officials carrying out legal duties, and they have a

10:36AM 1 legal duty here.  There is a valid court order issuing a

10:36AM 2 death warrant and there's a statute that says TDCJ shall

10:36AM 3 carry out lethal injection.

10:36AM 4           Similar challenges have been raised in the

10:36AM 5 federal courts, as we've laid out in our briefing.  The

10:36AM 6 Fifth Circuit has repeatedly rejected challenges to

10:36AM 7 TDCJ's use of pentobarbital, including challenges that

10:37AM 8 allege that pentobarbital is expired.  Those have been

10:37AM 9 rejected by the Fifth Circuit.

10:37AM 10           To be entitled to injunctive relief the

10:37AM 11 Petitioners have to prove three elements, the first of

10:37AM 12 which is they have to show that they have a cause of

10:37AM 13 action.  For the reasons I've just said and for the

10:37AM 14 reasons laid out in our brief, they haven't satisfied the

10:37AM 15 first element or the second element, which is that they

10:37AM 16 have a probable right to relief.

10:37AM 17           The last element is they have to show a

10:37AM 18 probable imminent irreparable injury.  Now, you're going

10:37AM 19 to hear evidence from their -- or testimony from their

10:37AM 20 expert talking about what may happen, what she thinks

10:37AM 21 will happen.  She applies pharmaceutical standards in

10:37AM 22 reaching those conclusions.  And as I've just discussed,

10:37AM 23 the pharmaceutical standards in the USP do not apply to

10:37AM 24 this situation because we're not treating injury, illness

10:37AM 25 or disease.

10:37AM 1          And lastly, Your Honor, because this is a

10:37AM 2  challenge to the method of execution, the United States

10:38AM 3  Supreme Court has added another standard on top of the

10:38AM 4  injunctive relief standard that the Petitioners have to

10:38AM 5  meet, and that is found in <u>Blaze vs. Rees</u>.  The

10:38AM 6  Petitioners have to show that the State's lethal

10:38AM 7  injection creates a demonstrated risk of severe pain.

10:38AM 8          Your Honor, the TDCJ has carried out

10:38AM 9  executions using pentobarbital under the same testing

10:38AM 10 process that it uses now over 70 times.  It has carried

10:38AM 11 out lethal injection over 90 times.  What the Petitioners

10:38AM 12 describe has never happened; it simply has never

10:38AM 13 happened.  The drugs that TDCJ possesses and uses and

10:38AM 14 sends to labs to get tested are -- and the Petitioners'

10:38AM 15 own evidence shows that it was retested as recently as

10:38AM 16 January of 2022 -- it's proven to be potent and

10:38AM 17 effective.

10:38AM 18         The other factors that might be relevant to

10:39AM 19 therapeutic uses of drugs simply don't matter for

10:39AM 20 purposes of a lethal injection.  And for that reason we

10:39AM 21 believe that their request for injunctive relief and

10:39AM 22 declaratory relief should be denied.

10:39AM 23         THE COURT:  Thank you.  All right.  Well,

10:39AM 24 before we begin, I'm certainly aware of the Court of

10:39AM 25 Criminal Appeals order and I understand that I am

10:39AM 1  prohibited from issuing any order that purports to stay

10:39AM 2  the scheduled executions, and I would not assume to do

10:39AM 3  so.  This is a separate matter having to do with an

10:39AM 4  injunction on the use of what the Plaintiffs allege are

10:39AM 5  expired drugs that do not meet certain standards set out

10:39AM 6  in various civil statutes, so we'll proceed with that

10:39AM 7  evidence.

10:39AM 8          Mr. Kursman, if you would like to call your

10:39AM 9  first witness.

10:39AM 10          MR. KURSMAN:  Thank you, Your Honor.

10:39AM 11 Before I do, could I just ask that we be given time to

10:39AM 12 respond to Ms. O'Leary's legal arguments?

10:39AM 13          THE COURT:  Yes, go ahead.  After -- you

10:40AM 14 want to call your witness -- yes.

10:40AM 15          MR. KURSMAN:  Petitioners call Dr. Michaela

10:40AM 16 Almgren.

10:40AM 17          MICHAELA ALMGREN,

10:40AM 18 having been duly first sworn, testified as follows:

10:40AM 19          DIRECT EXAMINATION

10:40AM 20 BY MR. KURSMAN:

10:40AM 21     Q.   Dr. Almgren, can you introduce yourself to the

10:40AM 22 Court.

10:40AM 23     A.   So my name is Michaela Almgren.  I'm a clinical

10:40AM 24 associate professor of pharmacy at the University of

10:40AM 25 South Carolina College of Pharmacy.  I'm a licensed

10:40AM 1 pharmacist in South Carolina and a few other states and I

10:40AM 2 have really vast experience in sterile compounding.

10:40AM 3        When I was a student I was a pharmacy

10:40AM 4 technician working in a hospital performing sterile

10:40AM 5 compounding. When I graduated I was a pharmacist in a

10:40AM 6 large teaching hospital performing duties of a sterile

10:41AM 7 compounding pharmacist. I worked in oncology, I worked

10:41AM 8 in home infusion, all of those fields involving sterile

10:41AM 9 compounding.

10:41AM 10        I also teach CE, continuing educational

10:41AM 11 courses to pharmacists that deal with this subject matter

10:41AM 12 of sterile compounding. I'm very familiar with sterile

10:41AM 13 compounding under 503A regulations. And most recently I

10:41AM 14 became a pharmacist as a part of my clinical assignment

10:41AM 15 with the university as a 503B pharmacy. And so I also

10:41AM 16 have vast experience now in sterile compounding

10:41AM 17 regulations as they are related to 503B pharmacy.

10:41AM 18        I also have pharmaceutical industry

10:41AM 19 experience because prior to going to pharmacy school I

10:41AM 20 actually went to -- I worked for a number of drug

10:41AM 21 companies and I worked as an analytical chemist. So I

10:41AM 22 have this analytical chemistry experience, I have a

10:41AM 23 master's degree -- I have a college degree in biology and

10:42AM 24 chemistry. I have a master's degree in pharmaceutical

10:42AM 25 sciences in pharmacy and I also have a doctorate in

10:42AM 1   pharmacy.

10:42AM 2       Q.   And Dr. Almgren, can you just briefly describe

10:42AM 3   for the Court what a pharmacist does?

10:42AM 4       A.   So it really depends, because the area of

10:42AM 5   pharmacy practice is very vast.  So you can be a clinical

10:42AM 6   pharmacist working in a hospital, you can be a retail

10:42AM 7   pharmacist working in Rite Aid or a Walgreen's dispensing

10:42AM 8   and working directly with the public.  My area of

10:42AM 9   expertise is sterile compounding and so what I do is, I

10:42AM 10  prepare medications based on physicians' orders for

10:42AM 11  patients.

10:42AM 12      Q.   Can you tell the Court what sterile compounding

10:42AM 13  means?

10:42AM 14      A.   So sterile compounding involves preparation of

10:42AM 15  drugs where you start with either a sterile drug -- this

10:42AM 16  would be considered low risk compounding where you start

10:43AM 17  with maybe a vial of drug that comes from the

10:43AM 18  manufacturer and, according to the doctor's orders, you

10:43AM 19  will perhaps dilute the medication or maybe turn it from

10:43AM 20  an injection into an infusion.  So you are going to add

10:43AM 21  it to an IV bag.  So that would be considered low risk

10:43AM 22  compounding.

10:43AM 23          Then you have a medium risk compounding

10:43AM 24  that involves more complex procedures.  So if I was

10:43AM 25  compounding a total parenteral nutrition product, so

10:43AM 1    something that contains a number of additives -- so maybe

10:43AM 2    I'll add 10 or 12 additives -- that would be considered a

10:43AM 3    medium risk compounding.

10:43AM 4                   Then there is high risk compounding.  And

10:43AM 5    according to USP 797, the guidance that basically

10:43AM 6    provides all of the regulations for 503A pharmacies in

10:43AM 7    regards to sterile compounding, the high risk compounding

10:43AM 8    involves starting with a nonsterile product that would be

10:43AM 9    maybe an API active pharmaceutical ingredient that you

10:44AM 10   will weigh out, measure out in some way and then you're

10:44AM 11   going to dilute it and prepare a sterile product

10:44AM 12   basically by sterilizing it.  You prepare it, you maybe

10:44AM 13   add an additive or two and then you go in to either

10:44AM 14   filter, sterilize it, make it sterile or you could

10:44AM 15   autoclave it, depending on the product itself.

10:44AM 16        Q.   Do you also have experience with extending

10:44AM 17   beyond-use dates of --

10:44AM 18        A.   Yes.

10:44AM 19        Q.   -- medications?

10:44AM 20        A.   Yes, I do.  Of course, in a 503B environment we

10:44AM 21   have to follow CGAP regulations, so we extend beyond-use

10:44AM 22   dates according to that.  I also worked in a hospital

10:44AM 23   teaching pharmacy, and so we extended beyond-use dates

10:44AM 24   according to USP 797.

10:44AM 25        Q.   Did you prepare a CV in connection with this

10:44AM 1 case?

10:44AM 2     A.   I'm sorry; you broke up.

10:44AM 3     Q.   Did you prepare a CV in connection with this

10:44AM 4 case?

10:44AM 5     A.   Yes, I did.  Yes, I'm sorry.  Yes.

10:45AM 6     Q.   I'm going to show you what's marked as

10:45AM 7 Petitioner's Exhibit 1.

10:45AM 8           MS. O'LEARY:  Your Honor, Respondents

10:45AM 9 object to Exhibit 1 as hearsay.

10:45AM 10           THE COURT:  Mr. Kursman.

10:45AM 11           MR. KURSMAN:  Your Honor, because this is a

10:45AM 12 bench preliminary injunction hearing, we were thinking

10:45AM 13 that it would be -- it would streamline both this

10:45AM 14 presentation and whatever argument happens later on on

10:45AM 15 Ms. Almgren's expertise, but we're happy to just go

10:45AM 16 further through Ms. Almgren's expertise.

10:45AM 17           THE COURT:  That's all right, no.  The

10:45AM 18 objection will be overruled and the CV will be admitted.

10:45AM 19     Q.   (Mr. Kursman)  Dr. Almgren, are you familiar

10:45AM 20 with the United States Pharmacopeia?

10:46AM 21     A.   Yes, of course.  It's a -- basically it governs

10:46AM 22 a lot of the pharmacy practice, pharmaceutical industry.

10:46AM 23 It's a really excellent reference for practice.

10:46AM 24     Q.   And can you tell the Court why it's important

10:46AM 25 for a pharmacist to be familiar with the United States

10:46AM 1  Pharmacopeia?

10:46AM 2      A.   You must be familiar with the USP because it

10:46AM 3  basically provides guidance on our everyday activities;

10:46AM 4  everything from how we compound, how we handle

10:46AM 5  medications, storage conditions.  A lot of really good

10:46AM 6  references is in USP.

10:46AM 7      Q.   Are you familiar with USP Chapter 797?

10:46AM 8      A.   Yes, absolutely.  It is a subject matter that I

10:46AM 9  have been teaching for years.  And USP Chapter 797

10:46AM 10 basically governs or provides guidance on how to perform

10:46AM 11 sterile compounding in 503A regulated environment.

10:46AM 12     Q.   And are you familiar with USP Chapter 790?

10:46AM 13     A.   Yes, absolutely.  USP Chapter 790 describes how

10:47AM 14 to perform visual inspection for injectables.

10:47AM 15     Q.   And are you familiar with USP Chapter 71?

10:47AM 16     A.   Yes.  Yes, that's another very good compounding

10:47AM 17 method that describes how to perform sterility testing on

10:47AM 18 the products that are compounded.

10:47AM 19     Q.   Dr. Almgren, have you served as an expert in

10:47AM 20 litigation before, an expert in pharmacy?

10:47AM 21     A.   Yes.

10:47AM 22          MR. KURSMAN:  Your Honor, we would move to

10:47AM 23 have Dr. Almgren qualified as an expert in pharmacy

10:47AM 24 compounding, United States Pharmacopeia and extending

10:47AM 25 beyond-use dates.

10:47AM 1          THE COURT:  She's so accepted.  You may

10:47AM 2  proceed.

10:47AM 3      Q.   (Mr. Kursman)  Dr. Almgren, were you retained

10:47AM 4  in this case by Petitioners' counsel?

10:47AM 5      A.   Yes.

10:47AM 6      Q.   Were you asked to provide an opinion about this

10:47AM 7  case?

10:47AM 8      A.   Yes.

10:47AM 9      Q.   Can you tell the Court what you were asked to

10:48AM 10  provide an opinion about?

10:48AM 11      A.   So I was provided a number of documents to

10:48AM 12  review and basically assess whether the beyond-use date

10:48AM 13  on the products that I used are -- is appropriate.

10:48AM 14      Q.   Were you asked to reach a conclusion about

10:48AM 15  whether the pentobarbital in TDCJ's possession is

10:48AM 16  expired?

10:48AM 17      A.   Yes, I was asked to analyze and basically see

10:48AM 18  if I -- what are my thoughts on the expiry of those

10:48AM 19  products, yes.

10:48AM 20      Q.   And what is your opinion on whether the

10:48AM 21  pentobarbital in TDCJ's possession is expired?

10:48AM 22      A.   Those products are well beyond expiry.  The way

10:48AM 23  that the TDCJ extends beyond-use dating is not

10:48AM 24  appropriate.  This is not how you are supposed to extend

10:48AM 25  beyond-use dating on drugs.

10:48AM 1    Q.    Do you hold that opinion to a reasonable degree

10:48AM 2  of scientific certainty?

10:48AM 3    A.    Absolutely.

10:49AM 4    Q.    Can you tell the Court what documents you

10:49AM 5  reviewed to come to that opinion?

10:49AM 6    A.    So I looked at the -- I guess the documents are

10:49AM 7  listed in my testimony, in my report.  But some of the

10:49AM 8  key documents that I looked at were some of the

10:49AM 9  analytical reports that were provided that basically show

10:49AM 10  the potency and some of the testing results of the drugs,

10:49AM 11  as well as I reviewed I guess the storage logs for the

10:49AM 12  drugs themselves.

10:49AM 13    Q.    Were you also asked to opine on whether there

10:49AM 14  was a risk of harm that can be caused by the

10:49AM 15  administration of the expired compounded pentobarbital?

10:49AM 16    A.    Yes, that's correct.

10:49AM 17    Q.    Did you provide an opinion?

10:49AM 18    A.    I did.

10:49AM 19    Q.    And can you describe for the Court what that

10:49AM 20  opinion is?

10:49AM 21    A.    Well, the drugs that are currently in

10:49AM 22  possession, as far as I know from the records that I was

10:50AM 23  provided, all appear to be well-beyond expiry, well

10:50AM 24  beyond expiration date.  And with those types of

10:50AM 25  medications, it's really difficult to tell what the

10:50AM 1  pharmacological activity would be.  Typically when you

10:50AM 2  have medications that expired, the further away they are

10:50AM 3  from the date when they were prepared, the more chances

10:50AM 4  there are that the medication will not work as expected.

10:50AM 5          I looked at the data related to the

10:50AM 6  pentobarbital and I saw how the TDCJ is trying to extend

10:50AM 7  the beyond-use date using the assay testing, but that is

10:50AM 8  not appropriate; and actually the potency of the drug

10:50AM 9  might be much lower than what was determined, and so the

10:50AM 10 potency may be affected.  Typically as the medication

10:50AM 11 sits for a long time -- and of course I'm not sure, but

10:50AM 12 it does not appear that the storage conditions are really

10:51AM 13 well-monitored for those medications.

10:51AM 14          That also brings up another concern,

10:51AM 15 because medications, if they are stored in conditions

10:51AM 16 where the temperature changes, humidity changes, they may

10:51AM 17 be exposed to light; all of that has impact on medication

10:51AM 18 quality.  And of course, the medications are expired, to

10:51AM 19 begin with, and then they are, you know, exposed to all

10:51AM 20 of these unknown conditions.  So the chances of those

10:51AM 21 medications not functioning as they are supposed to are

10:51AM 22 really high.

10:51AM 23     Q.    Is one of the probable risks that the drugs

10:51AM 24 will fall out of solution?

10:51AM 25     A.    There is a good probable.  The reason for that

10:51AM 1 is the medication itself, pentobarbital, is not water

10:51AM 2 soluble, so it is not your typical type of medication.

10:51AM 3 People think, oh, you just take the vial, add some normal

10:51AM 4 saline, dissolve it; here it is in liquid and you go

10:51AM 5 ahead and inject it.

10:51AM 6 Pentobarbital is actually not water

10:51AM 7 soluble. So what you have to do is, you have to adjust

10:52AM 8 the pH of the solution and you have to dissolve the

10:52AM 9 pentobarbital powder in alcohol, and so this way you are

10:52AM 10 making it to come into the solution. But what happens in

10:52AM 11 time is the pH will shift because of, like I said, the

10:52AM 12 environmental exposure, just time itself; also alcohol,

10:52AM 13 as we all know, will evaporate over time. The

10:52AM 14 concentration of that will shift, as well, and all of

10:52AM 15 that can potentially lead to the drug degrading, coming

10:52AM 16 out of solution.

10:52AM 17 I would like to see the vials of the drug.

10:52AM 18 I have no doubt that every one of them have changed color

10:52AM 19 from the original. You know, it's supposed to be clear

10:52AM 20 colored solution. You know, looking at the records that

10:52AM 21 I was provided, I have no doubt at all that those vials

10:52AM 22 are probably yellow by now, and that just shows the signs

10:52AM 23 of degradation.

10:52AM 24 Q. And if the drug falls out of solution, does

10:52AM 25 that cause pain at the injection site?

10:52AM 1   A.   Oh, absolutely.  Medications, if there is any

10:53AM 2   precipitation -- this is the whole point of USP

10:53AM 3   Chapter 790.  You perform visual inspection to make sure

10:53AM 4   that the medications do not have any precipitant form in

10:53AM 5   them.  Because if you inject medication that has

10:53AM 6   particulate matter in them, if you inject them

10:53AM 7   intravenously, it definitely can cause pain, burning at

10:53AM 8   injection site.  A lot of times you will have occlusion

10:53AM 9   of the blood vessels and that can cause severe pain.

10:53AM 10       I have read literature because I do a lot

10:53AM 11  of assessments, clinical assessments for my 503B pharmacy

10:53AM 12  appointment.  So I a lot of times assess clinical risks

10:53AM 13  of medication that contains particulate matter, and they

10:53AM 14  can have very severe outcomes.  Patients can get a

10:53AM 15  stroke, embolism, those types of things from having

10:53AM 16  particulates in a solution.

10:53AM 17  Q.   I'm going to show you what's marked as

10:54AM 18  Plaintiff's Exhibit 2.  Do you recognize this exhibit?

10:54AM 19  A.   Yes.

10:54AM 20       MS. O'LEARY:  Respondents object to this

10:54AM 21  exhibit, Your Honor.  It is inadmissible hearsay.  Expert

10:54AM 22  reports are typically inadmissible without a non-hearsay

10:54AM 23  purpose, and this doesn't fall within any of the

10:54AM 24  exclusions or exceptions in Rule 801 or 803.

10:54AM 25       In re:  Commitment of Johnson, Delamar vs.

10:54AM 1 <u>Fort Worth Mountain Bikers Association</u>, these are just a

10:54AM 2 handful of cases that exclude expert reports. Regardless

10:54AM 3 of whether the expert is testifying, the report itself is

10:54AM 4 hearsay.

10:54AM 5         THE COURT: Mr. Kursman.

10:54AM 6         MR. KURSMAN: Your Honor, we are just

10:54AM 7 attempting to streamline this presentation because

10:54AM 8 there's not a jury; but, of course, we are willing to

10:54AM 9 just go into the details of the report rather than enter

10:54AM 10 it, if you would like.

10:54AM 11         THE COURT: The objection is sustained.

10:55AM 12    Q. Aside from the documents that you discussed

10:55AM 13 earlier that you relied on, did you rely on any

10:55AM 14 scientific sources in coming to your conclusions?

10:55AM 15    A. Absolutely. This is typically what I do. I

10:55AM 16 mean, I have a lot of experience working in analytical

10:55AM 17 chemistry for almost ten years and working in industry

10:55AM 18 and working in a pharmacy. I do have vast experience,

10:55AM 19 but I typically prefer to find scientific arguments that

10:55AM 20 will support, you know, whatever my findings are.

10:55AM 21    Q. I'm going to show you what's marked as

10:55AM 22 Plaintiff's Exhibit 3. Do you recognize Plaintiff's

10:55AM 23 Exhibit 3?

10:55AM 24    A. Yes, that's USP Chapter 797.

10:55AM 25         MS. O'LEARY: Your Honor, Respondents

10:55AM 1  object to Exhibits 3, 4, 5, which are all similar to the
10:56AM 2  one that we see here, as hearsay.  They also have
10:56AM 3  improper foundation; there's no authentication.  There's
10:56AM 4  nothing to show that these standards apply in Texas.
10:56AM 5  When Texas has standards, they are codified.  There are
10:56AM 6  pharmacy standards codified in the Texas Administrative
10:56AM 7  Code and this is not a copy of the administrative code
10:56AM 8  so...
10:56AM 9          THE COURT:  Sorry, Ms. O'Leary.  You froze
10:56AM 10 there for a second.  You got cut off.
10:57AM 11          (Brief pause.)
10:57AM 12          MS. O'LEARY:  As I was saying, Exhibits 3,
10:57AM 13 4 and 5, each are inadmissible hearsay, they don't fall
10:57AM 14 within one of the exceptions or exemptions, and the
10:57AM 15 expert has not linked this to what is applicable in
10:57AM 16 Texas, which is found in the Texas Administrative Code.
10:57AM 17          MR. KURSMAN:  Your Honor, I think if I ask
10:57AM 18 another question maybe it would clear this up.
10:57AM 19          THE COURT:  All right, go ahead.
10:57AM 20      Q.  (BY MR. KURSMAN)  Is this a source that is
10:57AM 21 ordinarily relied upon by experts in your field?
10:57AM 22      A.  Absolutely.  This is something that we use
10:57AM 23 across the country.  This is something that pharmacists
10:57AM 24 in Texas, South Carolina, anywhere in the United States
10:57AM 25 use.  Yes, this is a very common standard.

10:57AM 1          As a matter of fact, if you work in any

10:58AM 2     kind of a health system, pharmacy setting, you have to

10:58AM 3     comply with the JCAHO regulations and, of course, this is

10:58AM 4     one of the requirements.  So this is a very widely

10:58AM 5     accepted standard of practice.

10:58AM 6          MR. KURSMAN:  So we would move to admit

10:58AM 7     Exhibit 3 under Rule 703.

10:58AM 8          MS. O'LEARY:  The Respondents continue to

10:58AM 9     object based on hearsay, Your Honor.

10:58AM 10          THE COURT:  How do you responded to the

10:58AM 11     hearsay objection, Mr. Kursman?

10:58AM 12          MR. KURSMAN:  Your Honor, I believe

10:58AM 13     Rule 703 allows documents in that experts rely on if it's

10:58AM 14     relied upon ordinarily by experts in their field, and

10:58AM 15     Dr. Almgren testified it was.  So I believe it comes in

10:58AM 16     under 703.

10:58AM 17          THE COURT:  The objection is overruled.

10:58AM 18     Exhibit 3 is admitted.

10:58AM 19     Q.   (Mr. Kursman)  Dr. Almgren, let me show you

10:58AM 20     what is marked as Plaintiff's Exhibit 4.  Do you

10:59AM 21     recognize this exhibit?

10:59AM 22     A.   Yes, yes.  This is USP Chapter 71.  It

10:59AM 23     describes how to perform sterility tests on products that

10:59AM 24     are sterile compounds.

10:59AM 25     Q.   Is this a source that is ordinarily relied upon

10:59AM 1  by experts in your field?

10:59AM 2      A.   Absolutely, yes.

10:59AM 3             MR. KURSMAN:  I move to admit Petitioner's

4  Exhibit 4.

5             THE COURT:  Mr. Marshall, are you taking

6  over?  I don't see Ms. O'Leary.

7             MR. MARSHALL:  Ms. O'Leary is attempting to

8  restart her computer.

9             THE COURT:  Let's give her a moment to do

10:59AM 10  that.

10:59AM 11             MR. MARSHALL:  Your Honor, I'm perfectly

10:59AM 12  willing to follow along with the testimony here.  If

10:59AM 13  we're going to examine the witness, I will be the one

10:59AM 14  asking the questions so...

10:59AM 15             THE COURT:  Well, if you are going to be

10:59AM 16  the one asking the questions, you need to be making the

11:00AM 17  objections; we don't go back and forth.  Ms. O'Leary had

11:00AM 18  started with making the objections, so I assumed she

11:00AM 19  would be doing the cross-examination.  You don't get to

11:00AM 20  tag team.  Let's wait for Ms. O'Leary to get back,

11:00AM 21  please.

11:01AM 22             MS. O'LEARY:  I apologize for that.

11:01AM 23             THE COURT:  That's all right.

11:02AM 24             Mr. Kursman had offered Exhibit 4.

11:02AM 25             MS. O'LEARY:  Your Honor, Respondents

11:02AM 1    object for the same reasons as 3.

11:02AM 2              THE COURT:  No. 4 will be admitted.

11:02AM 3        Q.   (Mr. Kursman)  I'm just going to ask is this a

11:02AM 4    source -- I think I did ask while Ms. O'Leary was gone.

11:02AM 5    This is a source that is ordinarily relied upon by --

11:02AM 6              THE COURT:  Hold on.  Before you go on, I

11:02AM 7    can see your the -- there you go.

11:02AM 8        Q.   (Mr. Kursman)  This is a source that is

11:02AM 9    ordinarily relied upon by experts in your field?

11:02AM 10       A.   Yes.

11:02AM 11             MR. KURSMAN:  We will move to admit

11:02AM 12   Petitioner's Exhibit 4.

11:02AM 13             THE COURT:  I had just admitted 4 a moment

11:02AM 14   ago.  You can move on from that.

11:02AM 15       Q.   (Mr. Kursman)  Dr. Almgren, I want to show you

11:02AM 16   Petitioner's Exhibit 5.  Do you recognize this exhibit?

11:03AM 17       A.   Yes, I do.

11:03AM 18       Q.   Can you describe for the Court what this

11:03AM 19   exhibit is?

11:03AM 20       A.   So this is the USP chapter that describes how

11:03AM 21   to perform visual inspection for visible particulates in

11:03AM 22   the injections.  It's very commonly used.  We use it in

11:03AM 23   the hospital when we examine and prepare medications.

11:03AM 24   I've used it in industry, used it in pharmacy, in 503B

11:03AM 25   setting.  It's very commonly used by pharmacists.

11:03AM 1    MR. KURSMAN:  I would move to admit

11:03AM 2 Petitioner's Exhibit 5.

11:03AM 3    THE COURT:  Ms. O'Leary.

11:03AM 4    MS. O'LEARY:  Respondents object to 5 on

11:03AM 5 the same basis as 3 and 4; hearsay.

11:03AM 6    THE COURT:  No. 5 is admitted.

11:03AM 7    Q.   (Mr. Kursman)  Dr. Almgren, in your initial

11:03AM 8 testimony you described commercially manufactured drugs

11:04AM 9 versus compounded drugs.  Can you -- first, is there a

11:04AM 10 difference between the two?

11:04AM 11    A.   Yes, there is absolutely a big difference

11:04AM 12 between the two.  Typically your commercially prepared

11:04AM 13 medications undergo very rigorous testing.

11:04AM 14        You know, think about medications that are

11:04AM 15 made by Baxter and Pfizer.  When they make those, let's

11:04AM 16 say, sterile preparations, they make thousands, tens of

11:04AM 17 thousands of dosages.  And so, of course, they have to

11:04AM 18 have a very strict and a good manufacturing control,

11:04AM 19 quality control over their products.  You know, the

11:04AM 20 medications are tested multiple times throughout the

11:04AM 21 manufacturing process.  At the beginning, throughout you

11:04AM 22 want to assure there is continuity and uniformity that

11:04AM 23 the sterility is tested properly and all that.  So the

11:04AM 24 manufacturing process is very strictly controlled.  We

11:04AM 25 use CGMP regulations from the FDA that basically oversee

11:05AM 1    this process and they are very detailed, very vigorous.

11:05AM 2              By comparison, when you perform sterile

11:05AM 3    compounding in a 503A setting, let's say in the hospital

11:05AM 4    or in a pharmacy, the 503A compounding does not have

11:05AM 5    those controls in place.  All we have is USP Chapter 797,

11:05AM 6    and that is what we follow.  And so in Chapter 797, you

11:05AM 7    know, when you read for example how beyond-use dating is

11:05AM 8    established, it's much shorter because you don't have as

11:05AM 9    much control over the compounds as you do when you follow

11:05AM 10   CGMP.

11:05AM 11             You know, when I teach my pharmacy students

11:05AM 12   I always compare, I tell them, "You know when we talk

11:05AM 13   about USP Chapter 797, it's kind of like the high school

11:05AM 14   level regulations; then when you are looking at the CGMP,

11:05AM 15   it's kind of like the doctorate level regulations."  Like

11:05AM 16   they are really strict, very specific, you know, and they

11:05AM 17   are really made to, you know, to promulgate really good

11:06AM 18   control over the entire manufacturing process.

11:06AM 19             THE COURT:  Doctor, let me stop you.  Tell

11:06AM 20   me, what does CGMP stand for?

11:06AM 21             THE WITNESS:  Yes, absolutely.  So CGMP

11:06AM 22   stands for Current Good Manufacturing Practices, and

11:06AM 23   those are specified in the Food, Drug and Cosmetic Act.

11:06AM 24   I think it's in the Federal Register.  Chapter 210, 211

11:06AM 25   specify specifically sterile compounding practices.

11:06AM 1    And like I said, the CGMP, the Current Good

11:06AM 2 Manufacturing Practices are practices that are

11:06AM 3 implemented by pharmaceutical manufacturers and also 503B

11:06AM 4 compounders, so both of those.  Because of the sizes of

11:06AM 5 batches, you have to have a much more strict control over

11:06AM 6 your process, over your compounding or manufacturing

11:06AM 7 process because your medications go to thousands of

11:06AM 8 patients.

11:06AM 9    So on the other end of the spectrum you

11:07AM 10 have USP Chapter 797 that provides you the basics on how

11:07AM 11 to perform compounding, sterile compounding, to prepare

11:07AM 12 safe drugs for individual patients.

11:07AM 13    Q.   (Mr. Kursman)  Does USP also describe how to

11:07AM 14 extend the beyond-use dates of compounded drugs?

11:07AM 15    A.   It does touch upon that, yes.

11:07AM 16    Q.   And does it also describe what the beyond-use

11:07AM 17 date of compounded drugs would be?

11:07AM 18    A.   Yes, absolutely.  And this is very crucial

11:07AM 19 because, again, when you think about manufacturing you

11:07AM 20 have so many controls in place; with compounding you

11:07AM 21 don't.  It's really the pharmacist or the pharmacy

11:07AM 22 technician who is compounding, so those beyond-use dates

11:07AM 23 will be much shorter than your traditional expiry of the

11:07AM 24 manufactured medications.  You know, by comparison

11:07AM 25 manufactured drugs, they may have expired a couple of

11:07AM 1  years, two to three years.

11:07AM 2      I work for a 503B compounding drug company

11:08AM 3  and so we perform compounding under 503B regulations.  So

11:08AM 4  we follow CGMP, and none of our beyond-use dates are past

11:08AM 5  180 days.  So even though we have strict control over our

11:08AM 6  process, we still don't extend the beyond-use date past

11:08AM 7  180 days, just out of caution.

11:08AM 8      And then you have USP Chapter 797 that,

11:08AM 9  again as I said, the regulations are different and the

11:08AM 10  control of the process of the compounding isn't as good

11:08AM 11  because, as I said, those are small batches typically

11:08AM 12  made for one or two patients by pharmacists in a

11:08AM 13  hospital.  It's not your big, you know, manufacturing,

11:08AM 14  automated system where there is very little human

11:08AM 15  interaction.  The compounding is all human interaction,

11:08AM 16  so a lot of potential for error, a lot of potential for

11:08AM 17  contamination.  So because of that, your beyond-use dates

11:09AM 18  are going to be significantly shorter; typically in days

11:09AM 19  or hours.

11:09AM 20      Q.   And are the drugs in TDCJ's possession

11:09AM 21  commercially manufactured drugs or are they compounded

11:09AM 22  drugs?

11:09AM 23      A.   They are compounded drugs.  That's what it says

11:09AM 24  in their records.

11:09AM 25      Q.   And what does it mean for a drug to be

11:09AM 1  compounded?

11:09AM 2      A.    That basically means that it was probably a

11:09AM 3  pharmacist or pharmacy technician who prepared it.  It is

11:09AM 4  not commercially manufactured, an automated system.

11:09AM 5      Q.    And are these sterile compounded drugs?

11:09AM 6      A.    They need to be sterile because they are going

11:09AM 7  to be injected into a patient.  So, of course, they need

11:09AM 8  to be sterile.

11:09AM 9      Q.    According to the USP, what is the maximum

11:09AM 10 beyond-use date for a sterile compounded drug?

11:09AM 11     A.    So according to USP Chapter 797, if you keep

11:09AM 12 the medication deeply frozen -- so that means it's in a

11:10AM 13 minus 10 to minus 25 degree type of deep freeze setting

11:10AM 14 -- it is good for 45 days.

11:10AM 15     Q.    And the three exhibits I showed you previously,

11:10AM 16 Exhibits 3, 4 and 5, which were USP 797, 790 and 71, are

11:10AM 17 those guidelines that pharmacists follow when performing

11:10AM 18 sterile compounding of drugs?

11:10AM 19     A.    Yes.  Yes, of course.

11:10AM 20     Q.    Are the vials of pentobarbital in TDCJ's

11:10AM 21 possession considered high risk sterile compounds?

11:10AM 22     A.    My assumption is that they are high risk

11:10AM 23 compounds, yes.

11:10AM 24     Q.    Can you tell the Court why?

11:10AM 25     A.    Because they are most likely -- they have been

11:10AM 1  prepared from the API, from the powdered drug.  So if you

11:10AM 2  are starting with an API that's typically nonsterile, you

11:10AM 3  are going to weigh out the medication, you are going to

11:10AM 4  prepare the solution.  As I described earlier, this is a

11:11AM 5  non-water soluble drug, so more technically advanced in

11:11AM 6  terms of how you prepare it.  And so the medication is

11:11AM 7  prepared and then put in the vials, and so then it has to

11:11AM 8  be sterilized prior to being put in vials.

11:11AM 9      Q.    And I believe you testified this a minute ago

11:11AM 10 about all compounded drugs, but what is the maximum

11:11AM 11 beyond-use date for high risk sterile compounds?

11:11AM 12     A.    It is the same.  It's 45 days.  So 45 days in

11:11AM 13 deep freeze, yes.

11:11AM 14     Q.    And what if they are not in deep freeze?

11:11AM 15     A.    Then, depending on the storage conditions,

11:11AM 16 24 hours if they are stored in room temperature -- that's

11:11AM 17 for high risk compounds -- and 72 hours, or 3 days, if

11:11AM 18 they are stored in refrigerator.

11:11AM 19     Q.    And what chapter of the USP should be followed

11:11AM 20 for compounding of high risk sterile compounds?

11:11AM 21     A.    It's USP Chapter 797.

11:11AM 22     Q.    I'm going to show you again Plaintiff's

11:12AM 23 Exhibit 3.  And is this USP 797 we are looking at right

11:12AM 24 here?

11:12AM 25     A.    Yes, it is.

11:12AM 1     Q.    Now, if we go to Page 33 of Exhibit 3, do you

11:12AM 2  see where it says the maximum beyond-use dates of

11:12AM 3  compounded drugs?

11:12AM 4     A.    Yes.  All the way on the bottom it says, "High

11:12AM 5  risk level compounded sterile products."  It says, "Not

11:12AM 6  more than 24 hours at room temperature, three days at

11:12AM 7  cold and 45 in solid frozen state."

11:12AM 8     Q.    Now I'm going to show you what's previously

11:12AM 9  been admitted as Plaintiff's Exhibit 6.  Do you recognize

11:13AM 10 this exhibit?

11:13AM 11    A.    Yes, I do.

11:13AM 12    Q.    And did you rely on this exhibit in forming

11:13AM 13 your opinion?

11:13AM 14    A.    Yes, I did.

11:13AM 15    Q.    I'm going to take you to -- do you see the date

11:13AM 16 that says 3-18-21?

11:13AM 17    A.    Yes.  3-18-21, received from supplier line.

11:13AM 18 Yes, I see it.

11:13AM 19    Q.    According to these records, this is the last

11:13AM 20 time that TDCJ received 50 milliliter vials of

11:13AM 21 pentobarbital?

11:13AM 22    A.    That's what it appears to be, from the records

11:13AM 23 that I was given.

11:13AM 24    Q.    So according to the USP, when would the 50

11:13AM 25 milliliter vials of pentobarbital have expired?

11:13AM 1    A.   So if this medication was stored in deep

11:13AM 2 freeze, that would be good for 45 days.  So 3-18-21 -- I

11:14AM 3 would say sometime early May of 2021 is when this

11:14AM 4 medication would have expired.

11:14AM 5    Q.   I'm going to show you Plaintiff's Exhibit 7.

11:14AM 6 Do you recognize this exhibit?

11:14AM 7    A.   Yes.

11:14AM 8    Q.   And what is this exhibit?

11:14AM 9    A.   So this appears to be the storage inventory of

11:14AM 10 the pentobarbital vials that have 100 milliliter volume.

11:14AM 11    Q.   And do you see the entry that says 4-29-19?

11:14AM 12    A.   Yes.  That's when I'm assuming the six vials

11:14AM 13 were received, or six vials were -- let me see -- oh, 15

11:14AM 14 vials were received from the supplier and added into the

11:14AM 15 inventory.

11:14AM 16    Q.   And according to these records, 4-29-19 is the

11:14AM 17 last time TDCJ received 100 milliliters vials of

11:14AM 18 pentobarbital?

11:15AM 19    A.   That's what it appears to be.

11:15AM 20    Q.   According to USP, when would have the 100

11:15AM 21 milliliter vials in TDCJ's possession have expired?

11:15AM 22    A.   Sometime in mid June of 2019.

11:15AM 23    Q.   Based on your review of the records, has TDCJ

11:15AM 24 been following the USP when extending the beyond-use date

11:15AM 25 of pentobarbital in its possession?

11:15AM 1        A.    No.   Because what they appear to be doing is

11:15AM 2    they just basically test the medication and if it appears

11:15AM 3    that potency is there, then they somehow -- and I'm not

11:15AM 4    really sure what the reasoning is -- they are just

11:15AM 5    extending it beyond that.  But you know, there are a lot

11:15AM 6    of flaws in that particular methodology, number one being

11:15AM 7    the fact that when you tested one vial from one batch,

11:16AM 8    that is not representative of all of the other vials and

11:16AM 9    all of the other batches that you have in possession.

11:16AM 10        So it's very important to have good quality

11:16AM 11   manufacturing process like when you do 503B compounding

11:16AM 12   or sterile compounding, you know, manufacturing where you

11:16AM 13   have large batches and you have contact uniformity.  When

11:16AM 14   you are doing small scale, there's no guarantee that

11:16AM 15   other vials are exactly the same.  So that's one concern.

11:16AM 16        The other concern that I have is the fact

11:16AM 17   that when you are testing the potency using an assay, the

11:16AM 18   methodology that's used to test for the actual potency,

11:16AM 19   the strength is not appropriate.  You have to use a

11:16AM 20   method that looks at the stability and looks at the

11:16AM 21   degradation of the product, especially when these

11:16AM 22   products are so old and expired.

11:17AM 23        Your stability indicating method will show

11:17AM 24   you if there are any other potential degradants in the

11:17AM 25   product itself.  And those would be bundled in with the

11:17AM 1   main drug in an assay, so you would not be able to see

11:17AM 2   them.

11:17AM 3       Q.   So in layman's terms, can you describe for the

11:17AM 4   Court what TDCJ is doing to purportedly extend the B-U

11:17AM 5   date of the pentobarbital in their possession?

11:17AM 6       A.   So from what I can tell from the records that

11:17AM 7   are provided for my review, they basically test the drug

11:17AM 8   and if it still has what they assume is the correct

11:17AM 9   potency, which we are not really sure that it does, they

11:17AM 10   just say all of the vials are still good, regardless

11:17AM 11   whether they are 50 ml vials or 100 ml vials and they

11:17AM 12   just somehow assign it the further date out.

11:17AM 13          But that's completely inappropriate,

11:17AM 14   because what you need to do is you need to do a stability

11:18AM 15   study that basically will determine what is the proper

11:18AM 16   span for the medications expiring.  So if you perform a

11:18AM 17   stability study, then you will be able to project the

11:18AM 18   dates forward.  But you can't do that as you go; that's

11:18AM 19   not a correct way of doing it.  You can't just assume

11:18AM 20   that next time we test it, it probably will be fine; it's

11:18AM 21   fine between now and the next date.

11:18AM 22       Q.   And did they perform all the tests that are

11:18AM 23   required under the United States Pharmacopeia?

11:18AM 24       A.   No.  I also did not see all of the tests that

11:18AM 25   they are supposed to do, and one that really concerns me

11:18AM 1 is actually pH. PH is a concerning one because, number

11:18AM 2 one, if the pH is not appropriate the drug may fall out

11:18AM 3 of solution -- and you may say, "Oh, I don't see

11:18AM 4 anything," because you may have microcrystal formation.

11:18AM 5 There is actually potential for these difficult-to-see

11:18AM 6 particles to be formed that you may not see with the

11:18AM 7 naked eye.

11:18AM 8 And so they may -- so they really should

11:19AM 9 perform pH to assess that the drug still has the pH that

11:19AM 10 it's supposed to have. And of course, pH itself, if it's

11:19AM 11 inappropriate, it can cause burning and pain at the

11:19AM 12 injection site. So pH is definitely something that needs

11:19AM 13 to be tested.

11:19AM 14 And also the sterility that they have

11:19AM 15 performed or they had the contract lab to perform is done

11:19AM 16 via scan RDI, which is a technology that provides quicker

11:19AM 17 turnaround. It's a quick technology, but it is not as

11:19AM 18 accurate. And in particular, it does not capture a lot

11:19AM 19 of times some of the long-term microorganisms, some of

11:19AM 20 the fungus, some of the microorganisms that you will only

11:19AM 21 see in USP 71 methodology. So the sterility is not

11:19AM 22 tested via correct method, either.

11:19AM 23 Q. I want to show you what is marked as

11:19AM 24 Plaintiff's Exhibit 8. Do you recognize this exhibit?

11:20AM 25 A. Yes.

11:20AM 1    Q.    Do you see it's from August 12, 2022?

11:20AM 2    A.    Yes, that's correct.

11:20AM 3    Q.    Can you see it's from TDCJ?

11:20AM 4    A.    Yes.

11:20AM 5    Q.    Do you see that on August 12, 2022, the

11:20AM 6  beyond-use date of the 2.5 gram vials in TDCJ's

11:20AM 7  possession was assigned at October 9, 2022, and

11:20AM 8  December 8, 2022?

11:20AM 9    A.    Yes, that's correct.

11:20AM 10   Q.    Do you see that on that same date the 5 gram

11:20AM 11 vials had beyond-use date or purported beyond-use date of

11:20AM 12 12-8-2022?

11:20AM 13   A.    That's correct.

11:20AM 14   Q.    Now I'm going to point you to Plaintiff's

11:20AM 15 Exhibit 9 which has already been admitted.  Do you

11:20AM 16 recognize this exhibit?

11:20AM 17   A.    Yes.

11:20AM 18   Q.    Do you see it's an e-mail from TDCJ on

11:20AM 19 November 29, 2022?

11:20AM 20   A.    Yes.

11:21AM 21   Q.    Do you see that the beyond-use dates for

11:21AM 22 pentobarbital changed from that last e-mail?

11:21AM 23   A.    Right.

11:21AM 24   Q.    Can you tell the Court what those beyond-use

11:21AM 25 dates now are assigned by TDCJ?

11:21AM 1    A.   They seem to be projected way out, far out.  We

11:21AM 2  are talking about September of 2023 and November of 2023.

11:21AM 3  That's a really significant change from the previous

11:21AM 4  beyond-use date.

11:21AM 5    Q.   Do you know how TDCJ extended the beyond-use

11:21AM 6  dates of the pentobarbital in their possession?

11:21AM 7    A.   Unless they performed a stability study, I

11:21AM 8  would say incorrectly, because there's no really other

11:21AM 9  way of assigning beyond-use dates out far like this.

11:21AM 10    Like I said, we compound in my pharmacy, we

11:21AM 11  compound medications according to 503B, according to CGMP

11:21AM 12  regulations and we don't typically assign BUD's past

11:22AM 13  180 days.  So it's really impressive they are able to

11:22AM 14  extend the BUD this far out, but I would really wonder

11:22AM 15  what type of documentation they have that they are able

11:22AM 16  to do so.

11:22AM 17    Q.   Now I'm going to show you what's marked as

11:22AM 18  Plaintiffs Exhibit 10 which has previously been admitted.

11:22AM 19  Have you reviewed Plaintiff's Exhibit 10 before?

11:22AM 20    A.   Yes.

11:22AM 21    Q.   Have you reviewed what testing has been done by

11:22AM 22  the laboratory for TDCJ's pentobarbital?

11:22AM 23    A.   Yes, that's correct.  This is an assay that was

11:22AM 24  performed.

11:22AM 25    Q.   What they have done, is that the proper way to

11:22AM 1  extend the beyond-use dates of drugs according to the

11:22AM 2  USP?

11:22AM 3      A.   No.  No, this is not the assay that you should

11:22AM 4  use.  This assay is traditionally used when you are

11:22AM 5  performing quality control or maybe when you receive the

11:22AM 6  raw material.  So when you receive an API, active

11:22AM 7  pharmaceutical ingredient, maybe from a manufacturer, you

11:22AM 8  are going to do a compounding activity, you are going to

11:22AM 9  receive the API and you will have it tested by a contract

11:23AM 10 lab to make sure that it has the potency that you need.

11:23AM 11          So once you have that, then you are going

11:23AM 12 to compound it and maybe at the end of your compounding

11:23AM 13 procedure you will send out a sample to test it again.

11:23AM 14 But this is all -- this assay is typically used to just

11:23AM 15 verify that the drug has the potency that it has.

11:23AM 16     Q.   Based on the testing that you reviewed by the

11:23AM 17 pharmacy or the laboratory, would it be appropriate to

11:23AM 18 extend the beyond-use dates of the pentobarbital as far

11:23AM 19 out as TDCJ has done?

11:23AM 20     A.   Using this methodology, no.  You need to

11:23AM 21 perform a stability indicating assay.  And the stability

11:23AM 22 indicating assay is the proper methodology that will

11:23AM 23 explore how well is your drug holding up; are there any

11:23AM 24 degradants that are potentially forming.  And so you need

11:23AM 25 to perform the stability indicating assay that will

11:23AM 1　analyze quality of a drug that, you know, you are looking

11:24AM 2　at potentially extending the BUD for.

11:24AM 3　　　Q.　What I'm going to show you now, can you explain

11:24AM 4　what this chart shows to the Court?

11:24AM 5　　　A.　Sure.　So this is an example from just when you

11:24AM 6　run your typical run-of-the-mill assay.　So you want to

11:24AM 7　know what is the potency of my medication, you want to

11:24AM 8　know what is the -- how many milligrams of pentobarbital

11:24AM 9　is in my solution, or any drug for that matter.

11:24AM 10　　　　　So what you will do is, this is a

11:24AM 11　chromatography example from a HPLC, High Precision Liquid

11:24AM 12　Chromatograph.　It's a system that basically analyzing --

11:24AM 13　a very commonly used system in pharmaceutical industry

11:25AM 14　and pharmacy in general.

11:25AM 15　　　　　So what happens is, you will analyze your

11:25AM 16　medication.　You will have a curve, so you are going to

11:25AM 17　use for standards that will create a calibration curve so

11:25AM 18　you can quantitate what -- you know, how much of the

11:25AM 19　analyte you have.　So you are going to create -- you

11:25AM 20　purchase your USP standards from USP that basically you

11:25AM 21　can confirm that it is the correct medication.　And so

11:25AM 22　you use the standards, you will make a calibration curve.

11:25AM 23　And then you use this calibration curve to quantitate

11:25AM 24　your recovery, to see that your drug that you compounded

11:25AM 25　has the appropriate potency.　So that's what this is.

11:25AM 1    So this is an example of your HPLC method
11:25AM 2 that's used to analyze your finished product or maybe
11:25AM 3 your API.  You're just looking strictly for potency; you
11:25AM 4 want to see how much of the drug is in a solution.
11:25AM 5    Q.   And this is the testing that TDCJ is doing to
11:26AM 6 extend their beyond-use dates?
11:26AM 7    A.   I believe so, because it was listed at the
11:26AM 8 bottom where they basically -- in the report, the
11:26AM 9 analytical report, it said which methodology they used
11:26AM 10 and they refer to USP; I think it's 624, which is an HPLC
11:26AM 11 analysis.  And of course, you will get more detail if you
11:26AM 12 go into a nomograph for the pentobarbital.  It will give
11:26AM 13 you details of how to perform this analytical method.
11:26AM 14    But again, the monograph for the
11:26AM 15 pentobarbital injection provides guidance on how to
11:26AM 16 perform just a regular essay.  So that's what this is.
11:26AM 17 This is an example of an assay.  You are just
11:26AM 18 quantitating how much pentobarbital was in there and you
11:26AM 19 are assuming that it's all just pure pentobarbital.
11:26AM 20    Q.   Can you describe for the Court what this
11:26AM 21 picture shows?
11:26AM 22    A.   This is as great example of a stability
11:26AM 23 indicating assay.  So in this case what you are seeing
11:26AM 24 is, it could be exactly the same sample that you the saw
11:26AM 25 on the previous example.  So it may be exactly same drug,

11:27AM 1 but if that drug is maybe close to expiring, maybe it's

11:27AM 2 expired, it's been around for a while, it has most likely

11:27AM 3 passed its expiry, you will start seeing degradants,

11:27AM 4 which is of course a natural process with any medication.

11:27AM 5 That's why we have expiration dates, because we can only

11:27AM 6 guarantee their quality and their activity up to the

11:27AM 7 expiry. And so once you start getting past the expiry,

11:27AM 8 you will start seeing degradants forming.

11:27AM 9 What you see in this example, you see the

11:27AM 10 separation of the degradant from the analyte. So in the

11:27AM 11 first example the degradant is basically part of the

11:27AM 12 analyte because it's a different method. So this is a

11:27AM 13 stability indicating method and your elution time in the

11:27AM 14 mobile phase, the chemicals that basically help to kind

11:27AM 15 of separate out your degradants are being used to

11:27AM 16 basically see if there is any degradation.

11:28AM 17 So if you had a fresh drug, if you had

11:28AM 18 pentobarbital that you just purchased from the

11:28AM 19 manufacturer, you will not see the degradant at all. Or

11:28AM 20 you may see a tiny little peak that would not really

11:28AM 21 impact your total size of the analyte peak. But as the

11:28AM 22 drugs degrade over time, you will start seeing these

11:28AM 23 degradants and that's exactly what is shown here.

11:28AM 24 So you see this degradant that's a peak. I

11:28AM 25 mean, in this case the peak is almost probably about

11:28AM 1   80 percent the size of the analyte peak.  So this would

11:28AM 2   be completely different and this could be a different

11:28AM 3   chemical and most likely is a very different structure

11:28AM 4   that might not have any of the pharmacologic activity of

11:28AM 5   your analyte.

11:28AM 6        Q.   So can you describe in layman's terms for the

11:28AM 7   Court what a degradant is?

11:28AM 8        A.   So a degradant is basically a chemical entity

11:29AM 9   that just develops from whatever you have, let's say a

11:29AM 10  pentobarbital molecule.  Over time it just -- it gets

11:29AM 11  exposed to light, maybe a different temperature, and so

11:29AM 12  it kind of falls apart and the structures change.

11:29AM 13       So eventually these other chemicals that

11:29AM 14  are being formed from the mother analyte, from the

11:29AM 15  original peak, these other peaks that are being formed,

11:29AM 16  these are different chemicals.  At times -- I was looking

11:29AM 17  at some literature to see the degradation process of

11:29AM 18  pentobarbital and I do believe I included it in my expert

11:29AM 19  report as well.  There is an example of degradation of

11:29AM 20  pentobarbital.

11:29AM 21       But what happens, the pentobarbital

11:29AM 22  actually breaks down into some of the entities that

11:29AM 23  initially when you are preparing pentobarbital from raw

11:29AM 24  materials -- so those chemicals that you made it from --

11:29AM 25  those are the chemicals that it basically goes back to.

11:29AM 1    So it kind of falls apart into those.

11:30AM 2        Q.    So is pentobarbital known to have degradants

11:30AM 3    that form over time?

11:30AM 4        A.    Yes.  Yes, of course.  Yes, a majority of the

11:30AM 5    medications do.

11:30AM 6        Q.    And when those degradants form over time, do

11:30AM 7    they have the same pharmacological effect as

11:30AM 8    pentobarbital itself?

11:30AM 9        A.    No, they do not.  A lot of times they are not

11:30AM 10   studied just because, you know, there is really -- we

11:30AM 11   don't use medications that are past expiry, so we

11:30AM 12   typically don't study them in great detail.

11:30AM 13            But I was curious and I looked up a couple

11:30AM 14   because, like I said, those are actually, for

11:30AM 15   pentobarbital, those are actually drugs that they started

11:30AM 16   with.  I shouldn't say drugs; they are chemicals that

11:30AM 17   they started with and then they synthesized the

11:30AM 18   pentobarbital.

11:30AM 19            So some of them do have some described

11:30AM 20   activity and, if I remember correctly, one of them was

11:30AM 21   stimulating the pancreas.  Like they do not have any more

11:30AM 22   pharmacological activity of the pentobarbital; they are

11:30AM 23   very different structures.

11:30AM 24       Q.    And the potency testing that was done by the

11:31AM 25   pharmacy employed by TDCJ, did they do testing to detect

11:31AM 1 the degradants?

11:31AM 2     A.    I don't believe so because they use the

11:31AM 3 standard assay method, and the assay method is not a

11:31AM 4 stability indicating method.  So it's a different method.

11:31AM 5 So when they run the assay, they will just see one peak.

11:31AM 6 That peak could actually be containing all of these other

11:31AM 7 degradants, but you don't see them because you are using

11:31AM 8 different methods.  So you are not eluting, you are not

11:31AM 9 separating out all of the degradants; instead you are

11:31AM 10 just running it as a one-peak.  So it will appear as a

11:31AM 11 one-peak and in reality it could be serial peaks that you

11:31AM 12 are just not seeing.

11:31AM 13     Q.    Now I'm going to show you again Plaintiff's

11:31AM 14 Exhibit 7.  If I take you to Page 3 of Plaintiff's

11:31AM 15 Exhibit 7, can you tell the Court the last time TDCJ

11:32AM 16 returned a vial to the lab to test the 100 milliliters

11:32AM 17 vials of pentobarbital?

11:32AM 18     A.    So it appears on here it was all the way on the

11:32AM 19 bottom.  December 20, 2021, return to supplier or -- yes,

11:32AM 20 I think so.

11:32AM 21     Q.    If you look at Page 4, which is the very last

11:32AM 22 page, were there any times after December 20, 2021, that

11:32AM 23 TDCJ returned one of the 100 milliliter vials to the

11:32AM 24 laboratory to be tested?

11:32AM 25     A.    No, there does not appear to be.

11:32AM 1    Q.   Now let's turn to Exhibit 6 which is already

11:32AM 2  been admitted.  And if I take you to Page 2, can you tell

11:32AM 3  the Court the last time TDCJ returned a 50 milliliter

11:33AM 4  vial to the supplier to be tested?

11:33AM 5    A.   It appears it is September 30, 2022.  That's

11:33AM 6  what it says, "Return to supplier."

11:33AM 7    Q.   Do you also see, I believe it says 9-30-2022,

11:33AM 8  as well, "Return to supplier"?

11:33AM 9    A.   Yes, 9-30-2022, "Return to supplier."  That's

11:33AM 10  correct.

11:33AM 11    Q.   And that would have been between the two

11:33AM 12  e-mails that I showed you before, correct; the e-mail on

11:33AM 13  August 12, 2022, and the e-mail on 11-29-22 from TDCJ?

11:33AM 14    A.   Yes, that's correct.

11:33AM 15    Q.   So from August 12, 2022 when TDCJ sent that

11:33AM 16  first e-mail to 11-29-2022, were any of the 100

11:34AM 17  milliliter vials returned to the supplier?

11:34AM 18    A.   I don't believe so.

11:34AM 19    Q.   If none of those vials were returned to the

11:34AM 20  supplier, could there be a scientific basis to extend the

11:34AM 21  BUD of the 100 milliliter vials?

11:34AM 22    A.   No, absolutely not, because that's a couple of

11:34AM 23  different sizes, a potentially different container,

11:34AM 24  container closure.  So all that, it's not just the drug

11:34AM 25  itself, but you know you have a potential different

11:34AM 1  compounding process. You definitely have a different

11:34AM 2  container size and volume. All of that would require its

11:34AM 3  own testing to be able to project -- or not even project,

11:34AM 4  but to test the assay to figure out what is the potency.

11:34AM 5      Q.   But even though in your expert opinion there

11:34AM 6  was no scientific basis based on your review of the

11:34AM 7  records, you saw that TDCJ nevertheless extended the BUD

11:34AM 8  of the 100 milliliter or 5 gram vials of pentobarbital?

11:35AM 9      A.   They did, but I am not really sure how they

11:35AM 10  could have done that with what they are supposed to be

11:35AM 11  doing. They did not follow the proper procedures.

11:35AM 12      Q.   Now let's talk about the 50 milliliter vials.

11:35AM 13  You just testified a minute ago that TDCJ transferred 102

11:35AM 14  vials during the period of the two e-mails, right?

11:35AM 15      A.   Yes.

11:35AM 16      Q.   In terms of extending the BUD for all 50

11:35AM 17  milliliter vials, even if they did the correct testing on

11:35AM 18  those two vials, would it be consistent after correct

11:35AM 19  testing on two vials to extend the entire batch of the 50

11:35AM 20  milliliter vials?

11:35AM 21      A.   No, because they are not representative. Also

11:35AM 22  I'm concerned, I'll be honest, that does not seem to be

11:36AM 23  -- of course there's a redacted portion, so maybe that's

11:36AM 24  what data is hiding. But it does not appear that there

11:36AM 25  is a very good control, inventory control in terms of lot

11:36AM 1  numbers.

11:36AM 2  And so it would be very crucial to test, if

11:36AM 3  you have any testing performed, that it really relates to

11:36AM 4  vials you tested. It does not relate to different

11:36AM 5  batches and different products, different sizes or

11:36AM 6  anything like that; those are just the ones that you

11:36AM 7  tested.

11:36AM 8  Q.   Now based on your review of the records, did

11:36AM 9  TDCJ test the pH of the pentobarbital?

11:36AM 10  A.   No, it was not included in the report.

11:36AM 11  Q.   Is that required to extend the BUD under the

11:36AM 12  USP?

11:36AM 13  A.   Absolutely, yes, all of the testing that's

11:36AM 14  listed in the monograph -- so when you have a

11:36AM 15  pentobarbital injection monograph that's listed in the

11:36AM 16  USP compounding, it lists all that needs to be performed,

11:36AM 17  and pH is one of them. So whenever you perform any kind

11:36AM 18  of stability studies, you will make sure that your

11:37AM 19  stability study results will meet all of the USP

11:37AM 20  monograph requirements.

11:37AM 21  Q.   Based upon your review of the records, was

11:37AM 22  visual inspection performed to extend the BUD of the

11:37AM 23  pentobarbital?

11:37AM 24  A.   It was not recorded on the report.

11:37AM 25  Q.   Is this required by USP?

11:37AM 1    A.    Yes, it is.

11:37AM 2    Q.    Can you tell the Court why visual inspection is

11:37AM 3 important?

11:37AM 4    A.    Visual inspection is very important in

11:37AM 5 particular with injectable drugs because you need to

11:37AM 6 examine it in case there is any formation of

11:37AM 7 precipitation.

11:37AM 8    Q.    Dr. Almgren, we discussed this a bit before,

11:37AM 9 but did TDCJ test at all for sterility?

11:37AM 10    A.    Yes, it did appear that they did test the

11:37AM 11 sterility of the products.

11:37AM 12    Q.    Was it the correct test for sterility?

11:37AM 13    A.    No, it was not correct.  They were using scan

11:37AM 14 RDI instead of the required method in USP 71 that is

11:38AM 15 specified in a monograph for pentobarbital injection.

11:38AM 16    Q.    Now, let's talk about TDCJ's record keeping in

11:38AM 17 relation to the pentobarbital.  Can you describe for the

11:38AM 18 Court how drugs are removed from storage when they are

11:38AM 19 tested?

11:38AM 20    A.    In the case of TDCJ or just the regular how?

11:38AM 21    Q.    In TDCJ; meaning does it just show that they

11:38AM 22 are re-sent to the supplier?

11:38AM 23    A.    Yes, that's what appears.  So they basically

11:38AM 24 take them out of the inventory, then it appears it says,

11:38AM 25 "Return to supplier."  What's really not good is the fact

11:38AM 1   that they don't have really any storage details about the

11:38AM 2   temperature, how the drugs are actually stored.  And then

11:38AM 3   when they are transferred, if they are being shipped to

11:38AM 4   the supplier, are they in frozen state, are they in a

11:39AM 5   refrigerator?  None of that is documented and it just

11:39AM 6   says, "Return to supplier."

11:39AM 7   Q.    Now I'm going to show you again Exhibit 7.

11:39AM 8   We're going to go to Page 3.  Do you see on 9-8-20 they

11:39AM 9   returned a vial to the supplier?

11:39AM 10  A.    Yes, I do see that.

11:39AM 11  Q.    Then if you go to Exhibit 10 which has already

11:39AM 12  been admitted, I'm going to take you to Page 3.  Do you

11:39AM 13  see on 9-18-2020 they tested a vial?

11:39AM 14  A.    Yes, that's correct.

11:40AM 15  Q.    Now if we go back to Exhibit 7 that you just

11:40AM 16  saw before, do you see on 1-21-21 a vial was returned?

11:40AM 17  A.    Yes.  I saw that, yes.  The assumption I'm

11:40AM 18  making is that a vial was sent out to the supplier who

11:40AM 19  then sent it off to be tested.  The drug was tested and

11:40AM 20  then it was returned back and put back into inventory,

11:40AM 21  which is completely inappropriate.  You cannot return

11:40AM 22  medication after it was tested back into inventory by --

11:40AM 23  you would never, you should never use it in a patient,

11:40AM 24  never use it in a person because the medication could be

11:40AM 25  tampered with.

11:40AM 1          It was not stored properly, it was opened,

11:40AM 2   a portion of it was removed for testing.  There's a very

11:40AM 3   good potential for bacterial contamination or, for that

11:41AM 4   matter, physical or chemical contamination, as well.  So

11:41AM 5   vials like that should never be returned; that should

11:41AM 6   have been disposed of.

11:41AM 7          Q.   And is that practice consistent with the USP,

11:41AM 8   to test a vial and then return it?

11:41AM 9          A.   No.   No, you would never do that.  It's not

11:41AM 10  consistent with the USP, FDA, pharmacy general practice,

11:41AM 11  you know, aseptic technique.  All of those would direct

11:41AM 12  you to not use vials that have been opened and tested.

11:41AM 13         Q.   Now let me direct your attention again to

11:41AM 14  Exhibit 7.  You see it says "Expired"?

11:41AM 15         A.   Yes.

11:41AM 16         Q.   And one vial was taken out of storage?

11:41AM 17         A.   Yes.

11:41AM 18         Q.   What does that tell you as an expert in

11:41AM 19  pharmacy?

11:41AM 20         A.   It's actually extremely mind boggling, I'll be

11:41AM 21  honest with you, because I don't understand how you can

11:42AM 22  have one vial that's expired.  How did you identify that

11:42AM 23  this vial expired, how were you able to determine by

11:42AM 24  looking at it that it's expired and why were there not

11:42AM 25  other vials within the same batch that were also expired.

11:42AM 1    I think it's very poor practice and there
11:42AM 2  should be, if nothing else, some form of explanation of
11:42AM 3  why this vial was expired.  But that's very disturbing
11:42AM 4  because it just tells me that the folks who are handling
11:42AM 5  these medications, my assumption is they probably looked
11:42AM 6  at a vial and maybe saw some physical changes that made
11:42AM 7  them expire this.  But you never just expire one vial.
11:42AM 8    If one vial has -- you see some type of
11:42AM 9  changes, you're going to expire all within the same lot.
11:42AM 10  Because there's a very good chance that all of them are
11:42AM 11  going through the same chemical changes or physical
11:42AM 12  changes as this one; you may just not be able to quite
11:42AM 13  see them, but they may definitely be happening.
11:42AM 14    Q.    In your career as a pharmacist has there ever
11:42AM 15  been a situation where you had one vial expired but the
11:43AM 16  rest of the batch was not?
11:43AM 17    A.    No, no.  We would not do that.  I mean, if one
11:43AM 18  expires, all expire.
11:43AM 19    Q.    Dr. Almgren, based on the documents you have
11:43AM 20  reviewed and on your professional experience, what is
11:43AM 21  your scientific opinion about the pentobarbital in TDCJ's
11:43AM 22  possession?
11:43AM 23    A.    It is expired.  It is well beyond the
11:43AM 24  beyond-use date, and there's really no way to tell what
11:43AM 25  state the medication is in, if it's, you know -- how much

11:43AM 1 of it is actually still pentobarbital, how much of it is

11:43AM 2 degradants.  It's difficult to tell because it has not

11:43AM 3 been analyzed using a stability method.

11:43AM 4     Q.   Do you hold this opinion to a reasonable degree

11:43AM 5 of scientific certainty?

11:43AM 6     A.   I do.

11:43AM 7          MR. KURSMAN:  I have nothing further, Your

11:43AM 8 Honor.

11:43AM 9          THE COURT:  Could you go ahead and unshare

11:44AM 10 your screen.  I need to give Ms. Hayes a break.  And I'm

11:44AM 11 cognizant of the doctor's time before we do that, so I

11:44AM 12 need to take at least a 10-minute break because my court

11:44AM 13 reporter can't keep going.

11:44AM 14          Let me ask counsel for Mr. Brown, do you

11:44AM 15 have questions for this witness or are we going to go

11:44AM 16 directly to the State?

11:44AM 17          MR. SCHARDL:  Nothing from Mr. Fratta, Your

11:44AM 18 Honor.

11:44AM 19          MR. WOLFF:  Nothing for Mr. Brown.  Thank

11:44AM 20 you, Your Honor.

11:44AM 21          THE COURT:  Thank you.  Let's be on break

11:44AM 22 for ten minutes.

11:44AM 23     (Whereupon There was a Break in the Proceedings)

11:57AM 24          THE COURT:  All right, Ms. O'Leary.

11:57AM 25          MS. O'LEARY:  Yes, Your Honor.

<u>CROSS-EXAMINATION</u>

<u>BY MS. O'LEARY:</u>

Q.   Good morning, Dr. Almgren.  I just have a few questions and I'll try to make it quick because I know you are on a quick turnaround.

You have not worked in a pharmacy where you compounded lethal doses of a drug; is that accurate?

A.   That's correct.

Q.   You testified earlier that it is really difficult to assess what the pharmacological activity might be in TDCJ's supply of drugs; is that accurate?

A.   Right.

Q.   Are you familiar with a study conducted by a Priest Geisbuhler where he [sic] studied injectable sodium pentobarbital stability at room temperature?

A.   I am, and actually I read it last night just to make sure that I'm up-to-date on all of the literature, so yes.

Q.   Okay good.  So let me get to the table here.

THE COURT:  Hold on one second.  I'm sorry. I should have asked Ms. Hayes -- I need to make sure Ms. Hayes is with us.

THE STENOGRAPHER:  Yes, I'm here.

THE COURT:  Ok.  Thank you.  Proceed.

MS. O'LEARY:  Thank you, Your Honor.

11:58AM 1    Q.    (Ms. O'Leary)  In that study the person who

11:58AM 2  conducted the study says that about 15 to 25 milligrams

11:58AM 3  of pentobarbital is a lethal does.  Is that consistent

11:58AM 4  with your understanding of pentobarbital?

11:58AM 5    A.    I guess so.

11:58AM 6    Q.    You are not familiar with what would be a

11:58AM 7  lethal does of pentobarbital?

11:58AM 8    A.    No, no.  I mean yeah -- yeah, I mean

11:58AM 9  pentobarbital is a very potent drug.

11:58AM 10    Q.    Okay.  And so if 15 to 25 milligrams is a

11:59AM 11  lethal does, are you aware that TDCJ uses about 10 times

11:59AM 12  that to conduct lethal injection?

11:59AM 13    A.    Right.  I'm assuming you use a whole 50?  What

11:59AM 14  do you normally use?  Is it a vial?

11:59AM 15    Q.    So it's five grams and five more grams as a

11:59AM 16  backup.

11:59AM 17    A.    Right.

11:59AM 18    Q.    In that same study the lab conducted studies of

11:59AM 19  compounded pentobarbital solution, which is similar to

11:59AM 20  what we're discussing today.  Did you see the part where

11:59AM 21  he -- his finding is that the chemical degradation occurs

11:59AM 22  at about half a percent per year for sodium pentobarbital

11:59AM 23  compound?

11:59AM 24    A.    So I would like to point out one thing, and I'm

11:59AM 25  not sure that we can share the document in any way

11:59AM 1 because it appears like maybe you have it on paper.

12:00PM 2 If you read that study, if you will start

12:00PM 3 -- I think it's on maybe, it's on the first page. The

12:00PM 4 study starts off by discussing the two methods that they

12:00PM 5 have used. Can you -- I wish -- can I look? I have that

12:00PM 6 study on my computer. Would it be okay for me to open it

12:00PM 7 so we can talk about the same study together? I have the

12:00PM 8 study right here.

12:00PM 9     Q. Well, let me just re-ask the question.

12:00PM 10     THE COURT: No, ma'am. Doctor, just let

12:00PM 11 Ms. O'Leary ask her question, please.

12:00PM 12     Q. (Ms. O'Leary) Do you agree that that finding

12:00PM 13 concludes that it degrades at half a percent per year?

12:00PM 14     A. No, they use incorrect method. So there are

12:00PM 15 two methods --

12:00PM 16     Q. I'm sorry. That's not my question.

12:00PM 17     MR. KURSMAN: Objection, Your Honor. If

12:00PM 18 Ms. O'Leary is going to ask these questions, I would just

12:00PM 19 ask that she allow Dr. Almgren to answer those questions.

12:00PM 20     THE COURT: Well, I think Dr. Almgren, she

12:00PM 21 did answer it. She said no, she did not agree.

12:00PM 22 Ms. O'Leary can ask her next question.

12:01PM 23     Q. (Ms. O'Leary) Your explanation, Doctor, is

12:01PM 24 that was the finding, but you disagree with the methods.

12:01PM 25 Is that what you mean?

12:01PM 1     A.   That's exactly what I mean.  When you read the

12:01PM 2 article, they quote two separate methods.  So they have a

12:01PM 3 method by Morley and Elrod and they have a method by is

12:01PM 4 it Reef?  There are two different methods.  So the method

12:01PM 5 that they use is the one by Morley and Elrod, and that

12:01PM 6 method is actually your analytical method that you use

12:01PM 7 for confirmation of analyte.

12:01PM 8         The second method that is used by, like I

12:01PM 9 said, I think it's Reef and --- I can't remember; there

12:01PM 10 are a couple of other authors on the other method.  That

12:01PM 11 is the stability indicating method.  And they did not use

12:01PM 12 that one, so they don't explain in that particular study

12:01PM 13 based on what they chose, the Method One.  But they just

12:01PM 14 performed Method One, which is not stability indicating;

12:01PM 15 it does provide the guidance on how to perform an assay.

12:02PM 16         So that's why I disagree with them being

12:02PM 17 able to assess the degradation being 0.5 percent per

12:02PM 18 year.  Because if you are not using correct method, what

12:02PM 19 they are really just showing is that, using the regular

12:02PM 20 analytical method, they are seeing some degradation as

12:02PM 21 well.  I think an actual stability indicating method

12:02PM 22 would probably show a higher percentage of degradation.

12:02PM 23     Q.   So that first method, is that the method that

12:02PM 24 TDCJ uses in their testing that you also disagree with,

12:02PM 25 the standard assay?

12:02PM 1    A.   So I would have to look, honestly, because I do

12:02PM 2  not know 100 percent.  It sounds like the method that's

12:02PM 3  used, but I could not confirm it without actually seeing

12:02PM 4  chromatography and seeing the settings what buffer they

12:02PM 5  use, elution method.  There are a lot of details that

12:02PM 6  would have to be confirmed.

12:02PM 7    Q.   Okay.  That's fine if you are not sure.

12:02PM 8         So one last question about this study, the

12:02PM 9  finding was that the pentobarbital solution had a --

12:03PM 10 let's see what the terminology is -- it was good for as

12:03PM 11 long as six years.  And my question for you is, do you

12:03PM 12 agree that that was the finding even if you don't -- if

12:03PM 13 you disagree with the method, that's fine; you have

12:03PM 14 already said that -- but that was the finding of this

12:03PM 15 particular study; is that right?

12:03PM 16    A.   That study is incorrect.  You know, if you read

12:03PM 17 through that study --

12:03PM 18         MS. O'LEARY:  I'll object to nonresponsive,

12:03PM 19 Your Honor.

12:03PM 20         THE COURT:  Sustained.  Doctor, just listen

12:03PM 21 to her questions and answer her specific questions,

12:03PM 22 please.

12:03PM 23    A.   Can you restate the question again?  I'm sorry.

12:03PM 24    Q.   I believe you gave the answer.  You disagree

12:03PM 25 with the methods but the finding was, in fact, that it

12:03PM 1 was good for six years?

12:03PM 2     A.   No, it's not.

12:03PM 3     Q.   Okay.

12:03PM 4     A.   Can I comment why I think it's not correct?

12:03PM 5          THE COURT:  Not at this point, ma'am.  You

12:03PM 6 may have a chance when we go on, but not now.

12:04PM 7          MS. O'LEARY:  I pass the witness, Your

12:04PM 8 Honor.

12:04PM 9          THE COURT:  Mr. Kursman, do you have any

12:04PM 10 follow-up?

12:04PM 11          MR. KURSMAN:  Just very briefly.

12:04PM 12          <u>REDIRECT EXAMINATION</u>

12:04PM 13 BY MR. KURSMAN:

12:04PM 14     Q.   Dr. Almgren, can you tell the Court why that's

12:04PM 15 not correct?

12:04PM 16     A.   Yes.  It is incorrect because if you are using

12:04PM 17 incorrect method, analytical method, you are not going to

12:04PM 18 be able to assess stability.  So that's my number one

12:04PM 19 comment.

12:04PM 20          Number two concern is, if you read that

12:04PM 21 study, it also talks about how the authors were unable to

12:04PM 22 explain why they were not seeing changes, greater changes

12:04PM 23 in potency when they were seeing changes in color.  And

12:04PM 24 typically change in color is a major concern and, as a

12:04PM 25 matter of fact, per USP you would not be able to use a

12:04PM 1 drug that changed color, as in you need to -- the color

12:04PM 2 of the drug indicates that there are some changes

12:04PM 3 happening.

12:04PM 4 And so the fact that they noted and they

12:04PM 5 did measurements trying to capture the change in color

12:04PM 6 over time, the fact that they noted they saw changes but

12:04PM 7 they were not able to explain how come the potency didn't

12:05PM 8 change is just a true indication that study was not done

12:05PM 9 correctly.

12:05PM 10 I also want to point out one more thing.

12:05PM 11 They really were not looking at USP standards and this

12:05PM 12 drug being used in humans. This study was strictly

12:05PM 13 focused on the fact that this drug was used for animal

12:05PM 14 studies. And so I think that they were trying to kind of

12:05PM 15 justify why they are using this drug past expiry and

12:05PM 16 making sure it is potent enough for animals. So I think

12:05PM 17 that that was their -- the intent was not here to extend

12:05PM 18 beyond-use date for human use.

12:05PM 19 MR. KURSMAN: I have nothing further, Your

12:05PM 20 Honor.

12:05PM 21 THE COURT: Ms. O'Leary, do you have

12:05PM 22 anything further?

12:05PM 23 MS. O'LEARY: Sorry, Your Honor. I have no

12:05PM 24 further questions for this witness.

12:05PM 25 THE COURT: May this witness be excused?

12:05PM 1        MR. KURSMAN:  Yes, Your Honor.

12:05PM 2        THE COURT:  All right.  Thank you, Doctor.

12:05PM 3   I hope we can get you to your class on time.  Thank you

12:05PM 4   for your time and your testimony.  You may be excused,

12:06PM 5   which means you may log off of Zoom, if you'd like.

12:06PM 6        Mr. Kursman, do you want to respond, now

12:06PM 7   that we've gotten the doctor's testimony, to the legal

12:06PM 8   points Ms. O'Leary made previously or do you have any

12:06PM 9   other evidence you would like to present first?

12:06PM 10       MR. KURSMAN:  Yeah, I do, Your Honor.

12:06PM 11  Could I turn to Ms. Nelson-Major who will respond to the

12:06PM 12  statutory arguments made?

12:06PM 13       THE COURT:  Yes.  That's fine.

12:06PM 14       Ms. Nelson-Major.

12:06PM 15       MS. NELSON-MAJOR:  Good afternoon, Your

12:06PM 16  Honor.  I would like to begin by responding to the

12:06PM 17  argument that Ms. O'Leary made in her opening statement

12:06PM 18  that <u>Blaze vs. Rees</u> provides applicable legal standard

12:06PM 19  here in that the temporary injunction should not issue

12:06PM 20  because we have not proffered an alternative to the use

12:06PM 21  of expired pentobarbital.

12:06PM 22       This is not an 8th Amendment challenge.

12:06PM 23  Petitioners are not challenging the protocol and they are

12:06PM 24  not challenging the use of compounded pentobarbital in

12:06PM 25  general.  No prisoner in Texas has brought a similar

12:07PM 1    challenge before under the four state statutes that are

12:07PM 2    at issue in this complaint; so therefore, the 8th

12:07PM 3    Amendment standards are completely irrelevant and not

12:07PM 4    before this Court.

12:07PM 5              I would next like to turn to the arguments

12:07PM 6    that Respondents have made about the various state

12:07PM 7    statutes at issue here.  I would like to go through each

12:07PM 8    statute individually, but I would like to first note that

12:07PM 9    one overarching theme runs throughout all of the

12:07PM 10   arguments that Respondents have made.  That is,

12:07PM 11   essentially that they are above the law and that when

12:07PM 12   carrying out executions state statutes do not apply to

12:07PM 13   their conduct.  They urge that as long as lethal

12:07PM 14   injection is the method used, but no ultra vires claims

12:07PM 15   can lie with respect to the drugs or how they are

12:07PM 16   administered.

12:07PM 17             If this argument is accepted, essentially

12:07PM 18   it would mean that Respondents are immune, automatically

12:07PM 19   immune from any state statute or constitutional

12:07PM 20   restraints from carrying out an execution.  Discretion is

12:08PM 21   bound by the law, no matter how much power Respondents

12:08PM 22   wish to afford themselves.  And when carrying out

12:08PM 23   official duties state actors must comply with statutory

12:08PM 24   framework.  That's the entire point of the ultra vires

12:08PM 25   doctrine.  And I would argue that compliance with the law

| | | |
|---|---|---|
| 12:08PM | 1 | is of paramount importance when the State is doing |
| 12:08PM | 2 | something so serious and final as taking a life. |
| 12:08PM | 3 | I would like to turn to the Texas Pharmacy |
| 12:08PM | 4 | Act. Ms. O'Leary suggested that the Texas Pharmacy Act |
| 12:08PM | 5 | does not apply because it only applies in the context of |
| 12:08PM | 6 | treating patients for treatment. In support of this |
| 12:08PM | 7 | argument they rely on one of the two stated legislative |
| 12:08PM | 8 | purposes that are found in the Texas Pharmacy Act, and |
| 12:08PM | 9 | those appear at Texas Occupational Code |
| 12:08PM | 10 | Section 551.002(c). |
| 12:08PM | 11 | In making this argument they completely |
| 12:08PM | 12 | ignore the other stated legislative purpose of the Texas |
| 12:09PM | 13 | Pharmacy Act, and that is to regulate and control the |
| 12:09PM | 14 | practice of pharmacy. Respondents have elected to use a |
| 12:09PM | 15 | method of execution that relies on the practice of |
| 12:09PM | 16 | pharmacy. As such, application of the Texas Pharmacy |
| 12:09PM | 17 | Act, the lethal injection context is completely |
| 12:09PM | 18 | consistent with the legislative purpose of the act. |
| 12:09PM | 19 | Furthermore, there's a statement that |
| 12:09PM | 20 | appears along with the legislative purposes which states |
| 12:09PM | 21 | that the act was enacted to ensure that the practice of |
| 12:09PM | 22 | pharmacy receive the confidence of the public. Here that |
| 12:09PM | 23 | goal is also of paramount importance. The public must be |
| 12:09PM | 24 | confident that the drugs used to carry out executions are |
| 12:09PM | 25 | compounded in a professional way and will not cause pain |

12:09PM 1   and suffering.

12:09PM 2           Respondents cite a number of Administrative

12:09PM 3   Code provisions to further argue that the Pharmacy Act

12:10PM 4   does not apply here.  They cite language which

12:10PM 5   unfortunately only applies to nonsterile compounding, and

12:10PM 6   thus Dr. Almgren explained the pentobarbital in TDCJ's

12:10PM 7   possession applies to sterile compouded preparations, so

12:10PM 8   those provisions are also irrelevant.

12:10PM 9           And I want to specifically address the

12:10PM 10  regulation at the heart of claim one of Petitioners'

12:10PM 11  complaint, and that appears at Administrative Code

12:10PM 12  Section 291.133(b)(9).  That's the regulation which

12:10PM 13  prohibits the administration of an expired drug.  The

12:10PM 14  only drug that a pharmacist is authorized to administer

12:10PM 15  is Epinephrine.  So therefore, Respondents' argument that

12:10PM 16  this provision only applies to pharmacists is clearly

12:10PM 17  inconsistent with the plain language of the statute.

12:11PM 18  It's obviously intended to reach conduct by individuals

12:11PM 19  other than pharmacists.

12:11PM 20          And I would also like to note that the

12:11PM 21  pharmacist that actually prepares the drugs for TDC is

12:11PM 22  also named as a respondent in this action, and is the

12:11PM 23  proper respondent in this action as well.

12:11PM 24          So for those reasons the arguments that

12:11PM 25  Respondents have made about the applicability of the

12:11PM 1  Texas Pharmacy Act are inaccurate and inconsistent with

12:11PM 2  the plain language, as well as the legislative purpose of

12:11PM 3  the Texas Pharmacy Act.

12:11PM 4         I would like to move on to the Controlled

12:11PM 5  Substances Act unless Your Honor has questions about the

12:11PM 6  applicability of the Pharmacy Act.

12:11PM 7         THE COURT:  No.  Go ahead.

12:11PM 8         MS. NELSON-MAJOR:  Respondents argue that

12:11PM 9  they are immune from the Controlled Substances Act

12:11PM 10 because they are carrying out an execution.  For this

12:11PM 11 broad exception they cite Health and Safety Code

12:12PM 12 Section 481.062(a)(4) and argue that they need not comply

12:12PM 13 with the Controlled Substances Act.  However, that

12:12PM 14 subsection provides that a state actor may possess a

12:12PM 15 controlled substance if they are lawfully engaged in the

12:12PM 16 enforcement, and I quote, "of a law relating to a

12:12PM 17 controlled substance or drug or to a customs law."

12:12PM 18        Respondents urge that they fall under this

12:12PM 19 provision simply because they are carrying out an

12:12PM 20 execution.  However, they are asking this Court to

12:12PM 21 completely disregard the explicit limitation in this

12:12PM 22 provision which says that state actors may possess

12:12PM 23 controlled substances when enforcing only two kinds of

12:12PM 24 laws:  The Controlled Substance Act or a customs law.

12:12PM 25 When Respondents carry out executions, they are clearly

12:12PM 1    doing neither; therefore, this exemption does not cover

12:12PM 2    their conduct.

12:12PM 3            Alternatively, Respondents argue that they

12:12PM 4    are immune from the CSA because they possess a DEA

12:13PM 5    license.  Again, they are asking the Court to rewrite the

12:13PM 6    play language of this exception.  That exception they

12:13PM 7    cite appears at Section 481.061 of the Controlled

12:13PM 8    Substances Act.  They seem to argue that this provision

12:13PM 9    means that anyone with a DEA license is automatically

12:13PM 10   immune and exempt from compliance with the CSA.  This is

12:13PM 11   absolutely not true.  The provision they cite says that a

12:13PM 12   person with a DEA license may "possess, manufacture,

12:13PM 13   distribute, analyze, dispense or conduct research with a

12:13PM 14   substance to extent authorized by the chapter and in

12:13PM 15   conformity with the chapter."

12:13PM 16           I first note that this provision doesn't

12:13PM 17   speak of administration of the controlled substance.

12:13PM 18   Petitioner's CSA claim is related to the administration

12:14PM 19   of a controlled substance; so therefore, the provision

12:14PM 20   doesn't even reach the conduct at issue.  But

12:14PM 21   furthermore, the statute is clear that, even if you

12:14PM 22   possess a DEA license, your conduct with respect to the

12:14PM 23   covered activities must still be in conformance with the

12:14PM 24   statute.

12:14PM 25           I would also note that Respondents haven't

12:14PM 1 offered any evidence to demonstrate that they have a

12:14PM 2 valid DEA license. We have received several DEA forms in

12:14PM 3 response to Public Information Act requests. We don't

12:14PM 4 have any information about the actual DEA license they

12:14PM 5 claim to possess and whether that encompasses schedule II

12:14PM 6 controlled substances which pentobarbital, in fact, is.

12:14PM 7 And in addition to those two arguments I

12:14PM 8 would also note that the Controlled Substance Act has an

12:14PM 9 explicit exception for humane society and animal control

12:14PM 10 personnel to possess pentobarbital for the use in

12:15PM 11 euthanizing animals, and that appears at Health and

12:15PM 12 Safety Code Section 481.11(b). And no similar exception

12:15PM 13 exists that would authorize Respondents to possess

12:15PM 14 pentobarbital without a prescription for use in

12:15PM 15 executions. So therefore, the arguments that Respondents

12:15PM 16 made that they are immune and above the Controlled

12:15PM 17 Substance Act fail and are inconsistent with the plain

12:15PM 18 language of that statute.

12:15PM 19 Similarly, the arguments they made with

12:15PM 20 respect to the Food, Drug and Cosmetic Act similarly find

12:15PM 21 no basis in the plain language of the statute. They

12:15PM 22 argue that they are immune and above the FDCA because

12:15PM 23 they are not introducing drugs into commerce; however,

12:15PM 24 they cite no statutory provision that supports this

12:15PM 25 reading and the prescription requirement in the FDCA

12:16PM 1   contains no such language.  Again, Respondents are asking

12:16PM 2   this Court to rewrite the statutes and create exceptions

12:16PM 3   for their conduct that simply do not exist.

12:16PM 4           And lastly with respect to the Texas Penal

12:16PM 5   Code, Respondents argue that they are exempt from this

12:16PM 6   statute as well because they are carrying out executions.

12:16PM 7   Respondents have cited no legal authority for this

12:16PM 8   argument whatsoever.  Perhaps sensing that that argument

12:16PM 9   is without any statutory foundation, they argue that

12:16PM 10  their conduct is nonetheless justified because they

12:16PM 11  reasonably believe that they were not subject to the

12:16PM 12  Texas Penal Code.  However, that belief can no longer be

12:16PM 13  reasonable since the filing of this action in which it

12:16PM 14  was specifically detailed how their conduct violates that

12:16PM 15  statute.

12:16PM 16           So having addressed Respondents' arguments

12:16PM 17  about the applicability of the statutes, I briefly wanted

12:16PM 18  to return to the factual record.  Dr. Almgren's testimony

12:17PM 19  involved, you know, a significant number of technical

12:17PM 20  terms and concepts.  However, distilled to its essence,

12:17PM 21  there's a number of rather simple facts at issue here and

12:17PM 22  we believe that the record that was just introduced

12:17PM 23  demonstrates that they are unrebutted and clear.  And

12:17PM 24  that is that TDCJ receives pentobarbital in two different

12:17PM 25  sized vials:  50 milliliters, and 100 milliliters, and

12:17PM 1 that TDCJ last received new 100 milliliter vials in April

12:17PM 2 of 2019 and last received 50 milliliter vials in March

12:17PM 3 of 2021.

12:17PM 4 Dr. Almgren explained that these are

12:17PM 5 considered high risk sterile compounded preparations and

12:17PM 6 that the USP sets forth careful and detailed expiration

12:17PM 7 dates for these high risk preparations. And those are

12:18PM 8 24 hours at room temperature, three days in refrigeration

12:18PM 9 and 45 days in a solid frozen state.

12:18PM 10 All vials in TDCJ's possession are expired.

12:18PM 11 That record is undisputed, as per USP. The 100

12:18PM 12 milliliter vials expired in June of 2019. The 50

12:18PM 13 milliliter vials expired in May of 2021.

12:18PM 14 You also heard Dr. Almgren explain how

12:18PM 15 Respondents claimed to extend the beyond-use dates beyond

12:18PM 16 what is recognized as a scientifically valid deadline,

12:18PM 17 and that is by on occasion sending out a vial for a

12:18PM 18 potency test alone, then claiming to extend the

12:18PM 19 expiration date of all the vials in their possession for

12:18PM 20 up to 11 months at a time.

12:18PM 21 You also heard Dr. Almgren explain these

12:18PM 22 actions violate USP and Respondents have violated USP

12:19PM 23 upon initial compounding of pentobarbital in TDCJ's

12:19PM 24 possession. There is no record that any vial was ever

12:19PM 25 subjected to pH testing or to a visual inspection and

12:19PM 1    that when TDCJ performed sterility test they, in fact,

12:19PM 2    performed the wrong test.

12:19PM 3              You also heard Dr. Almgren clearly explain

12:19PM 4    that these vials as a matter of pharmaceutical science

12:19PM 5    are expired and have been expired between 20 and

12:19PM 6    43 months.

12:19PM 7              You also heard Dr. Almgren explain that the

12:19PM 8    methods that Respondents use to claim to extend the

12:19PM 9    beyond-use dates are completely unscientific and invalid.

12:19PM 10   But the only valid way to extend the expiration date of a

12:19PM 11   drug is with a stability indicating test and that the

12:19PM 12   potency test that TDCJ does is not a stability indicating

12:19PM 13   test and will give a false picture of how potent the

12:19PM 14   drugs are.

12:20PM 15             Rather TDCJ uses the potency test alone and

12:20PM 16   claims to extend the beyond-use dates.  Even if you could

12:20PM 17   use the potency test alone, which you cannot, Dr. Almgren

12:20PM 18   explained that the way that TDCJ is using these potency

12:20PM 19   tests is further invalid under the USP.  It is invalid to

12:20PM 20   take a vial from one batch and then say, based on the

12:20PM 21   test of that one vial, all of the vials in your

12:20PM 22   possession are expired.  That is not a scientific method

12:20PM 23   or conclusion to reach.

12:20PM 24             Dr. Almgren offered the conclusion that

12:20PM 25   these drugs are expired under USP and that the beyond-use

12:20PM 1 date must be disregarded that Respondents have claimed to

12:20PM 2 admit.

12:20PM 3 In their response to the emergency motion,

12:20PM 4 Respondents seem to disregard the clear conclusions under

12:20PM 5 USP and instead have offered their own definition of when

12:21PM 6 a drug is considered expired. They claim that for

12:21PM 7 purposes of an execution a drug is unexpired if it

12:21PM 8 retains sufficient potency -- and I want to quote the

12:21PM 9 language -- so that it is "Quickly effective so that no

12:21PM 10 pain or suffering will be experienced."

12:21PM 11 Even if that was a definition, that was

12:21PM 12 acceptable under USP or the Texas Pharmacy Act, the

12:21PM 13 evidence demonstrates that they are not meeting their own

12:21PM 14 standard of expiration. Dr. Almgren was clearly

12:21PM 15 explaining that even if a drug returns a test result on a

12:21PM 16 potency test in a sufficient range, it nonetheless poses

12:21PM 17 risk of harm and suffering upon administration.

12:21PM 18 So therefore, even accepting Respondents'

12:21PM 19 own definition of an expired drug, these drugs are

12:21PM 20 expired. So in this way the record demonstrates that

12:21PM 21 Respondents are in violation of multiple state statutes

12:22PM 22 when they procure, compound, maintain and then administer

12:22PM 23 the pentobarbital in TDCJ's possession.

12:22PM 24 Each of the failures that I just outlined

12:22PM 25 to comply with USP is a violation of the Pharmacy Act.

12:22PM 1   First the Pharmacy Act requires compliance with USP on

12:22PM 2   initial compounding; Respondents are not doing that.  USP

12:22PM 3   says that expired drugs may not be administered;

12:22PM 4   Respondents are not doing that.  And USP says that you

12:22PM 5   may not prepare amounts of a compounded drug in excess of

12:22PM 6   what you reasonably expect to administer prior to an

12:22PM 7   expiration date.  In other words, USP and the Pharmacy

12:22PM 8   Act prohibits stockpiling drugs.  That is what

12:22PM 9   Respondents are doing.  That's a further violation of

12:22PM 10  USP.

12:22PM 11          And the Pharmacy Act and the Texas

12:23PM 12  Controlled Substances Act, the Texas Food, Drug and

12:23PM 13  Cosmetics Act, the Texas Penal Code all require a

12:23PM 14  prescription to possess, distribute or administer

12:23PM 15  pentobarbital.  No prescriptions have been produced to us

12:23PM 16  in response to multiple Public Information Act requests;

12:23PM 17  therefore, Respondents lack legal authority under these

12:23PM 18  statutes to administer pentobarbital to Petitioners.

12:23PM 19          So I've just outlined the causes of action

12:23PM 20  stated in the complaint, how the evidence introduced

12:23PM 21  today demonstrates a probable right to relief under each

12:23PM 22  of these claims.  And I would like to briefly touch on

12:23PM 23  the evidence that demonstrates that, absent this Court's

12:23PM 24  intervention, Petitioners will suffer probable imminent

12:23PM 25  irreparable injury.

12:23PM 1           As Dr. Almgren explained, as a drug

12:23PM 2  degrades it can turn into a completely different compound

12:23PM 3  that will act upon the body in a way that pentobarbital

12:24PM 4  is not intended to act, and that as a drug ages

12:24PM 5  precipitants form and that those precipitants can cause

12:24PM 6  pain at the injection site and can clog IV lines.  It

12:24PM 7  also appears and is worth noting again that TDCJ has not

12:24PM 8  subjected any of the vials in its possession to --

12:24PM 9           THE COURT:  I'm sorry.  To what?  What did

12:24PM 10 you say?  I missed the last part.

12:24PM 11          MS. NELSON-MAJOR:  I was saying it's worth

12:24PM 12 noting in this context again that Respondents have not

12:24PM 13 subjected, based on the records before us, any of the

12:24PM 14 vials to pH testing.  And that's significant because as a

12:24PM 15 drug ages pH can change, and that can lead to a whole

12:24PM 16 host of issues, including pain upon injection and further

12:24PM 17 causing degradants and particulates to form.

12:24PM 18          Dr. Almgren also discussed how Respondents'

12:24PM 19 handling of the drugs exposes the vials to contaminants

12:25PM 20 which can cause vomiting, nausea, pain, renal failure and

12:25PM 21 Dr. Almgren also explained that these risks increase the

12:25PM 22 further past the expiration date you are.

12:25PM 23          And because Petitioners can't be adequately

12:25PM 24 redressed for the risk of these harms absent this Court's

12:25PM 25 intervention -- because if these harms occurred during

12:25PM 1 their execution, Petitioners will obviously be dead and

12:25PM 2 no longer able to pursue a form in which to have these

12:25PM 3 important allegations heard.

12:25PM 4 　　　　　Therefore, this Court should grant the

12:25PM 5 request for a temporary injunction and issue an order

12:25PM 6 prohibiting Respondents from procuring, possessing,

12:25PM 7 distributing or administering pentobarbital to

12:25PM 8 Petitioners in violation of the Texas Pharmacy Act, the

12:25PM 9 Texas Controlled Substances Act, the Texas Penal Code,

12:25PM 10 and the Texas Food, Drug and Cosmetics Act.  Therefore,

12:26PM 11 the record adequately demonstrates the issuance of the

12:26PM 12 temporary injunction is justified and necessary in this

12:26PM 13 case.  Thank you, Your Honor.

12:26PM 14 　　　　　THE COURT:  Thank you, Ms. Nelson-Major.

12:26PM 15 　　　　　Ms. O'Leary.

12:26PM 16 　　　　　MS. O'LEARY:  Yes, Your Honor.  I'll just

12:26PM 17 respondent to a couple of those points, if I may.

12:26PM 18 　　　　　First, even if Blaze vs. Rees didn't apply

12:26PM 19 -- which is the Supreme Court case that sets the standard

12:26PM 20 for challenges to the method of execution, which this

12:26PM 21 case can certainly be categorized as that -- even if this

12:26PM 22 didn't apply, an injunction requires they show a probable

12:26PM 23 irreparable imminent injury.  And an injury, when it

12:26PM 24 comes to lethal injection, is that it's going to cause

12:26PM 25 more pain than it normally would.  And by "normally

12:26PM 1   would" I mean it doesn't feel --

12:26PM 2              THE COURT:  Isn't that violative of the

12:26PM 3   penal statutes that govern how executions are supposed to

12:27PM 4   be carried out?

12:27PM 5              MS. O'LEARY:  I'm sorry, Your Honor.  The

12:27PM 6   Code of Criminal Procedure is the lethal injection

12:27PM 7   statute.

12:27PM 8              THE COURT:  Okay.  All right.

12:27PM 9              MS. O'LEARY:  And the provision of the

12:27PM 10  penal code that Petitioners allege is being violated is

12:27PM 11  bringing a controlled substance into a correctional

12:27PM 12  facility.

12:27PM 13             THE COURT:  All right.  Go ahead.

12:27PM 14             MS. O'LEARY:  The Petitioners cannot show

12:27PM 15  an imminent injury because they cannot show that any pain

12:27PM 16  or suffering is going to be experienced beyond just what

12:27PM 17  it feels like to have blood drawn when the IV's are

12:27PM 18  placed.

12:27PM 19             THE COURT:  How would anyone -- other than

12:27PM 20  the expert testimony I've heard today from a

12:27PM 21  pharmacologist, how could that ever be established?

12:27PM 22             MS. O'LEARY:  Well, Your Honor, the media

12:27PM 23  and witnesses are present at every single execution and

12:28PM 24  they describe what they see in every execution.  The

12:28PM 25  Petitioners haven't presented evidence of a single

12:28PM  1  execution where any abnormal pain or suffering has been

12:28PM  2  observed.  The sounds, movements, eye movements, all of

12:28PM  3  those details are described for each execution.  And

12:28PM  4  since I can't prove a negative, the Petitioners have the

12:28PM  5  burden here.  They haven't presented that a single

12:28PM  6  execution in Texas history, and not since 2013 when

12:28PM  7  single does pentobarbital began its use, has this

12:28PM  8  terrible problem that they are describing ever occurred.

12:28PM  9           Additionally, Your Honor, the Pharmacy Act,

12:28PM  10  the categories are listed in the statute, it's laid out

12:28PM  11  in our briefing; it applies to certain categories of

12:28PM  12  actors.  It applies to a provider prescribing medications

12:28PM  13  to their patient, it provides a pharmacy compounding

12:29PM  14  solutions for another pharmacy.  Categories like that;

12:29PM  15  certainly no category that TDCJ or its actors fall into.

12:29PM  16  The controlled substances --

12:29PM  17           THE COURT:  What about -- let me ask about

12:29PM  18  the Pharmacy Act.  What about the second --

12:29PM  19  Ms. Nelson-Major told me was the second legislative, the

12:29PM  20  purpose of the Pharmacy Act was to regulate pharmacies

12:29PM  21  and pharmaceuticals consistent with the purposes of the

12:29PM  22  act.  Because they are used for execution purposes, is it

12:29PM  23  your position that the Respondents are taken out of

12:29PM  24  requirements to comply with the Pharmacy Act?  Is there

12:29PM  25  an exception in the Pharmacy Act that says for purposes

| | | |
|---|---|---|
| 12:29PM | 1 | of execution we don't have to comply with those |
| 12:29PM | 2 | provisions? |
| 12:29PM | 3 | MS. O'LEARY:  There is not an explicit |
| 12:29PM | 4 | exception that says "executions," Your Honor, but |
| 12:29PM | 5 | certainly there are -- that is the general stated |
| 12:30PM | 6 | purpose.  It says, "To regulate the practice of pharmacy |
| 12:30PM | 7 | and licensing pharmaceuticals who engage in the practice |
| 12:30PM | 8 | of treating illness, injury or disease."  And so the -- |
| 12:30PM | 9 | then it lists categories of actors that it applies to. |
| 12:30PM | 10 | In case the stated overall purpose is too broad or not |
| 12:30PM | 11 | specific enough, then it goes on to list who it applies |
| 12:30PM | 12 | to.  And it certainly doesn't apply to TDCJ, it doesn't |
| 12:30PM | 13 | apply to lethal doses of pentobarbital, things that are |
| 12:30PM | 14 | not used for therapeutic purposes. |
| 12:30PM | 15 | THE COURT:  Let me ask you another |
| 12:30PM | 16 | question.  Why does TDCJ test the drugs in its possession |
| 12:30PM | 17 | periodically?  If they are not worried about the |
| 12:30PM | 18 | efficacy, the potency, the stability of those drugs, why |
| 12:30PM | 19 | are they even tested? |
| 12:30PM | 20 | MS. O'LEARY:  We certainly can't say that |
| 12:30PM | 21 | they are not worried about the potency or efficacy, Your |
| 12:31PM | 22 | Honor.  They are not doing that in order to comply with |
| 12:31PM | 23 | the Texas Pharmacy Act; they are doing that to comply |
| 12:31PM | 24 | with the 8th Amendment, to be sure they have effective, |
| 12:31PM | 25 | potent drugs when it's time to use them, because |

12:31PM 1 certainly they are interested in carrying out executions

12:31PM 2 in the most humane way possible. And they are regulated

12:31PM 3 by the 8th Amendment; they are not regulated by

12:31PM 4 pharmaceutical standards.

12:31PM 5 THE COURT: But isn't the pharmacist,

12:31PM 6 whoever compounded the drugs, aren't they regulated by

12:31PM 7 those standards? Is it your position that once they are

12:31PM 8 put out and given to TDCJ that, therefore, none of the

12:31PM 9 pharmaceutical regulations apply and, therefore, the

12:31PM 10 Respondents can just take some drugs, they are out of

12:31PM 11 date, and use them however they see fit?

12:31PM 12 MS. O'LEARY: No, Your Honor. The

12:31PM 13 confidential pharmacy and whoever is conducting the lab

12:31PM 14 testing for TDCJ, they simply don't fall into these

12:31PM 15 categories under the Pharmacy Act. They are not

12:32PM 16 dispensing a drug for a Class A pharmacy, to the

12:32PM 17 practitioner for the office's use. They just don't fall

12:32PM 18 into those categories, because the Pharmacy Act was not

12:32PM 19 written to cover this kind of situation, and so the

12:32PM 20 categories it describes don't capture it.

12:32PM 21 Another point, Your Honor, that I think is

12:32PM 22 important to discuss is that ultra vires claims cannot

12:32PM 23 lie if there is conflicting statutory authority. An

12:32PM 24 ultra vires claim is for an official who is acting

12:32PM 25 without authority.

12:32PM 1          Now, if you look at the Code of Criminal

12:32PM 2   Procedure, the statute directs TDCJ to carry out

12:32PM 3   executions by lethal injection.  Now, implicit in that

12:32PM 4   mandate is that a lethal injection is going to be

12:32PM 5   conducted using a controlled substance.  That's the only

12:32PM 6   humane way to do it; that's the only type of substance

12:32PM 7   that could be effective for lethal injection.  And so

12:32PM 8   that mandate implicitly requires TDCJ to administer a

12:33PM 9   controlled substance.  It also implicitly requires that

12:33PM 10  substance to be administered without a prescription from

12:33PM 11  a medical provider because a medical provider cannot

12:33PM 12  ethically prescribe a medication to kill somebody.

12:33PM 13  Hippocratic oath.

12:33PM 14          THE COURT:  Mr. Kursman, hold on.  You will

12:33PM 15  have a chance to respond.

12:33PM 16          Go ahead, Ms. O'Leary.

12:33PM 17          MS. O'LEARY:  They have the hippocratic

12:33PM 18  oath.  Nursing and non-doctor medical providers have

12:33PM 19  similar ethical responsibilities.  They cannot write a

12:33PM 20  prescription that is meant as a lethal does to kill

12:33PM 21  somebody.  And so when we have a statute from the

12:33PM 22  legislature directing TDCJ to administer a lethal does of

12:33PM 23  a controlled substance, that context matters.  That is

12:33PM 24  authority that has to be done, and implicitly that means

12:33PM 25  certain things.  And so the medical provider can't be

12:33PM 1    directly involved in the prescription.

12:33PM 2              So each of these acts that the

12:34PM 3    Petitioner -- the statutes that the Petitioners have

12:34PM 4    listed, they are citing to portions that require a

12:34PM 5    prescription from a provider.  And while clever, as the

12:34PM 6    Court of Criminal Appeals noted, it conflicts with the

12:34PM 7    statute that directs TDCJ to carry out lethal injection.

12:34PM 8    And so whether there's conflicting statute, it cannot be

12:34PM 9    said that these officials are acting without authority.

12:34PM 10             And then I'll address Dr. Almgren quickly.

12:34PM 11   She acknowledged a scientific study that she had read

12:34PM 12   just last night.  That study found that compounded

12:34PM 13   pentobarbital has a shelf life of up to six years, that

12:34PM 14   it degrades at half a percent per year and she disagrees

12:34PM 15   was the methodology, and that's fine.  It's another study

12:34PM 16   by another pharmaceutical scientist.  Reasonable minds

12:34PM 17   can differ, even when it comes to scientific methodology.

12:34PM 18   So that is the only point that I want to make with

12:34PM 19   Dr. Almgren, is that her methodology is different and

12:35PM 20   because the Pharmacy Act doesn't apply to TDCJ, the

12:35PM 21   methodology that she prefers does not have to be used

12:35PM 22   here.

12:35PM 23             Additionally, the USP, United States

12:35PM 24   Pharmacologica [sic], only portions of that are codified

12:35PM 25   in the administrative code, so the exhibits we saw citing

12:35PM 1 to the USP, we don't know if those are actually codified.

12:35PM 2 The USP is not a statute and certainly someone cannot act

12:35PM 3 ultra vires by violating standards, United States

12:35PM 4 standards for pharmacology.

12:35PM 5         The penal code -- just very quickly.

12:35PM 6 Petitioners in their argument said that we cited no

12:35PM 7 authority at all to say that we're exempt from the Penal

12:35PM 8 Code. But we cited 9.21(a) of the Penal Code that

12:35PM 9 specifically says that a state official carrying out a

12:36PM 10 legal court order for a legal process can do what they

12:36PM 11 need to, even if it violates the Penal Code. So that

12:36PM 12 exception is quite clear.

12:36PM 13         And again, even if it wasn't, when you have

12:36PM 14 a conflicting statute like the one that directs the

12:36PM 15 director of TDCJ correctional institutions to carry out a

12:36PM 16 lethal injection, implicitly he has to take certain

12:36PM 17 action in order to comply with that statute. And that

12:36PM 18 means administering pentobarbital without a prescription

12:36PM 19 and in a correctional facility. And unless the Court has

12:36PM 20 any other questions, that concludes my argument.

12:36PM 21         THE COURT: Thank you. I'll let the

12:36PM 22 Petitioners close the argument. I don't know if it's

12:36PM 23 Mr. Kursman or Ms. Nelson-Major.

12:36PM 24         MR. KURSMAN: Sure, Your Honor.

12:36PM 25         What you heard from Ms. O'Leary was just a

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
| 12:36PM  | 1  | bunch of purported facts that were never introduced into    |
| 12:37PM  | 2  | evidence.  One of those purported facts were that doctors   |
| 12:37PM  | 3  | can't write a prescription.  Well, not only was that not    |
| 12:37PM  | 4  | produced in evidence; it simply not true.  Other states,    |
| 12:37PM  | 5  | including the State of Tennessee, obtains a prescription    |
| 12:37PM  | 6  | for every execution.  So we have no way to challenge        |
| 12:37PM  | 7  | these facts, these purported facts, that Ms. O'Leary has    |
| 12:37PM  | 8  | just stated because she hasn't entered any of these in      |
| 12:37PM  | 9  | evidence.                                                   |
| 12:37PM  | 10 | Every fact that was entered today in                        |
| 12:37PM  | 11 | evidence was from the Petitioners and every single one of   |
| 12:37PM  | 12 | those facts went virtually unrebutted.  We have proven by   |
| 12:37PM  | 13 | clear evidence that the Respondents are violating all of    |
| 12:37PM  | 14 | the statutes that we had named; therefore, we would         |
| 12:37PM  | 15 | request that you grant the requested preliminary            |
| 12:37PM  | 16 | injunction.  Thank you, Your Honor.                         |
| 12:37PM  | 17 | THE COURT:  Thank you.  All of the                          |
| 12:37PM  | 18 | decisions I make on the Bench are important.  I have to     |
| 12:38PM  | 19 | say this one weighs on me particularly heavily, given the   |
| 12:38PM  | 20 | exigent nature of the requested relief, which requires me   |
| 12:38PM  | 21 | to make a decision in the next few hours, as well as --     |
| 12:38PM  | 22 | well, just as well as what's at issue here.  I want to go   |
| 12:38PM  | 23 | back and look at a couple of these statutes.  I'll get      |
| 12:38PM  | 24 | you-all a ruling within the next -- no later than two       |
| 12:38PM  | 25 | hours.  I understand what the deadlines are and I           |

12:38PM 1 understand the importance of the ruling I'm about to

12:38PM 2 make.

12:38PM 3          I also am very clear and cognizant of the

12:38PM 4 Court of Criminal Appeal's opinion and I would -- do not

12:38PM 5 purport in any way to attempt to stay or set aside the

12:38PM 6 sentences that have been leveled against the Petitioners

12:38PM 7 and the Intervenors or to attempt to stay their execution

12:39PM 8 dates.

12:39PM 9          I think the State -- I haven't heard any

12:39PM 10 evidence about whether or not the State can get anymore

12:39PM 11 unexpired pentobarbital.  The State is certainly entitled

12:39PM 12 to carry out the executions that have been ordered with

12:39PM 13 unexpired drugs.  What I'm going to decide is whether or

12:39PM 14 not the State is permitted to use expired drugs, and I'll

12:39PM 15 get you an order and a decision just within the next

12:39PM 16 couple of hours.  It will be e-mailed to all counsel.

12:39PM 17          Thank you-all very much.  You may be

12:39PM 18 excused.

12:39PM 19          MR. WILSON:  Your Honor, if I may.  Daniel

12:39PM 20 Wilson.  Throughout the hearing we've been preparing a

12:39PM 21 potential proposed order that tracks a lot of what I've

12:39PM 22 heard.  Would the Court find that helpful?

12:39PM 23          THE COURT:  Yes.  Both sides are invited to

12:39PM 24 send me proposed orders.  Please send them to my

12:39PM 25 submission e-mail address.

1        (Proceedings concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# REPORTER'S CERTIFICATE

STATE OF TEXAS          )
                        )
COUNTY OF TRAVIS        )

I, Leah Hayes, Official Court Reporter in and for the 419th District Court of Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred REMOTELY VIA VIDE CONFERENCE and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered in evidence by the respective parties.

WITNESS MY OFFICIAL HAND this the 15th day of January, 2023.


      _____/s/ Leah Hayes_____
      Leah Hayes, Texas CSR No. 3973
      Expiration Date:  07/31/2023
      Texas Certified Realtime Reporter
      Official Court Reporter
      419th District Court
      Travis County, Texas
      Austin, Texas 78701
      (512) 854-9329

EXHIBIT 14

*Catherine Clare Bernhard*

attorney
P.O. Box 506
Seagoville, Texas 75159
972-294-7262
Fax-972-421-1604
ccb@ccbernhardlaw.com

September 8, 2023

TDCJ Executive Services
Public Information Request
Huntsville, Texas 77342

   Via email transmission to pia@tdcj.texas.gov

   Re: **Jedidiah Murphy, scheduled for execution October 10, 2023**

To Whom it May Concern:

   I represent Jedidiah Murphy who is scheduled for execution on October 10, 2023. In my capacity as Mr. Murphy's counsel and on his behalf, pursuant to the Texas Public Information Act ("the Act"), the Texas Constitution, and the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution, I am requesting the following information.

I. **Any and all records containing information regarding the location of drugs intended for use in lethal injection executions, including but not limited to:**

   1. The name of the Texas Department of Criminal Justice (TDCJ) Unit where such drugs are kept in the regular course of business, including on August 24 and August 25, 2023, and

   2. The area or wing of such TDCJ Unit where such drugs are kept in the regular course of business, including on August 24 and August 25, 2023.

**II.   Any and all records containing information regarding the fire at the TDCJ Huntsville Unit on or around August 25, 2023 ("the fire"), including but not limited to:**

1. The area(s) of the Huntsville Unit that were affected by the fire, including by heat, smoke, or electrical outages,

2. The area(s) of the Huntsville Unit that were affected by efforts or actions undertaken to extinguish the fire,

3. The proximity of any drugs intended for use in lethal injection executions to any areas affected by the fire,

4. Whether the rooms, spaces, or areas where drugs intended for use in lethal injection executions are kept were affected in any way by the fire, including by fire, smoke, excessive heat or efforts undertaken to extinguish the fire, and

5. Whether the execution chamber and adjacent rooms were affected in any way by the fire, including by fire, smoke, excessive heat or efforts undertaken to extinguish the fire

The term "records," as used in this request, includes records in practically any medium, including: paper; film; a magnetic, optical, solid state or other device that can store an electronic signal; tape; Mylar; and any physical material on which information may be recorded, including linen, silk, and vellum. *See* Tex. Gov't Code § 552.002(b). Section 552.002(c) specifies that "[t]he general forms in which the media containing public information exist include a book, paper, letter, document, e-mail, Internet posting, text message, instant message, other electronic communication, printout, photograph, film, tape, microfiche, microfilm, photostat, sound recording, map, and drawing and a voice, data, or video representation held in computer memory.

Public Information defined by the Act includes "any electronic communication created, transmitted, received or maintained on any device if the communication is in connection with the transaction of official business." *See* Tex. Gov't Code § 552.002(a-2).

Moreover, the "characterization of the information as 'public information' under the Act is not dependent on whether the requested records

are in the possession of an individual, rather than a governmental body, or whether a governmental body has a particular policy or procedure that establishes a governmental body's access to the information. If information was made, transmitted, maintained, or received in connection with a governmental body's official business, the mere fact that the governmental body does not possess the information does not take the information outside the scope of the Act." See Public Information Act Handbook, pp. 16-17.

I look forward to your timely response.

Sincerely,

Catherine Clare Bernhard

EXHIBIT 15

Your request was received on 9/8/2023 and sent for processing.

We are allowed 10 full business days (Monday through Friday and excluding holidays) to process all requests, which means that your request is currently on day # 8.

All requests are processed in the order in which they are received, not on the basis of need or urgency.

We appreciate your patience.

Regards,
Texas Department of Criminal Justice - PIA
Open Records Coordinator
Executive Services

---

**From:** Catherine Clare Bernhard <cbernhard@sbcglobal.net>
**Sent:** Tuesday, September 19, 2023 4:10 PM
**To:** PIA <PIA@tdcj.texas.gov>
**Subject:** Re: PIA request

**CAUTION:** This email was received from an EXTERNAL source, use caution when clicking links or opening attachments.
If you believe this to be a malicious and/or phishing email, please contact the Information Security Office (ISO).

The below and attached PIA was sent on September 8, 2023 and to date, I have not received any response.

The Public Information Act requires that the governmental body must produce the requested information "promptly." Gov't Code 552.221. Given that my client is scheduled for execution in three weeks, the delay in your response is neither prompt nor reasonable. If you intend to seek an Attorney General opinion, please advise immediately, so that I have time to respond. Regardless of the fact that the Act gives you 10 days to request such an opinion, in these circumstances the unnecessary use of the full period flouts the language and the spirit of the Act.

*Catherine Clare Bernhard*

attorney

P.O. Box 506
Seagoville, Texas 75159

972-294-7262
fax - 972-421-1604
cbernhard@sbcglobal.net



On 9/8/2023 7:51 AM, Catherine Clare Bernhard wrote:

Please see attached.

--

*Catherine Clare Bernhard*

attorney

P.O. Box 506
Seagoville, Texas 75159

972-294-7262
fax - 972-421-1604
[cbernhard@sbcglobal.net](cbernhard@sbcglobal.net)
[www.ccbernhardlaw.com](www.ccbernhardlaw.com)



EXHIBIT 16

Ms. Bernhard,

On September 8, 2023, the Texas Department of Criminal Justice (TDCJ) received your request under Chapter 552 of the Texas Government Code, the Public Information Act (PIA), seeking information pertaining to the fire at the TDCJ Huntsville Unit on or around August 25, 2023. Some of the responsive information is excepted from disclosure under the PIA and therefore not releasable.

This email is to advise you that the TDCJ has requested a decision from the Office of the Attorney General (OAG) who will determine whether certain information responsive to your request should be made available to you, or any other member of the public. Attached please find a copy of the request for decision submitted to the OAG. A copy of our written comments will also be provided once submitted.

Contact this office if you have any questions.

Amy Lee
Project Coordinator
Office of the General Counsel - TDCJ

*The information contained in this email and any attachments is intended for the exclusive use of the addressee(s) and may contain confidential, privileged, or proprietary information. Any other use of these materials is strictly prohibited. This email shall not be forwarded outside the Texas Department of Criminal Justice, Office of the General Counsel, without the permission of the original sender. If you have received this material in error, please notify me immediately by telephone and destroy all electronic, paper, or other versions.*

---

**From:** Catherine Clare Bernhard <cbernhard@sbcglobal.net>
**Sent:** Friday, September 8, 2023 7:52 AM
**To:** PIA <PIA@tdcj.texas.gov>
**Subject:** PIA request

**CAUTION:** This email was received from an EXTERNAL source, use caution when clicking links or opening attachments.
If you believe this to be a malicious and/or phishing email, please contact the Information Security Office (ISO).

Please see attached.

--
*Catherine Clare Bernhard*

attorney

P.O. Box 506
Seagoville, Texas 75159

972-294-7262
fax - 972-421-1604
cbernhard@sbcglobal.net
www.ccbernhardlaw.com



Attachments:

| | |
|---|---|
| 2023-09-07 - Murphy PIA re Fire.pdf | 96.7 KB |
| Notification Letter re RFD-Catherine Bernhard 09.08.23.pdf | 96.8 KB |
| Request for Decision-Catherine Bernhard 09.08.23.pdf | 105 KB |